UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA
INDIANS,

        Plaintiff,

        v.

UNITED STATES OF AMERICA, et al.,

        Defendants

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  1:06CV01826 (CKK)

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
ON COUNTS I AND III, AND FOR
PARTIAL SUMMARY JUDGMENT ON COUNT II**

Plaintiff Red Lake Band of Chippewa Indians, pursuant to Fed. R. Civ. P. 56 and LCvR

7(h), respectfully moves the Court for summary judgment on Counts I and III of its Complaint

and for partial summary judgment on Count II.  The grounds for this Motion are more fully set

out in the attached Memorandum of Points and Authorities and Statement of Material Facts as to

Which There is No Genuine Dispute, together with the exhibits thereto.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: */s/ Philip Baker-Shenk*

PHILIP BAKER-SHENK
(D.C. Bar #386662)
STEVEN D. GORDON
(D.C. Bar #219287)
2099 Pennsylvania Avenue, N.W. Suite 100
Washington, D.C.  20006
Phone:    (202) 955-3000
Fax:        (202) 955-5564

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA )
INDIANS, )
)
        Plaintiff, )
)
        v. )     Civil Action No.  1:06CV01826 (CKK)
)
UNITED STATES OF AMERICA, et al., )
)
        Defendants )
)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
ON COUNTS I AND III, AND FOR
PARTIAL SUMMARY JUDGMENT ON COUNT II**

Plaintiff Red Lake Band of Chippewa Indians ("Tribe") submits this Memorandum of

Points and Authorities in Support of its Motion for Summary Judgment on Counts I and III of its

Complaint and for Partial Summary Judgment on Count II.

## INTRODUCTION

This case concerns the Government's repeated, cavalier disregard of contractual

commitments it made to the Tribe in a Compact of Self-Governance and associated Multi-Year

Funding Agreement pursuant to the Indian Self-Determination and Education Assistance Act, 25

U.S.C § 450, et seq. ("ISDEAA" or the "Act").

## FACTS

The Tribe is a federally-recognized Indian tribe.  (Plaintiff's Statement of Material Facts

("SOF") ¶ 1).  On or about January 14, 1997, the Tribe and the United States entered into a

Compact of Self-Governance ("Compact") pursuant to the ISDEAA.  (SOF ¶ 5; Appendix of

Exhibits ("App. Ex.") A).  The purpose of the Compact is to transfer control to the Tribe over

funding and decision-making for certain federal programs, services, functions and activities as an effective way to implement the federal policy of government-to-government relations with Indian tribes. (SOF ¶ 6). Pursuant to Article II, Section 3 of the Compact, the Secretary of the Interior or an authorized representative "shall provide to the Tribe the total amount specified in the Annual Agreement incorporated by reference in [the Compact]." (SOF ¶ 7).

On or about November 15, 2004, the Tribe and the United States entered into a Multi-Year Funding Agreement ("Agreement") for 2005-2010 pursuant to the Compact and an attached "Self Governance 2005 Annual Funding Agreement – Reprogramming Request" ("2005 Reprogramming Request"). (SOF ¶ 10; App. Ex. B). The Agreement was executed on behalf of the United States by the Director of the Office of Self-Governance (the "OSG"), which is responsible for administering the tribal self-governance program for the Department of the Interior ("Department"), including Bureau of Indian Affairs ("BIA") programs. (SOF ¶ 3; App. Ex. B, p. 6). The Agreement provides for the Tribe to assume responsibility for various programs, functions, services, and activities specified in the Agreement and the 2005 Reprogramming Request. (SOF ¶ 12; App. Ex. B § 2). In return, "the Secretary [of the Interior] shall make available to the Tribe the total amount of funds negotiated as they are identified in the attached REPROGRAMMING REQUEST for Calendar Year 2005." (SOF ¶ 13; App. Ex. B § 5). The Agreement became effective in 2005 and has a termination date of December 31, 2010. (SOF ¶ 11).

## A.    Breaches of the BIA's Commitments for Funding Operations of the Tribe's Juvenile Detention Facility

In the late 1990s, the Department assumed responsibility to request funds for staffing and operating juvenile detention facilities on Indian reservations, including those facilities constructed with Department of Justice ("DOJ") grant funds. The Tribe used DOJ and BIA grant

funds to design two detention facilities comprising parts of the Red Lake Law Enforcement Complex: a Phase I facility housing medium and minimum security adults and juveniles, and a Phase III facility housing minimum security juveniles in a rehabilitative setting. (SOF ¶ 8). The Tribe then constructed both the Phase I and Phase III facilities using DOJ grant funds. (SOF ¶ 9).

Thereafter, the Tribe and the United States entered into the Agreement. Attached to and incorporated into the Agreement was the 2005 Reprogramming Request that set forth, by line item and program title, the funds to be provided by the United States to the Tribe for 2005. (SOF ¶¶ 10, 14; App. Ex. B). Funding for both the adult and the juvenile detention facilities was addressed in line item 177, which covered "Law Enforcement – NON TPA"[1] and specified that a total of $4,582,036 would be provided to the Tribe.[2] (SOF ¶ 15; App. Ex. B). This was by far the largest amount for any single line item.

A detailed footnote to this line item – footnote 25 – covered several different substantive issues and set forth additional agreements between the parties with respect to law enforcement funding. It provided that:

> The Assistant Secretary – Indian Affairs and the Tribe agree that this amount represents original and historical base-transferred amounts of $1,413,500 from TPA Law Enforcement – Agency, $5,283 from TPA Law Enforcement Area, and $18,799 from Law Enforcement Area, in addition to $95,000 in base eligible funding from the FY 1999 Law Enforcement Initiative, $94,000 in base eligible funding from the FY 2000 Law Enforcement Initiative, and $224,000 in base eligible funding from the 2001 Law Enforcement Initiative. The Assistant Secretary – Indian Affairs agrees to do everything in his power to ensure these amounts are not reduced, and that Self-Governance tribes are treated on an equal

---

[1] "TPA" is an acronym for Tribal Priority Allocations, a budget category. Law Enforcement is located within a budget category sometimes called "Other Recurring" or "NON TPA."

[2] The Reprogramming Request contained a number of footnotes to various line items that provided additional information or commentary. In some instances, the footnotes simply set forth the Tribe's position that the funding amount for that particular line item was insufficient and inadequate to meet the needs of the service population. Other footnotes were more lengthy and contained additional substantive agreements between the Tribe and the United States.

footing with BIA Law Enforcement with regard to any additional Law Enforcement funds distributions. The Red Lake Band requests an additional $1 million for operation of Law Enforcement. Any new law enforcement program funding is to be determined and added to the AFA [the Agreement] based on national distribution methodology developed by the BIA. The OSG and BIA also agree that it [sic] will keep the Tribe closely informed about all activities pertaining to Public Safety and Justice, so that the Tribe can participate to the fullest degree. The OSG and BIA agree that the $1.555 million obtained in FY 2002 for detention funding is for staffing the Tribes [sic] new [adult] detention facility, and the Tribe cannot staff this facility for just one year. <u>The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in CY 2005, and to request this amount in the next Presidents [sic] budget</u>. With regard to any new initiatives pertaining to Homeland Security, it is mutually agreed that Red Lake Law Enforcement shall be eligible to participate at the same level as BIA Law Enforcement in any new programs and funding increases. (emphasis added)

(SOF ¶ 16). The $1,218,482 for funding operations of the Tribe's juvenile detention facility in CY 2005 was part of the $4,582,036 total funding specified in line item 177. (SOF ¶ 15).

At the time the 2005 Reprogramming Request was negotiated and executed, in the fall of 2004, the next President's budget was for Fiscal Year 2006. (The President's budget for FY 2006 was submitted to Congress on February 7, 2005). (SOF ¶ 21). Thus, the Government's commitment with respect to the juvenile correction facility addressed annual funding of $1,218,482 in each of Calendar Year 2005 and Fiscal Year 2006.

The Government failed to provide – or to obtain or assist the Tribe in obtaining -- $1,218,482 in program operations funding for the juvenile facility in CY 2005. (SOF ¶¶ 17-20). The head of the BIA's Office of Justice Services, Christopher Chaney, testified that the BIA did not provide any assistance to the Tribe in obtaining staffing and program operations funding for the facility in CY 2005. (SOF ¶ 18). Patrick Ragsdale, Director of the BIA, stated that he is not aware of any such efforts. (SOF ¶ 19). And Kenneth Reinfeld, the Acting Director of the OSG and the person who had executed the 2005 Reprogramming Request on behalf of the United States, testified that he personally did not make any such efforts. (SOF ¶ 20).

Likewise, the Government did not include a request for $1,218,482 for the Tribe's juvenile facility in the President's budget for FY 2006.  (SOF ¶ 22).

Meanwhile, in January 2006 the Tribe and the Government completed bilateral negotiations on a Fourth Amendment to the Agreement and an associated "Self Governance 2006 Annual Funding Agreement - Reprogramming Request" ("2006 Reprogramming Request"). (SOF ¶ 24).  Pursuant to standard procedure, the Tribe's Chairman executed the Fourth Amendment to the Agreement and the 2006 Reprogramming Request on January 19, 2006, after negotiations were concluded, and then submitted them to the BIA for execution.  (SOF ¶ 28).

Line item 176 of the 2006 Reprogramming Request addressed "Law Enforcement – NON TPA."  It specified that a total of $4,554,258 would be provided to the Tribe.  (SOF ¶ 25).  The same footnote 25 was appended to this line item as in the 2005 Reprogramming Request.  This footnote was identical to the previous one except for two changes.  First, the sentence regarding funding for the juvenile correction facility was updated to state that "The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in CY 2006, and further agrees to request $1,599,225 for operation of the Tribes [sic] juvenile corrections facility in the Presidents [sic] FY 2007 budget."  Second, a new final sentence was added to the footnote which provided that "The BIA and OSG agree that the Red Lake Reservation be designated as a high crime area, and that the Tribe shall receive extraordinary consideration for high crimes area funding, in light of the March 21, 2005 shooting incident at Red Lake High School."[3]  (SOF ¶ 26).

---

[3] In this highly publicized incident, commonly referred to as the "Red Lake High School massacre," a 16-year-old Red Lake Indian shot and killed seven people on the Reservation school campus, comprising five students, one teacher and an unarmed security guard, and wounded multiple others. The shooting ended when the gunman exchanged fire with police, then retreated to a classroom where he took his own life. The gunman had previously killed his paternal grandfather and the grandfather's girlfriend.  (SOF ¶ 27).

After receiving the 2006 Reprogramming Request from the Tribe, Mr. Reinfeld, the Acting Director of the OSG, struck out by hand two sentences in footnote 25 and added the hand-written notation that "These sentences are not agreed to by the Secretary." (SOF ¶ 30). The two sentences were the new final sentence to the footnote and the updated sentence stating that "The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in CY 2006, and further agrees to request $1,599,225 for operation of the Tribes [sic] juvenile corrections facility in the Presidents [sic] FY 2007 budget." (SOF ¶ 30). Mr. Reinfeld executed the Fourth Amendment to the Agreement and the 2006 Reprogramming Request on or about January 23, 2006, and sent them back to the Tribe. (SOF ¶ 29). The Tribe never agreed to the unilateral changes to footnote 25 to the 2006 Reprogramming Request made by Mr. Reinfeld. (SOF ¶ 31).

The Department's budgets for FY 2005 and FY 2006 included significant, general funding increases for staffing and operations of Indian country detention facilities. (SOF ¶ 32). Congress appropriated $180,063,000 for BIA's Public Safety and Justice law enforcement and detention programs for FY 2005 (including $2,328,000 for the Indian Police Academy), an increase of $7,568,000 over what was appropriated for the same purposes in FY 2004. (SOF ¶ 33). The President's budget for FY 2006 requested $192,265,000 (including $2,378,000 for the Indian Police Academy) for BIA's Public Safety and Justice law enforcement programs, including funding for the operation of detention services, programs, and facilities (SOF ¶ 34). Congress increased this FY 2006 funding by an additional $1.1 million, appropriating a total of $193,377,000, an increase of $13,314,000 over what was appropriated for the same purposes in FY 2005. (SOF ¶ 35).

On February 17, 2006, counsel for the Tribe submitted to Mr. Reinfeld at the OSG a

certified claim for damages arising from the Department's breaches of the Agreement, namely

failing to obtain or assist the Tribe in obtaining $1,218,482 in programs operation funding for the

Tribe's juvenile corrections facility in CY 2005 and failing to include or request $1,218,482 in

programs operation funding for the facility in the FY 2006 budget.  (SOF ¶ 38).  BIA Director

W. Patrick Ragsdale responded to this claim in a letter dated June 15, 2006, stating that "It is not

possible to provide this funding without decreasing allocations for other law enforcement

operations nationwide which would adversely impact other tribes.  However, in compliance with

the [Agreement], I am instructing OLES to make a renewed effort to assist the Tribe in finding

sources for operational funding ($1,218,482) for the Tribe's new juvenile facility."  (SOF ¶ 39).

No such funding was ever forthcoming.  (SOF ¶ 40).

### B.      Breach of the BIA's Obligation to Notify the Tribe of Additional Funding

Section 17 of the Agreement and of the Fourth Amendment to the Agreement provides:

**Additional Funds -** If the Midwest Region Office of the BIA receives notice of
the availability of <u>any</u> additional funding in any fiscal year for any purpose,
including any unspent funds, that the Tribe is eligible to apply for or receive, then
it must notify the Tribe as soon as possible about such funds so that the Tribe may
access or apply for those funds.  The Midwest Region Office <u>commits</u> to keeping
the Tribe informed of the existence of funding immediately upon learning of its
existence.

(emphasis in original).  (SOF ¶ 41).

Likewise, Article IV, Section 4 of the Compact states, "The Tribe shall be eligible for

new programs, activities, services and functions on the same basis as other tribes and the

Secretary or his authorized representative shall advise the Tribe of the funding available for such

programs."  (SOF ¶ 42; App. Ex. A).

In September 2006, the BIA Midwest Regional Office received and distributed approximately $200,000 in FY 2006 year-end funds to five of the thirty-five Indian tribes and tribal organizations within the BIA Midwest Region. (SOF ¶ 43). The Tribe was not informed about the availability of these funds until weeks after they were distributed. (SOF ¶ 44). The Tribe did not receive any of these year-end funds. (SOF ¶ 45).

One month after the BIA distributed these year-end funds, on October 18, 2006, the Tribe was informed by the BIA Midwest Regional Office that the BIA Central Office had made a decision to distribute the year-end funds only to tribes having contracts under Title I of P.L. 93-638 (codified at 25 U.S. §§ 450f), and not to tribes – like the Tribe – having contracts under Title IV of P.L. 93-638 (codified at 25 U.S. §§ 458cc). (SOF ¶ 46). BIA Director Ragsdale testified that he does not dispute that self-governance tribes – like the Tribe -- were eligible to receive the end-of-year money. (SOF ¶ 47). He testified that "Self-governance tribes were eligible for funds, but my understanding is is [sic] that the money had to be obligated within a very short period of time and the Bureau's mechanism through the Office of Self-Governance could not mechanically do that. So the self-governance tribes were excluded from that – from that potential allocation." (SOF ¶ 48).

## C.    Breach of the BIA's Obligation to Provide a Pay Cost Report to the Tribe

Footnote 15 to the 2006 Reprogramming Request addresses the issue of pay cost adjustments for Tribal employees and provides in relevant part:

> The BIA will make every effort to treat Red Lake Tribal employees the same as all other Tribal and Federal employees for purposes of pay cost adjustments in FY 2006. ... Further, the BIA and OSG agree to provide to the Tribe by April 1, 2006, a detailed Pay Cost analysis for the years 2003-2006, showing what the Tribe was eligible to receive each year based upon Pay Cost data the Tribe provided, the actual amount received, and the shortfall or unfunded amount. This analysis will include Law Enforcement. The analysis will separately show the

total amounts received each year for Self Governance tribes, contracting tribes, and BIA programs, as well as the total amounts the BIA was eligible to receive for these programs based upon data it compiled. The above information has been requested by the Tribe to verify whether Red Lake, other Self Governance tribes, contracting tribes, and BIA programs were treated the same way with regard to the distribution of Pay Costs for the years 2003-2006.

(emphasis added).  (SOF ¶ 49).

The Department failed to provide a detailed Pay Cost analysis to the Tribe by April 1, 2006, and has yet to provide it to the Tribe.  (SOF ¶ 50).[4]

### D.     BIA's Obligation to Provide Pay Cost Funding to the Tribe

As set forth above, footnote 15 to the 2006 Reprogramming Request provides that "[t]he BIA will make every effort to treat Red Lake Tribal employees the same as all other Tribal and Federal employees for purposes of pay cost adjustments in FY 2006 ...." But, although all of the BIA's fixed costs, including pay costs, were funded for FY 2006, the Tribe believes that the BIA did not fully fund the Tribe's pay costs.  This is the basis for Count IV of the Complaint.

In discovery, Defendants have stated that, upon review of the estimated pay cost increases effective in FY 2006, the BIA believes that an error was made and that the Tribe will be owed an additional distribution.  (SOF ¶ 51).[5] This issue, however, cannot be resolved until the Government provides the Tribe with the detailed Pay Cost analysis for the years 2003-2006.  The Government's ongoing breach of its duty to provide this analysis prevents a determination of whether the Government is also breaching its obligation to provide the requisite funding so that Tribal employees are treated the same as Federal employees for purposes of pay cost adjustments in FY 2006.  Since a pay cost adjustment, once it is properly applied, impacts pay rates and

---

[4] Defendants stated in their discovery responses dated October 24, 2007, that the Department anticipated it would be able to complete the Pay Cost analysis and provide additional funds to the Tribe based on that analysis within 60 days, i.e. by December 24, 2007.  (SOF ¶ 52).  This would have been almost 21 months late.  Another six months later, i.e. some 27 months after the due date, the analysis still has not been provided to the Tribe.

[5] See footnote 4 above.

adjustments in successive years, the Pay Cost analysis to be provided by the Government could

lead the Tribe to seek relief for 2003 and for each of the following years and to amend its

complaint for that purpose.

## ARGUMENT

### A.    Standard for Summary Judgment

Pursuant to Fed. R. Civ. P. 56(c), a party seeking summary judgment must demonstrate

on the basis of its evidentiary submissions "that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247 (1986).  While the court must draw all justifiable inferences in

favor of the non-moving party,  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520

(1991), the non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

Summary judgment is appropriate where the dispute concerns the proper interpretation of

a public contract, a question of law.  Olympus Corp. v. United States, 98 F.3d 1314, 1316

(Fed.Cir. 1996).  Here there is no genuine issue as to any material fact and the Tribe is entitled to

judgment as a matter of law on its breach of contract claims.  See Holcomb v. Powell, 433 F.3d

889, 895 (D.C. Cir. 2006).

### B.    BIA's Breaches of Its Promises for Funding Operations of the Juvenile Facility (Count I)

The Compact, together with the Agreement and the 2005 Reprogramming Request,

constitutes a contract.  "For the purposes of [25 U.S.C. § 450m-1 – the ISDEAA provision which

10

authorizes civil actions for contract disputes and claims], the term 'contract' shall include compacts and funding agreements entered into under this part." 25 U.S.C. § 458aaa-10(a).

    The Supreme Court has recently emphasized that funding promises made in contracts under the ISDEAA are every bit as binding as other contractual promises.

> Congress, *in respect to the binding nature of a promise*, meant to treat alike promises made under the Act and ordinary contractual promises (say, those made in procurement contracts). ... Further, the Act says that if the Government refuses to pay, then contractors are entitled to 'money damages' in accordance with the Contract Disputes Act."

Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631, 639 (2005) (emphasis in original).

    In addition, the Supreme Court noted that, "as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made." Id. at 637 (emphasis in original).  As the Federal Circuit stated succinctly, "[t]he Secretary d[oes] not have the discretion to breach his contracts with [a tribe]." Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075, 1088 (Fed. Cir. 2003), aff'd sub nom. Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631 (2005).

    Congress amended the ISDEAA in 1988 specifically to address tribal funding problems regarding administrative costs of federal programs subject to self-determination contracts. Samish Indian Nation v. United States, 419 F.3d 1355, 1366 (Fed. Cir. 2005).  The Act must be construed "to advance its remedial purpose, namely, removing the financial burden incurred by tribes and tribal organizations when implementing federal programs under self-determination contracts." Id. at 1367; see also Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1462 (10th Cir.

1997).  This same rule applies in construing contracts entered into under the ISDEAA – the contract must be liberally construed for the benefit of the tribe.  See 25 U.S.C. § 450l.[6]

In this case, the contract committed the BIA to provide $4,582,036 to the Tribe for law enforcement in Calendar Year 2005, including $1,218,482 for operating the juvenile correction facility.  The footnote to this commitment added that "[t]he BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in CY 2005, and to request this amount in the next Presidents [sic] budget."  As discussed above, this devolves into two distinct promises:  (1) to provide $1,218,482 for operations funding for the juvenile facility in CY 2005, and (2) to request $1,218,482 for operations funding for the facility in the President's budget for FY 2006.  The Government failed to perform both of these promises.

    1.       **BIA's failure to provide funding for CY 2005**

The Agreement provides that "the Secretary [of the Interior] shall make available to the Tribe the total amount of funds negotiated as they are identified in the attached REPROGRAMMING REQUEST for Calendar Year 2005."  (SOF ¶ 13; App. Ex. B § 5).  The total amount of funds negotiated and identified for law enforcement in line item 177 of the 2005 Reprogramming Request was $4,582,036.  Yet the Government failed to provide this amount to the Tribe; the Government provided some $1,218,482 less.  This funding shortfall was a breach of contract.

The Government's failure is not excused by footnote 25, which stated that "[t]he BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic]

---

[6] In 1994 Congress amended the ISDEAA and specified a model self-determination agreement to be used between the Government and Indian Tribes.  Congress mandated that each self-determination contract entered into under the ISDEAA shall contain, or incorporate by reference, the provisions of the model agreement.  25 U.S.C. § 450l(a).  The model agreement, in turn, provides that "[e]ach provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and each provision of this Contract shall be liberally construed for the benefit of the Contractor [i.e. the Tribe]."  25 U.S.C. § 450l(c).

juvenile correction facility in CY 2005 [.]" This footnote does not negate the funding commitment made in line item 177. See Segar v. Mukasey, 508 F.3d 16, 24 (D.C. Cir. 2007) (footnote cannot be construed to read text out of a contract). Nor does it render the Government's obligation elective or discretionary in nature. Bilateral contracts should not be interpreted so as to place one party at the mere will or mercy of the other. S.A. Healy Co. v. United States, 576 F.2d 299, 305 (Ct.Cl. 1978). Thus, the courts have refused to subject government contractors "to the 'mere will or mercy' of the procuring agency, insofar as the duty to make reasonable budget requests is concerned." Id. And, as discussed above, "[t]he Secretary d[oes] not have the discretion to breach his [ISDEAA] contracts with [a tribe]." Thompson v. Cherokee Nation of Oklahoma, 334 F.3d at 1088.

At a minimum, the footnote language must be construed as a promise that the Government would make its best efforts to obtain the specified funding for the Tribe. Every contract contains an implied covenant of good faith and fair dealing, and the United States, when it enters into contracts, is subject to this covenant. First Nationwide Bank v. United States, 431 F.3d 1342, 1349 (Fed.Cir. 2005). This covenant "requires a party to respect and implement the contract in accordance with its terms...." Id. at 1350. Good faith requires a party to make its best efforts to perform the contract. See Hughes Communications Galaxy, Inc. v. United States, 47 Fed.Cl. 236, 239 (2000) (the "best efforts" standard has been held to be equivalent to that of good faith).

In this case, the Government plainly failed to make its best efforts to obtain the funding for the Tribe. In fact, the Government made no efforts to obtain the funding. Accordingly, the Government breached its contract. See Mergentime Corp. v. WMATA, 2006 WL 416177 at *78 (D.D.C. 2006) (even if construction schedule was nothing more than a set of "best efforts" dates,

contractor flunked its obligation to make its best efforts to meet the schedule). The Tribe is entitled to recover damages for this breach of contract.[7]

"Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 347, cmt. a (1981). Accordingly, in a situation where a defendant breached a "best efforts" obligation, a damages award can be based on the quantity of revenue that plaintiff reasonably anticipated that the defendant's best efforts would have produced. See Lexington Products Ltd. v. B.D. Communications, Inc., 677 F.2d 251, 253 (2d Cir. 1982). Here, the Tribe reasonably anticipated that the Government's best efforts would result in obtaining the promised amount of funding. The Government evidently agreed, since it undertook the commitment. Thus, $1,218,482 is the proper quantum of damages.[8]

## 2.    BIA's failure to request funding in the FY 2006 budget

The second promise the Government made to the Tribe was that it would request $1,218,482 for operations funding for the Tribe's juvenile facility in the President's budget for FY 2006. This promise was not qualified in any way. The Government failed to perform this promise, thereby breaching its contract with the Tribe.

Once again, the appropriate measure of damages is the amount of money that would place the Tribe in as good a position as it would have been in had the contract been performed.

---

[7] Pursuant to 25 U.S.C. § 450m-1, a tribal contractor may secure damages in a District Court or an order requiring the agency to pay amounts required by the tribe's contract. See S. Rep. No. 100-274 at 34 (1988), reprinted in 1988 U.S.C.C.A.N. 2620, 2653. In this case, the relief the Tribe seeks is more in the nature of damages than specific performance.

[8] In addition, the Tribe is entitled to receive interest on its damages, calculated from February 17, 2006. 41 U.S.C. § 611.

The undisputed evidence plainly establishes that, had this funding been requested in the President's budget, as promised, the money would have been appropriated by Congress. Not only did Congress appropriate all the lump sum funding for Indian law enforcement requested in the President's FY 2006 budget ($192,265,000) but it increased that amount by an additional $1.1 million. The Tribe is therefore entitled to damages in the amount of $1,218,482.[9]

**C.    BIA's Failure to Notify the Tribe of Additional Funding (Count II)**

The Agreement also provided that the Midwest Regional Office of the BIA would notify the Tribe immediately about the availability of any additional funding that the Tribe is eligible to apply for or receive. (SOF ¶ 41; Agreement § 17). It is undisputed that, in September 2006, the Midwest Regional Office received and then distributed approximately $200,000 in end-of-fiscal-year funds to five other tribes and tribal organizations in the Midwest Region without advising the Tribe of their availability. In so doing, the Government breached its contractual obligation to the Tribe. As a result, the Tribe was precluded from the opportunity to obtain a share of this additional funding for which it was eligible.

The Tribe seeks partial summary judgment on the issue of liability with respect to this breach. Establishing the amount of damages may require a brief trial. The Tribe's damages may not be calculable with mathematical accuracy, but this is not required. See Restatement (Second) of Contracts § 352 cmt. a (1981). The Tribe need only provide a reasonable basis for computing damages even if it is approximate and, if need be, a jury verdict method can be used when no more reliable method is available. See Celeron Gathering Corp. v. United States, 34 Fed.Cl. 745, 753 (1996). "[S]ince [the Government] produced the damage, it must bear the uncertainty of proof." Perma Research and Development v. Singer Co., 542 F.2d 111, 116 (2d Cir. 1976).

---

[9] The Tribe is also entitled to receive interest on these damages.

**D.    BIA's Failure to Provide the Tribe With a Pay Cost Report
(Count III)**

As recounted above, in January 2006 the Tribe and the Government completed

negotiations on a Reprogramming Request for 2006 to be incorporated into the Agreement.  The

Tribe's representative executed this Reprogramming Request after it was completed and then

submitted it to the BIA for execution.  Mr. Reinfeld, the Acting Director of the OSG, executed

this agreement on behalf of the Government on or about January 23, 2006.  In so doing, he struck

out two sentences in footnote 25 and added the notation that "These sentences are not agreed to

by the Secretary."  The two sentences related to operations funding for the Tribe's juvenile

correction facility and to designating the Red Lake Reservation as a high crime area.[10]  The

Government thereby accepted and approved the Reprogramming Request for 2006 except for

those two sentences.  See 25 C.F.R. §§ 900.25 and 900.26.

Among the obligations which the Government agreed to undertake pursuant to this

Reprogramming Request was to provide to the Tribe by April 1, 2006, a detailed Pay Cost

analysis for the years 2003-2006, showing the amount the Tribe was eligible to receive each year

based upon Pay Cost data the Tribe provided, the actual amount received, and the shortfall or

unfunded amount.  It is undisputed that the Government has not yet provided this Pay Cost

analysis to the Tribe, more than two years after it was due.

Accordingly, the Tribe is entitled to specific performance of this contractual obligation.

See 25 U.S.C. § 450m-1(a) (authorizing injunctive relief in actions under the ISDEAA); S. Rep.

No. 100-274 at 34 (1988), reprinted at 1988 U.S.C.C.A.N. 2620, 2653 (the ISDEAA, as

---

[10] The Government's declination of these provisions did not comport with applicable legal requirements and so was
ineffective.  See Cheyenne River Sioux Tribe v. Kempthorne, 496 F.Supp.2d 1059, 1067-68 (D.S.D. 2007).  The
Court need not address this issue, however, for purposes of the instant motion.

amended, "affords self-determination contractors the opportunity to secure injunctive relief ...

for violations of the Self-Determination Act (or the terms of contracts under the Act)").

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment on Counts I and III,

and for Partial Summary Judgment on Count II should be granted.  Judgment should be entered

on behalf of the Tribe and against the Defendants as follows:

(i) on Count I, an award of money damages in the amount of $2,436,964 plus interest

calculated from February 17, 2006;

(ii) on Count II, a judgment that in September 2006 the Defendants breached their duty to

notify the Tribe of the availability of approximately $200,000 in end-of-fiscal-year funds that the

Tribe was eligible to apply for and receive;

(iii) on Count III, injunctive relief ordering the Secretary to provide the Tribe forthwith a

detailed pay cost analysis for the years 2003-2006.

June 18, 2008.

Respectfully submitted,

HOLLAND & KNIGHT LLP


By:  */s/ Philip Baker-Shenk*
PHILIP BAKER-SHENK (D.C. Bar #386662)
STEVEN D. GORDON (D.C. Bar #219287)
2099 Pennsylvania Avenue, N.W. Suite 100
Washington, D.C. 20006
Phone:  202-955-3000
Fax:  202-955-5564

Attorneys for Plaintiff
Red Lake Band of Chippewa Indians

# 5349203_v7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.  1:06CV01826 (CKK) |
| UNITED STATES OF AMERICA, et al., | ) ) | |
| Defendants | ) ) ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR 7(h) and 56.1, Plaintiff Red Lake Band of Chippewa Indians (the "Tribe"), by counsel, submits the following statement of material facts as to which there is no genuine issue in support of its Motion for Summary Judgment on Counts I and III, and for Partial Summary Judgment on Count II, filed herewith.

1.  The Tribe is a federally recognized Indian  tribe.  (Answer, p. 1 at ¶ 1).

2.  Defendant Dirk Kempthorne is Secretary of the U.S. Department of the Interior (the "Department") and has overall responsibility for administering the Department as well as overseeing its constituent agencies, including the Bureau of Indian Affairs (BIA), and managing certain Indian affairs and appropriations.  (Answer, p. 2 at ¶ 2).

3.  The Office of Self-Governance (the "OSG") is the office within the Department responsible for administering the Secretary's tribal self-governance program, including BIA programs.  (Answer, p. 2 at ¶ 5).

4.  Kenneth Reinfeld at times relevant to the Complaint functioned as the Acting Director of the OSG and was responsible for executing the functions and duties of the OSG.  (Answer, p. 2 at ¶ 6).

5.  On or about January 14, 1997, the Tribe and the United States entered into a Compact of Self-Governance ("Compact") pursuant to the Indian Self-Determination and Education Assistance Act, 25 U.S.C § 450, <u>et seq</u>.  (App. Ex. A).[1]

6.  The purpose of the Compact is to transfer control to the Tribe over funding and decision-making for certain federal programs, services, functions and activities as an effective way to implement the federal policy of government-to-government relations with Indian tribes.  (App. Ex. A – Compact, Article I § 2(a)).

7.  Pursuant to Article II, Section 3 of the Compact, the Secretary of the Interior or an authorized representative "shall provide to the Tribe the total amount specified in the Annual Agreement incorporated by reference in [the Compact]."  (App. Ex. A – Compact, Article II § 3).

8.  The Tribe used Department of Justice ("DOJ") and BIA grant funds to design two detention facilities comprising parts of the Red Lake Law Enforcement Complex: a Phase I facility housing medium and minimum security adults and juveniles, and a Phase III facility housing minimum security juveniles in a rehabilitative setting. (App. Ex. D – Deposition Transcript of John N. Rever, July 20, 2007, pp. 29:5-30:5; Ex. F; Ex. G at Grant Manager's Memorandum, Pt. I:  Project Summary, p. 1 of 1, § 15; Ex. H).

---

[1] A separate Appendix of Exhibits in Support of Plaintiff's Motion for Summary Judgment on Counts I and III, and for Partial Summary Judgment on Count II is filed herewith.  Record excerpts contained in the Appendix of Exhibits are cited herein as "App. Ex. ___."

9. The Tribe subsequently constructed both the Phase I and Phase III facilities using DOJ grant funds. (App. Ex. I – Deposition Transcript of Kenneth D. Reinfeld, Ph.D., August 21, 2007 ("Reinfeld Depo."), pp. 17:1-9, 19:11-20:2).

10. On or about November 15, 2004, pursuant to the Compact, the Tribe and the United States entered into a Multi-Year Funding Agreement ("Agreement") for 2005-2010 and an attached "Self Governance 2005 Annual Funding Agreement - Reprogramming Request" ("2005 Reprogramming Request") that set forth, by line item and program title, the funds to be provided by the United States to the Tribe for 2005. (App. Ex. B; Ex. I –Reinfeld Depo., pp. 36:14-17, 42:7-9).

11. The Agreement became effective in 2005 and has a termination date of December 31, 2010. (Answer, p. 3 at ¶ 12; App. Ex. B – Agreement, p. 5 at § 21).

12. The Agreement provides for the Tribe to assume responsibility for various programs, functions, services, and activities specified in the Agreement and the 2005 Reprogramming Request. (App. Ex. B – Agreement, p. 1 at § 2).

13. The Agreement further provides that "the Secretary [of the Interior] shall make available to the Tribe the total amount of funds negotiated as they are identified in the attached REPROGRAMMING REQUEST for Calendar Year 2005." (App. Ex. B – Agreement, p. 2 at § 5).

14. The 2005 Reprogramming Request set forth, by line item and program title, the funds to be provided to the Tribe for 2005. (App. Ex. B – 2005 Reprogramming Request).

15. Funding for both the adult and the juvenile detention facilities was addressed in line item 177 of the 2005 Reprogramming Request, which covered "Law Enforcement – NON TPA" and specified that a total of $4,582,036 would be provided to the Tribe,

3

including $1,218,482 for funding operations of the Tribe's juvenile detention facility in CY 2005. (App. Ex. B – 2005 Reprogramming Request, p. 2; Ex. M – Declaration of David Conner, ¶ 4).

16. A footnote to line item 177 – footnote 25 – provided that:

The Assistant Secretary – Indian Affairs and the Tribe agree that this amount represents original and historical base-transferred amounts of $1,413,500 from TPA Law Enforcement – Agency, $5,283 from TPA Law Enforcement Area, and $18,799 from Law Enforcement Area, in addition to $95,000 in base eligible funding from the FY 1999 Law Enforcement Initiative, $94,000 in base eligible funding from the FY 2000 Law Enforcement Initiative, and $224,000 in base eligible funding from the 2001 Law Enforcement Initiative. The Assistant Secretary – Indian Affairs agrees to do everything in his power to ensure these amounts are not reduced, and that Self-Governance tribes are treated on an equal footing with BIA Law Enforcement with regard to any additional Law Enforcement funds distributions. The Red Lake Band requests an additional $1 million for operation of Law Enforcement. Any new law enforcement program funding is to be determined and added to the AFA [the Agreement] based on national distribution methodology developed by the BIA. The OSG and BIA also agree that it [sic] will keep the Tribe closely informed about all activities pertaining to Public Safety and Justice, so that the Tribe can participate to the fullest degree. The OSG and BIA agree that the $1.555 million obtained in FY 2002 for detention funding is for staffing the Tribes [sic] new [adult] detention facility, and the Tribe cannot staff this facility for just one year. The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in CY 2005, and to request this amount in the next Presidents [sic] budget. With regard to any new initiatives pertaining to Homeland Security, it is mutually agreed that Red Lake Law Enforcement shall be eligible to participate at the same level as BIA Law Enforcement in any new programs and funding increases.

(emphasis added). (App. Ex. B – 2005 Reprogramming Request, pp. 5-6 n. 25).

17. The Government did not provide the Tribe $1,218,482 in program operations funding for the juvenile facility in CY 2005. (App. Ex. K – Deposition Transcript of W. Patrick Ragsdale, July 11, 2007 ("Ragsdale Depo."), p. 39:1-8; Ex. I – Reinfeld Depo., p. 41:1-5; Ex. E – Deposition Transcript of Christopher Chaney, August 30, 2007 ("Cheney Depo."), pp. 71:2-8, 80:9-14).

18. The head of the BIA's Office of Justice Services, Christopher Chaney, testified that the BIA did not provide any assistance to the Tribe in obtaining staffing and program operations funding for the facility in CY 2005. (App. Ex. E – Chaney Depo., p. 72:5-14).

19. Patrick Ragsdale, Director of the BIA, testified that he is not aware of any efforts by the BIA to obtain staffing and program operations funding for the Tribe's juvenile facility for CY 2005. (App. Ex. K – Ragsdale Depo., pp. 39:9-40:22).

20. Kenneth Reinfeld, the Acting Director of the OSG and the person who executed the 2005 Reprogramming Request on behalf of the United States, testified that he personally did not make any efforts to obtain staffing and program operations funding for the Tribe's juvenile facility for CY 2005. (App. Ex. I – Reinfeld Depo., p. 41:6-12).

21. At the time the 2005 Reprogramming Request was negotiated and executed, in the fall of 2004, the next President's budget was for Fiscal Year 2006.  The President's budget for FY 2006 was submitted to Congress on February 7, 2005.  (App. Ex. P; App. Ex. Q, p. 1).

22. The Government did not include a request for $1,218,482 for the Tribe's juvenile facility in the President's budget for FY 2006. (App. Ex. E – Cheney Depo., p. 80:3-8; App. Ex. O - Defendants' Responses to Plaintiff's First Set of Interrogatories ("First Interrogatory Responses"), p. 5-6 at Response to Interrogatory No. 4).

23. The Government did not include a request for $1,218,482 for the Tribe's juvenile facility in the President's budget for FY 2007.  (App. Ex. E – Cheney Depo., p. 80:3-

8; App. Ex. O - First Interrogatory Responses, p. 5-6 at Response to Interrogatory No. 4).

24. In January 2006 the Tribe and the Government completed bilateral negotiations on a Fourth Amendment to the Multi-Year Funding Agreement for 2005-2010 ("Fourth Amendment") and an associated "Self Governance 2006 Annual Funding Agreement - Reprogramming Request" ("2006 Reprogramming Request").  (App. Ex. L – Fourth Amendment and attached 2006 Reprogramming Request; Ex. M – Declaration of David Conner, ¶ 6).

25. Line item 176 of this 2006 Reprogramming Request addressed "Law Enforcement – NON TPA" and specified that a total of $4,554,258 would be provided to the Tribe. (App. Ex. L – 2006 Reprogramming Request, p. 2).

26. The same footnote 25 was appended to this line item as in the 2005 Reprogramming Request.  This footnote was identical to the previous one except for two changes.  First, the sentence regarding funding for the juvenile correction facility was updated to state that "The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in CY 2006, and further agrees to request $1,599,225 for operation of the Tribes [sic] juvenile corrections facility in the Presidents [sic] FY 2007 budget."  Second, a new final sentence was added to the footnote which provided that "The BIA and OSG agree that the Red Lake Reservation be designated as a high crime area, and that the Tribe shall receive extraordinary consideration for high crimes area funding, in light of the March 21, 2005 shooting incident at Red Lake High School." (App. Ex. L – 2006 Reprogramming Request, p. 4 n. 25).

6

27. The reference to "the March 21, 2005 shooting incident at Red Lake High School" in the final sentence of footnote 25 referred to the highly-publicized incident, commonly referred to as the "Red Lake High School massacre," in which a 16-year-old Red Lake Indian shot and killed seven people on the Reservation school campus, comprising five students, one teacher and an unarmed security guard, and wounded multiple others. The shooting ended when the gunman exchanged fire with police, then retreated to a classroom where he took his own life. The gunman had previously killed his paternal grandfather and the grandfather's girlfriend. (Christopher Lee and Shankar Vedantam, <u>Minn. Rampage Leaves 10 Dead; Dozens are Shot on Reservation, Most at School; Suspect, Grandfather Die</u>, Washington Post, Mar. 22, 2005, at A1; Sylvia Moreno, <u>Slain Guard Called a Hero for Actions at Minn. School</u>, Washington Post, Mar. 24, 2005, at A1).

28. Pursuant to standard procedure, the Tribe's Chairman executed the Fourth Amendment to the Agreement and the 2006 Reprogramming Request on January 19, 2006, after negotiations were concluded, and then submitted them to the BIA for execution. (App. Ex. M – Declaration of David Conner, ¶ 6).

29. Kenneth Reinfeld, the Acting Director of the OSG, executed the Fourth Amendment to the Agreement and the 2006 Reprogramming Request on or about January 23, 2006, and sent them back to the Tribe. (App. Ex. L – Fourth Amendment, p. 6, and 2006 Reprogramming Request, p. 2; Ex. I – Reinfeld Depo., pp. 44:11-15, 49:5-7; Ex. M – Declaration of David Conner, ¶ 8).

30. After receiving the 2006 Reprogramming Request from the Tribe, Mr. Reinfeld, the Acting Director of the OSG, struck out by hand two sentences in footnote 25 and

added the hand-written notation that "These sentences are not agreed to by the

Secretary."  The two sentences were the new final sentence to the footnote and the

updated sentence stating that "The BIA agrees to assist the Tribe in obtaining

$1,218,482 for operations funding for the Tribes [sic] juvenile correction facility in

CY 2006, and further agrees to request $1,599,225 for operation of the Tribes [sic]

juvenile corrections facility in the Presidents [sic] FY 2007 budget."  (App. Ex. L –

2006 Reprogramming Request, p. 4 n. 25; Ex. I – Reinfeld Depo., pp. 36:14-17,

38:22-39:9, 44:11-15, 45:9-46:15; Ex. M – Declaration of David Conner, ¶ 8).

31. The Tribe never agreed to the unilateral changes to footnote 25 to the 2006

Reprogramming Request made by Mr. Reinfeld.  (App. Ex. M – Declaration of David

Conner, ¶ 9).

32. The Department's budgets for FY 2005 and FY 2006 included significant, general

funding increases for staffing and operations of Indian country detention facilities.

(App. Ex. E – Chaney Depo., pp. 47:4-15, 48:12-17).

33. Congress appropriated $180,063,000 for BIA's Public Safety and Justice law

enforcement and detention programs for FY 2005 (including $2,328,000 for the

Indian Police Academy), an increase of $7,568,000 over what was appropriated for

the same purposes in FY 2004.  (App. Ex. R).

34. The President's budget for FY 2006 requested $192,265,000 (including $2,378,000

for the Indian Police Academy) for BIA Public Safety and Justice law enforcement

programs, including funding for the operation of detention services, programs, and

facilities.  (App. Ex. R).

35. Congress increased this FY 2006 funding by an additional $1.1 million, appropriating a total of $193,377,000, an increase of $13,314,000 over what was appropriated for the same purposes in FY 2005.  (App. Ex. S).

36. A lump sum of $201,620,000 was requested in the President's budget for FY 2007 for BIA Public Safety and Justice law enforcement programs, including funding for the operation of detention services, programs, and facilities.  (App. Ex. S).

37. Congress increased the funding over and above this requested amount, appropriating a total of $204,454,000 for FY 2007, an increase of $11,077,000 over what was appropriated for the same purposes in FY 2006.  (App. Ex. T).

38. On February 17, 2006, counsel for the Tribe submitted to Mr. Reinfeld at the OSG a certified claim for damages arising from the Department's breaches of the Agreement, namely failing to obtain or assist the Tribe in obtaining $1,218,482 in programs operation funding for the Tribe's juvenile corrections facility in CY 2005 and failing to include or request $1,218,482 in programs operation funding for the facility in the FY 2006 budget.  (Answer, p. 5 at ¶¶ 26-27; App. Ex. J – Defendants' Responses to Plaintiff's First Requests for Admission ("First RFA Responses"), pp. 15-16 at ¶¶ 24-25).

39. BIA Director W. Patrick Ragsdale responded to this claim in a letter dated June 15, 2006, stating that "It is not possible to provide this funding without decreasing allocations for other law enforcement operations nationwide which would adversely impact other tribes.  However, in compliance with the [Agreement], I am instructing OLES to make a renewed effort to assist the Tribe in finding sources for operational funding ($1,218,482) for the Tribe's new juvenile facility."  (App. Ex. N, p. 2).

40. No federal funding for the Tribe's juvenile facility was ever provided for CY 2005, FY 2006, or FY 2007.  (App. Ex. I – Reinfeld Depo., pp. 41:1-5, 43:13-19; Ex. E – Chaney Depo., pp. 80:9-17, 89:3-13; Ex. M – Declaration of David Conner, ¶ 5).

41. Section 17 of the Agreement and of the Fourth Amendment provides:

    **Additional Funds -** If the Midwest Region Office of the BIA receives notice of the availability of <u>any</u> additional funding in any fiscal year for any purpose, including any unspent funds, that the Tribe is eligible to apply for or receive, then it must notify the Tribe as soon as possible about such funds so that the Tribe may access or apply for those funds.  The Midwest Region Office <u>commits</u> to keeping the Tribe informed of the existence of funding immediately upon learning of its existence.

    (emphasis in original). (App. Ex. B – Agreement, p. 4).

42. Article IV, Section 4 of the Compact states, "The Tribe shall be eligible for new programs, activities, services and functions on the same basis as other tribes and the Secretary or his authorized representative shall advise the Tribe of the funding available for such programs."  (App. Ex. A – Compact, p. 12).

43. In September 2006, the BIA Midwest Regional Office received and distributed approximately $200,000 in FY 2006 year-end funds to five of the thirty-five Indian tribes and tribal organizations within the BIA Midwest Region.  (Answer, p. 6 at ¶ 34; App. Ex. O – First Interrogatory Responses, p. 9-10 at Response to Interrogatory No. 7).

44. The Tribe was not informed about the availability of these funds until weeks after they were distributed.  (Answer, p. 6 at ¶ 37).

45. The Tribe did not receive any of these year-end funds.  (App. Ex. J – First RFA Responses, p. 21 at ¶ 37; Ex. K – Ragsdale Depo., pp. 63:6-14, 65:6-10).

46. One month after the BIA distributed these year-end funds, on October 18, 2006, the Tribe was informed by the BIA Midwest Regional Office that the BIA Central Office had made a decision to distribute the year-end funds only to tribes having contracts under Title I of P.L. 93-638 (codified at 25 U.S. §§ 450f), and not to tribes – like the Tribe – having contracts under Title IV of P.L. 93-638 (codified at 25 U.S. §§ 458cc). (Answer, p. 7 at ¶ 39).

47. BIA Director Patrick Ragsdale testified that he does not dispute that self-governance tribes – like the Tribe – were eligible to receive the end-of-year money. (App. Ex. K – Ragsdale Depo., pp. 63:6-14, 64:11-19).

48. Mr. Ragsdale testified that "Self-governance tribes were eligible for funds, but my understanding is is [sic] that the money had to be obligated within a very short period of time and the Bureau's mechanism through the Office of Self-Governance could not mechanically do that. So the self-governance tribes were excluded from that – from that potential allocation." (App. Ex. K – Ragsdale Depo., p. 64:1-7).

49. Footnote 15 to the 2006 Reprogramming Request addresses the issue of pay cost adjustments for Tribal employees and provides in relevant part:

> The BIA will make every effort to treat Red Lake Tribal employees the same as all other Tribal and Federal employees for purposes of pay cost adjustments in FY 2006. ... Further, the BIA and OSG agree to provide to the Tribe by April 1, 2006, a detailed Pay Cost analysis for the years 2003-2006, showing what the Tribe was eligible to receive each year based upon Pay Cost data the Tribe provided, the actual amount received, and the shortfall or unfunded amount. This analysis will include Law Enforcement. The analysis will separately show the total amounts received each year for Self Governance tribes, contracting tribes, and BIA programs, as well as the total amounts the BIA was eligible to receive for these programs based upon data it compiled. The above information has been requested by the Tribe to verify whether Red Lake, other Self Governance tribes, contracting tribes, and BIA programs were treated the same way with regard to the distribution of Pay Costs for the years 2003-2006.

11

(emphasis added).  (App. Ex. L – 2006 Reprogramming Request, p. 3 n. 15).

50. The Department failed to provide a detailed Pay Cost analysis to the Tribe by April 1,
   2006, and has yet to provide it to the Tribe. (Answer, p. 8 at ¶ 47; App. Ex. I –
   Reinfeld Depo., pp. 70:9-71:13; Ex. M – Declaration of David Conner, ¶ 10).

51. Defendants have stated that, upon review of the estimated pay cost increases effective
   in FY 2006, the BIA believes that an error was made and that the Tribe will be owed
   an additional distribution.  (App. Ex. O – First Interrogatory Responses, pp. 10-11 at
   Response to Interrogatory No. 8).

52. The Defendants stated in their discovery responses dated October 24, 2007, that the
   Department "anticipates that it will be able to provide the determination [of the
   amount of the additional distribution] and the additional funds within 60 days[,]" i.e.
   by December 24, 2007.  (App. Ex. O – First Interrogatory Responses, pp. 10-11 at
   Response to Interrogatory No. 8).

June 18, 2008.

                    Respectfully submitted,

                    HOLLAND & KNIGHT LLP


          By:   /s/ Philip Baker-Shenk
                    PHILIP BAKER-SHENK (D.C. Bar #386662)
                    STEVEN D. GORDON (D.C. Bar #219287)
                    2099 Pennsylvania Avenue, N.W. Suite 100
                    Washington, D.C. 20006
                    Phone:  202-955-3000
                    Fax:  202-955-5564

                    Attorneys for Plaintiff
                    Red Lake Band of Chippewa Indians

# 5383748_v7

12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA    )
INDIANS,                     )
                             )
       Plaintiff,        )
                             )
    v.                       )    Civil Action No.  1:06CV01826 (CKK)
                             )
UNITED STATES OF AMERICA, et al.,  )
                             )
       Defendants       )
                             )

## APPENDIX OF EXHIBITS IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## ON COUNTS I AND III, AND FOR
## PARTIAL SUMMARY JUDGMENT ON COUNT II

Plaintiff Red Lake Band of Chippewa Indians hereby lodges the following exhibits in support of its motion for summary judgment on Counts I and III, and for partial summary judgment on Count II:

Exhibit A – Compact of Self-Governance Between the Red Lake Band of Chippewa Indians and the United States of America

Exhibit B – Multi-Year Funding Agreement for 2005-2010 Between the Red Lake Band of Chippewa Indians and the United States of America, with attached Self Governance 2005 Annual Funding Agreement - Reprogramming Request

Exhibit C – November 20, 2000 letter from Theodore R. Quasula, Director of Office of Law Enforcement Services, to Honorable Bobby Whitefeather, Chairman of Red Lake Band of Chippewa Indians

Exhibit D – Deposition Transcript of John N. Rever, July 20, 2007, with errata

Exhibit E  – Deposition Transcript of Christopher Chaney, August 30, 2007, with errata

Exhibit F – November 9, 1999 memorandum from Director, BIA Office of Facilities Management and Construction, to Theodore R. Quasula, Director, Office of Law Enforcement Services

Exhibit G – October 25, 2000, U.S. Department of Justice, Office of Justice Programs, Corrections Program Office, Grant Award and accompanying documents

Exhibit H – December 14, 2005 Memorandum from Guillermo Rivera, Associate Director – Detention, BIA Office of Law Enforcement Services, to Chris Chaney, Deputy Bureau Director, Office of Law Enforcement Services

Exhibit I – Deposition Transcript of Kenneth D. Reinfeld, Ph.D., August 21, 2007, with errata

Exhibit J – Defendants' Responses to Plaintiff's First Requests for Admission

Exhibit K – Deposition Transcript of W. Patrick Ragsdale, July 11, 2007, with errata

Exhibit L – Fourth Amendment to the Multi-Year Funding Agreement for 2005-2010 Between the Red Lake Band of Chippewa Indians and the United States of America, with attached Self Governance 2006 Annual Funding Agreement – Reprogramming Request

Exhibit M – Declaration of David Conner, June 18, 2008

Exhibit N – June 15, 2006 Letter from W. Patrick Ragsdale, Director, BIA, to Honorable Floyd Jourdain, Jr., Chairman, Red Lake Band of Chippewa Indians

Exhibit O – Defendants' Responses to Plaintiff's First Set of Interrogatories

Exhibit P – The Budget Message of the President, dated February 7, 2005

Exhibit Q – February 8, 2005 Testimony of OMB Director Joshua B. Bolten, President's FY 2006 Budget Request, Committee on the Budget, United States House of Representatives

Exhibit R – Department of the Interior, Budget Justifications and Performance Information Fiscal Year 2006, Bureau of Indian Affairs, FY 2006 Bureau of Indian Affairs Budget, p. BIA-COMP-4

Exhibit S – Department of the Interior, Budget Justifications and Performance Information Fiscal Year 2007, Bureau of Indian Affairs, FY 2007 Bureau of Indian Affairs Budget, p. BIA-COMP-3

Exhibit T - Department of the Interior, Budget Justifications and Performance Information Fiscal Year 2009, Indian Affairs, Indian Affairs – FY 2009 Budget Request,  p. IA-CFT-3

June 18, 2008.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By:  */s/ Philip Baker-Shenk*
PHILIP BAKER-SHENK (D.C. Bar #386662)
STEVEN D. GORDON (D.C. Bar #219287)
2099 Pennsylvania Avenue, N.W. Suite 100
Washington, D.C. 20006
Phone:  202-955-3000
Fax:  202-955-5564

Attorneys for Plaintiff
Red Lake Band of Chippewa Indians

# 5391482_v5

# EXHIBIT A



# United States Department of the Interior

### OFFICE OF THE SECRETARY
Washington, D.C. 20240

─ 1997

**January 27, 1997**

Bobby Whitefeather, Chairman
Red Lake Band of Chippewa Indians
Red Lake, MN 56671

Dear Chairman Whitefeather:

Enclosed is an original of Red Lake Band of Chippewa Indians' Compact.

Sincerely,

Renee M. Buckner, Secretary
Office of Self-Governance

Enclosure

COMPACT OF SELF-GOVERNANCE
BETWEEN
THE RED LAKE BAND OF CHIPPEWA INDIANS
AND
THE UNITED STATES OF AMERICA


Article I  Authority and Purpose

Section 1 -- Authority.  This agreement, denoted a Compact of Self-Governance (hereinafter referred to as the "Compact"), is entered into by the Secretary of the Interior (hereinafter referred to as the "Secretary"), for and on behalf of the United States of America pursuant to the authority granted by Title II of P.L. 103-413, and by the Red Lake Band of Chippewa Indians by the authority of the Constitution and Bylaws of the Red Lake Band of Chippewa Indians (hereinafter referred to as the "Tribe").

Section 2 -- Purpose.  This Compact shall be liberally construed to achieve its purposes:

(a)  This Compact is to carry out Self-Governance as authorized by Title II of Pub. L. 103-413, which built upon the Self Governance Demonstration Project, and transfers control to tribal governments, upon tribal request, over funding and decision making of Federal programs, services, functions and activities as an effective way to implement the federal policy of government-to-government relations with Indian tribes.

(b)  This Compact is to enable the Red Lake Band of Chippewa Indians to redesign programs, activities, functions, and services of the Bureau of Indian Affairs; to reallocate funds for such programs, activities, functions, or services according to its tribal priorities; to provide such programs, activities, functions, and services, as determined by its tribal priorities; to enhance the effectiveness and long term financial stability of its tribal government; to plan, conduct, consolidate, and administer programs, services, functions, and activities, or portions thereof, administered by the Department of the Interior, other than through the Bureau of Indian Affairs, to the extent as provided in the annual funding agreement applicable to such non-BIA program, service, function or activity; and to reduce the Federal-Indian service bureaucracy.

(c)  This Compact is to enable the United States to maintain and improve its unique and continuing relationship

Compact of Self-Governance
Page 2

with and responsibility to the Red Lake Band of Chippewa Indians through tribal self-governance as proposed by the Red Lake Band of Chippewa Indians which will allow the Tribe to: remove federal obstacles to effective self-governance; reorganize tribal government programs and services; and provide a documented example for the development of future Federal-Indian policy. This policy of tribal self-governance shall permit an orderly transition from federal domination of programs and services to allow Indian tribes meaningful authority to plan, conduct, and administer those programs and services to meet the needs of their people. To implement Self-Governance, the Department of the Interior is also expected to reorganize to provide the same level of service to other tribal governments and demonstrate new policies and methods to provide improved service delivery to address tribal needs. In fulfilling its responsibilities under the Compact, the Secretary hereby pledges that the Department will conduct all relations with the Tribe on a government-to-government basis.

Section 3 -- Tribal Law and Forums. The duly enacted laws of the Tribe shall be applied in the execution of this Compact and the powers and decisions of the Tribe's Court shall be respected, to the extent that federal law, construed in accordance with the applicable canons of construction and Title II of Pub. L. 103-413, is not inconsistent.

## Article II  Terms, Provisions and Conditions

Section 1 -- Term. The term of this Compact begins, and shall extend thereafter throughout the time period authorized by Title II of Pub. L. 103-413, and any subsequent amendments thereto.

Section 2 -- Effective Date. This compact shall be effective when signed by the Secretary or an authorized representative and the Tribe. The annual funding agreement required by Pub. L. 103-413 and this compact shall be signed by the Tribe and the Secretary or an authorized representative and be forthwith submitted by the Secretary or an authorized representative and the Tribe to the Committee on Indian Affairs of the United States Senate, the Committee on Resources of the United States House of Representatives and to the tribes served by the Agency, and shall be effective ninety days after such submission, unless otherwise provided by law. Successor Annual Agreements shall be likewise submitted.

Section 3 -- Funding Amount. Subject only to the appropriation of funds by the Congress of the United States and to Section 403(g) of Pub. L. 103-413, the Secretary or an

Compact of Self-Governance
Page 3

authorized representative shall provide to the Tribe the total
amount specified in the Annual Agreement incorporated by
reference in Article VI, Section 2.

Section 4 -- Payment.  Payments shall be made as
expeditiously as possible in compliance with applicable Treasury
Department regulations and shall include financial arrangements
to cover funding during periods under continuing resolutions to
the extent permitted by such resolutions. To the extent
authorized by law, for each calendar year covered by the Compact,
the Secretary or an authorized representative will pay to the
Tribe the funds specified for that calendar year under the Annual
Agreement in advance in the form of annual or semi-annual
installments, at the discretion of the Tribe by using an
instrument such as a letter of credit, or other method authorized
by law, or a combination thereof, as may be specified in the
Annual Agreement.  To the extent applicable, each semi-annual
payment shall be made on the first day of the first and third
quarter of the calendar year except for the first quarter, for
which the payment shall be made on or before ten calendar days of
the date on which the Office of Management and Budget apportions
the appropriations for that calendar year for the programs,
activities, functions and services subject to the Compact.

Section 5 -- Reports to Congress.  In order to implement
Section 405 of Title II of Pub. L. 103-413, on each January 1
throughout the period of the Compact, the United States shall
make a written report to the Congress, which shall separately
include the views of the Tribe, concerning the matters
encompassed in Section 405(b) and (d).

Section 6 -- Audits.

(a)  The Tribe shall provide to the Designated Official
an annual single organization-wide audit as prescribed by
the Single Audit Act of 1984, 31 U.S.C. § 7501, et seq., and
P.L. 104-156, Amendments to the Single Audit Act, and shall
adhere to generally accepted accounting principles and
Circular A-128 of the Office of Management and Budget as
follows:

(I)  The costs of this Compact consist of the
direct and support costs, including indirect costs,
actually incurred in the performance of this Compact,
determined in accordance with the costs principles set
forth in the OMB Circular A-87 in effect as of January
1, 1997 except as provided herein; provided, however,
that if the Office of Management and Budget revises any
provisions of such Circular:

Compact of Self-Governance
Page 4

1.  The revisions shall not apply to the Compact
    unless agreed to by the Tribe or until the
    Secretary determines their applicability as
    provided below.

2.  The Secretary shall immediately review the
    revisions in consultation with the Tribe to
    determine if the revisions are detrimental to
    the self-governance project or inconsistent
    with the intent of the Act.

3.  If it is determined that the revisions are
    neither detrimental nor inconsistent with the
    intent of the Act, the Secretary will amend
    this Compact to include those revisions.

Without intending any limitation, a tribe/consortium may, without
the approval of the Secretary, expend funds provided under a
annual funding agreement for the following purposes to the extent
that the expenditure of the funds is supportive of a compacted
program:

1.  Depreciation and use allowances not otherwise
    specifically prohibited by law, including the
    depreciation of facilities owned by the tribe or
    tribal organization.

2.  Publication and printing costs.

3.  Buildings, realty, and facilities costs, including
    rental costs or mortgage expenses.

4.  Automated data processing and similar equipment or
    services.

5.  Costs for capital assets and repairs.

6.  Management studies.

7.  Professional services, other than services
    provided in connection with judicial proceedings
    by or against the United States.

8.  Insurance and indemnification, including insurance
    covering the risk of loss of or damage to property
    used in connection with the compact without regard
    to the ownership of such property.

9.  Costs incurred to raise funds or contributions
    from non-Federal sources for the purpose of

Compact of Self-Governance
Page 5

        furthering the goals and objectives of the annual
funding agreement.

10. Interest expenses paid on capital expenditures
such as buildings, building renovation, or
acquisition or fabrication of capital equipment,
and interest expenses on loans necessitated due to
delays by the Secretary in providing funds under a
compact.

11. Expenses of a governing body of a tribal
organization that are attributable to the
management or operation of programs under this
Act.

12. Costs associated with the management of pension
funds, self-insurance funds, and other funds of
the tribal organization that provide for
participation by the Federal Government.

(b)  No other audit or accounting standards, except as
specified in Article IV, Section 2, shall be required by the
Secretary or his authorized representative of the Tribe.  To
the extent that tribal law is not inconsistent, small and
minority business audit firms shall be afforded maximum
practical opportunity to participate in fulfilling the
requirements herein.  The preference requirements of the
Indian Self-Determination and Education Assistance Act, as
amended, 25 U.S.C. § 450e(b), shall apply to such audits
pursuant to Section 2 of Article V of this Compact.

Section 7 -- Records.

The following provisions will supplement tribal law on document
disclosure and will govern record keeping associated with this
Compact:

(a)  Except for previously provided copies of tribal
records that the Secretary or an authorized representative
demonstrates are clearly required to be maintained as part
of the record keeping system of the Department of the
Interior, tribal records shall not be considered federal
records for purposes of chapter 5 of title 5, United States
Code.

(b)  The Tribe shall maintain a record keeping system,
and provide reasonable access to records to the Secretary or
an authorized representative, which permits the Department
of the Interior to meet its minimum legal record keeping
program requirements under the Federal Records Act,
44 U.S.C. § 3101, et seq., and which will allow for

Compact of Self-Governance
Page 6

retrocession of this Compact in whole or in part pursuant to
Section 13 of this Article.

(c)  The Tribe shall maintain in its record keeping
system all documents necessary for the annual audit
requirement in Section 6 of this Article, and shall provide
reasonable access to records to the Secretary or his
authorized representative.

Section 8 -- Property.

(a)  At the request of the Tribe, the Secretary or an
authorized representative shall make available to the Tribe
reasonably divisible real property, facilities, equipment,
and personal property that the BIA had previously utilized
to provide the programs, activities, functions and services
now consolidated by the Tribe pursuant to Article III of
this Compact.  A mutually agreed upon list specifying the
property, facilities, and equipment to be utilized shall
also be prepared and periodically revised so that such
property can be properly recorded in the Bureau of Indian
Affairs Property Inventory.

(b)  Subject to the agreement of the General Services
Administration, the Secretary hereby delegates to the Tribe
the authority to acquire such surplus or "excess" property
as may be appropriate in the judgement of the Tribe to
support the programs, activities, functions, and services
designated under Article III of this Compact.  The Secretary
or an authorized representative agrees to make best efforts
to assist the Tribe in obtaining such confiscated, surplus
or excess property as may become available to tribes or
local governments. Upon the request of the Tribe, a Screener
Identification Card (General Services Administration
Form 2946) shall be issued to the Tribe.

(c)  The Tribe shall determine what capital equipment,
leases, rentals, property or services, it shall require to
perform its obligations under Title III of this Compact, and
shall acquire and maintain records of such capital
equipment, property rentals, leases, property or services
through tribal procurement procedures.

(d)  Property and equipment furnished by the federal
government for use in the performance of the compact and
annual funding agreement and property which was purchased
with funds under any compact and annual funding agreement
which has a value in excess of $5,000 at the time of
retrocession, rescission or termination of the funding
agreement, and is not donated, shall be subject to reversion

Compact of Self-Governance
Page 7

with title reverting to the Secretary, at the option of the
Secretary.

(e) Property and equipment furnished by the BIA for use
in the performance of the compact and funding agreement or
purchased with funds under any funding agreement that is
utilized by the tribe in performance of the compact shall
remain eligible for replacement on the same basis as if
title to such property were vested in the United States.

Section 9 -- Savings.  If it becomes apparent that funds
allocated by the Tribe pursuant to its budget process, to any
activity as defined in the Annual Agreement are in excess of that
needed for such activity, the Tribe may reallocate that excess to
any other activity under this Compact.  Any funds not expended
during the term of any of the calendar years of this Compact may
be carried over to the succeeding calendar year, but such
carry-over shall not diminish the amount of funds that the Tribe
is authorized to receive in that succeeding calendar year or in
any subsequent calendar year.

Section 10 -- Use of Motor Vehicles.  Subject to the
agreement of the General Services Administration, the Secretary
hereby authorizes the Tribe to obtain Interagency Motor Pool
vehicles and related services, if available, for performance of
any activities under this Compact.

Section 11 -- Regulatory Authority.  The Secretary and the
Tribe agree to utilize the following procedures governing the
establishment and application of regulations under this Compact:

(a) Program Guidelines Rules.  The Tribe is not
required to abide by federal program guidelines, manuals,
policy directives, etc. except for those which it
specifically agrees to.  The Tribe may adopt its own
guidelines to be used in place of the existing federal
guidelines.  However, if the Tribe decides to replace
federal guidelines, the Tribe shall give written notice to
the Designated Official.

(b) Federal Regulations.  The Tribe agrees to
abide by all federal regulations as published in the
Federal Register unless waived in accordance with
Section 403(I)(2) of Title II of Pub. Law 103-413.

(c)  In order to put to good use the Secretary's waiver
authority as authorized by Section 403 and (I) of Pub. L.
103-413, the Secretary will seek to expedite the waiver of
any federal regulation which the Secretary or the Tribe
determine presents an obstacle to the carrying out of the
Compact and annual funding agreement, its purposes, and the

Compact of Self-Governance
Page 8

programs, activities, functions, and services pursuant to
the Compact, under the following procedures:

(I)  if at any time the Tribe determines that one or
more specific federal regulations requires waiver to
effectively carry out the Compact or annual funding
agreement, the Tribe may submit a written request for
waiver to the Designated Official, identifying the
regulation sought to be waived and the basis for the
request.

(ii)  Not later than 60 days after receipt by the
Secretary of a written request by the tribe to waive
application of a federal regulation for any funding
agreement, the Secretary shall either approve or deny
the requested waiver in writing to the tribe. A denial
of a request may be made only upon a specific finding
by the Secretary that identified language in the
regulation may not be waived because such waiver is
prohibited by Federal law.

Section 12 -- Disputes.

(a)  Section 110 of Pub. L. 93-638, as amended, shall
apply to disputes under this Compact and any annual funding
agreement.

(b)  In addition or as an alternative to remedies and
procedures prescribed by Section 110 of Pub. L. 93-638, as
amended, the parties jointly may:

(I)  Submit disputes under this Compact to
third-party mediation, which for purposes of this
Section means that the Secretary or his authorized
representative and the Tribe nominate third parties who
together choose a third party mediator ("third-party"
means a person not employed by or significantly
involved with either the Tribe or the Secretary or the
Department of the Interior); or

(ii)  Submit the dispute to the Tribe's Court; or

(iii)  Submit the dispute to mediation processes
provided for under the Tribe's law.

(iv)  The Secretary shall be expected to accept
decisions reached by mediation processes or the tribal
court, but he shall not be bound by any decision which might
be in conflict with the interests of the Indians or the
United States.

Compact of Self-Governance
Page 9

Section 13 -- Retrocession.  The retrocession provisions of
Section 105(e) of Pub. L. 93-638, as amended, and any regulations
thereunder, are herein adopted, except that the effective date of
such retrocession of this Compact, in whole or in part, shall be
45 calendar days from the date of request by the Tribe unless the
Tribe requests an effective date that is more than 45 calendar
days, in which case the Tribe's requested date shall be the
effective date of such retrocession.  If the United States and
the Tribe mutually agree to an effective date of less than 45
calendar days from the date of the request by the Tribe, the
mutually-agreed upon date shall be the effective date of such
retrocession.

Section 14 -- Tribal Administrative Procedures.  Tribal law
and tribal forums shall provide administrative due process rights
pursuant to the Indian Civil Rights Act of 1968, 25 U.S.C.
§ 1301, et seq., that persons, or groups of persons, may have
with respect to services, activities, programs, and functions
that are provided by the Tribe pursuant to this Compact.

Section 15 -- Successor Annual Agreement.  Negotiations for
a successor Annual Agreement, as provided for in Article VI,
Section 2, shall begin no later than 120 days in advance of the
conclusion of the preceding Annual Agreement.  Pursuant to
Sections 403(b) and (g) and Section 404 of Pub. L. 103-413, the
Secretary shall make best efforts to continue and to promote self
governance in preparing his/her budgets for subsequent years.
The Tribe is hereby assured that future funding of successor
Annual Agreements shall only be reduced pursuant to the
provisions of Section 106(b) of Pub. L. 93-638, as amended.  The
Secretary or an authorized representative agrees to prepare and
supply relevant information, and promptly to comply with the
Tribe's requests for information reasonably needed to determine
the funds that may be available for a successor Annual Agreement
as provided for in Article VI, Section 2 of this Compact.

Section 16 -- Matching Funds. All funds provided under this
compact and any annual funding agreement entered into pursuant to
Title II of Pub. L. 103-413, and all funds provided under
contracts or grants made pursuant to Pub. L. 93-638, as amended,
shall be treated as non-Federal funds for purposes of meeting
matching requirements under any federal law.

### Article III  Obligations of the Tribe

Section 1 -- Consolidation.  With the exception of the
specific responsibilities of the United States identified and
retained in Article IV, Section 3, and the programs, activities,
functions, and services funded as provided in Section 403(b)(4)

Compact of Self-Governance
Page 10

of Pub. L. 103-413, the Tribe will perform the programs,
activities, functions and services as provided for in the Annual
Agreement, as provided for in Article VI, Section 2 of this
Compact.   To the extent a program, activity, function, or service
included within such Annual Agreement was included within a
contract or grant entered into pursuant to P.L. 93-638, as
amended or subject to any obligation arising from such contract
or grant, that contract or grant is terminated and the parties'
obligations shall be governed by this Compact.

Section 2 -- Amount of Funds.  The total amount of funds
covered by the consolidation and redesign provided for in
Section 1 of this Article that the Secretary or his authorized
representative shall make available to the Tribe shall be
determined in an Annual Agreement between the Secretary and the
Tribe, which shall be incorporated in its entirety to this
Compact and attached hereto as provided for in Article VI,
Section 2.

Section 3 -- Tribal Programs.  The Tribe agrees to provide
such programs, activities, functions, and services that are
identified in the Annual Agreement.  The Tribe pledges to
practice utmost good faith in upholding its responsibility to
provide such programs, activities, functions and services.

Section 4 -- Trust Services for Individual Indians.  To the
extent that the Annual Agreement endeavors to provide trust
services to individual Indians that were formerly provided by the
Secretary or an authorized representative, the Tribe will
maintain at least the same level of service as was previously
provided by the Secretary or an authorized representative.  The
Tribe pledges to practice utmost good faith in upholding its
responsibility to provide such service.  Trust Services for
Individuals Indians means only services that pertain to land or
financial management connected to individually held allotments.

Section 5 -- Reallocation.  Reallocation of funds from one
program, activity, function, or service to another within a
General Budget Category, or from one General Budget Category to
another shall be governed only by tribal law and procedure and
shall not require Secretarial consent.  In the event a
reallocation involves 30% or more, on a cumulative annual basis,
of funds for a physical resource trust or trust fund management
function performed by the Tribe, the Tribe shall provide notice
to the Secretary's Designated Official, together with an
explanation of how the Tribe's responsibilities will continue to
be fulfilled.

Compact of Self-Governance
Page 11

## Article IV  Obligations of the United States

Section 1 -- Trust Responsibility.  The United States reaffirms its trust responsibility to the Red Lake Band of Chippewa Indians to protect and conserve trust resources of the Tribe, and of individual Indians, of the Red Lake Band of Chippewa Indians.  Nothing in this Compact is intended to, nor should be interpreted, to terminate, waive, modify, diminish or reduce the Trust responsibility of the United States to the Tribe or individual Indians.  The Secretary pledges to practice utmost good faith in upholding said trust responsibility.

Section 2 -- Trust Evaluations.
The United States and the Red Lake Band of Chippewa Indians agree that Section 104 of the Tribal Self-Governance Act requires the United States to conduct annual evaluations of trust functions performed by the tribe on its own behalf and on behalf of its members.  Pursuant to this section, it is agreed that the United States will conduct an annual evaluation of the trust functions assumed by the Red Lake Band of Chippewa Indians under its annual funding agreement.  The annual trust evaluation will include a review of trust transactions; on-site inspections of trust resources as appropriate; compliance with applicable statutory law and regulatory requirements; compliance with the terms of the annual funding agreement; and will document the existence of systems of internal control, trust standards, and safeguards against conflicts of interest.  Additional review processes or the application of additional standards of review must be negotiated between the Tribe and the Secretary's representative designated to perform annual trust evaluations.  It is understood that the terms contained in this paragraph may be superceded by regulation.

The United States agrees that it will not reassume a trust function or the direct management of a trust resource performed by the Tribe except upon a finding of imminent jeopardy.  Until such time as the term is defined by regulation, the parties agree that imminent jeopardy means a significant devaluation and/or loss of a physical trust asset or natural resource or the intended benefit from such asset or resource; or significant diminishment of public health and safety caused by the Tribe's action or omission.  Upon a finding of imminent jeopardy, the United States will immediately notify the Tribe in writing and will commence reassumption of the affected trust function unless the Secretary's designated representative determines that the Tribe can cure the condition causing jeopardy within 60 days and without causing significant loss, harm, or devaluation of a trust asset, natural resource or the public health and safety.

Compact of Self-Governance
Page 12

Section 3 -- Programs Retained.  As specified in the Annual Agreement, the United States hereby retains the programs, services, functions, and activities with respect to the Tribe that are not specially assumed by the Tribe in the Annual Agreement.

Section 4 -- Financial and other Information.  The Tribe shall be eligible for new programs, activities, services and functions on the same basis as other tribes and the Secretary or his authorized representative shall advise the Tribe of the funding available for such programs.  To assist the Tribe in monitoring compliance with Title II of Pub. L. 103-413, the United States shall provide:

(a)  monthly copies of Bureau of Indian Affairs' Status of Obligations reports of the central Office concerning Minneapolis Area obligations;

(b)  monthly Status of Obligations reports of the Area Office concerning programs, activities, functions, and services performed in the Minneapolis Area which are comparable to those performed by the Tribe under this Compact; and

(c)  revisions in such program plans, guidelines or budgets as they are made.

Responses providing other information which may be requested by the Tribe shall be made within ten working days.

Article V  Other Provisions

Section 1 -- Designated Officials.  On or before the effective date of this Compact, both the United States and the Tribe shall provide each other with a written designation of a senior official as its representative/liaison official for notices, proposed amendments to the Compact and other purposes for this Compact.

Section 2 -- Indian Preference in Employment, Contracting and Subcontracting.  Tribal law shall govern the provision of Indian Preference in Employment, Contracting, and Subcontracting pursuant to this Compact.  Section 104 of Pub. L. 93-638, as amended, shall apply to individuals who leave federal employment for tribal employment.

Compact of Self-Governance
Page 13

   Section 3 -- Insurance.  The Tribe shall be fully covered by
such liability insurance or equivalent coverage that the
Secretary or his authorized representative provides or obtains
pursuant to Section 102(c) of Pub. L. 93-638, as amended.
Additionally, the Tribe shall be fully covered by all liability
coverage under the Federal Tort Claims Act that is made available
to the Secretary or his authorized representative or to
P.L. 93-638 contractors and their employees under federal law, as
the same may be amended from time to time, and shall be
responsible in the same manner as P.L. 93-638 contractors.

   Section 4 -- Compact Modifications or Amendments.  To be
effective any modifications of this Compact shall be in the form
of a written amendment to the Compact, and shall require the
written consent of the Tribe and the United States.

   Section 5 -- Construction.  In the implementation of this
Compact, the Secretary, to the extent feasible, shall interpret
Federal laws and regulations in a manner that facilitates this
Compact in accordance with Section 403(I) of Pub. L. 103-413.

   Section 6 -- Officials Not To Benefit.  No member of or
delegate to Congress, or resident commissioner, shall be admitted
to any share or part of any contract executed pursuant to this
Compact, or to any benefit that may arise therefrom; but this
provision shall not be construed to extend to any contract under
this Compact if made with a corporation for its general benefit.

   Section 7 -- Covenant Against Contingent Fees.  The parties
warrant that no person or selling agency has been employed or
retained to solicit or secure any contract executed pursuant to
this Compact upon an agreement or understanding for a commission,
percentage, brokerage, or contingent fee, excepting bona fide
employees or bona fide established commercial or selling agencies
maintained by the contractor for the purpose of securing
business.  For breach or violation of this warranty the
Government shall have the right to annul any contract without
liability or in its discretion to deduct from the contract price
or consideration, or otherwise recover, the full amount of such
commission, percentage, brokerage, or contingent fee.

   Section 8 -- Penalties.  The parties agree that the criminal
penalties set forth in 25 U.S.C. 450d apply to all activities
conducted pursuant to this Compact.

   Section 9 -- Non - BIA Programs. Subject to the provisions
of the regulations to be promulgated pursuant to Section 407 of
Title II of Pub. L. 103-413, the administration of programs,
services, functions or activities under Section 403 (b)(2),
(b)(3), and (C) of Title II of Pub. L. 103-413, shall be

Compact of Self-Governance
Page 14

controlled by the terms of the applicable annual funding
agreements.

## Article VI  Attachments

Section 1 -- Approval of Compact.  The resolution of the Red
Lake Band of Chippewa Indians approving this Compact is attached
hereto as Attachment 1.

Section 2 -- Annual Agreement.  The negotiated and duly
approved Annual Agreement with respect to Red Lake Band of
Chippewa Indians identifying those programs, services, functions,
and activities, to be performed, the General Budget Category
assigned, and the funds to be provided, is hereby incorporated in
its entirety in this Compact and attached hereto as Attachment 2.
This Compact shall be in effect only during the term of any such
Annual Agreement.

DATED THIS ___14th___ DAY OF ___January,___ , 1997.

RED LAKE BAND OF CHIPPEWA INDIANS

BY _____

UNITED STATES OF AMERICA DEPARTMENT OF THE
INTERIOR

BY _____

# EXHIBIT B



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



November 15, 2004

Floyd Jourdain, Jr., Chairman
Red Lake Band of Chippewa Indians
P.O. Box 550
Red Lake, Minnesota 56671

Dear Chairman King:

Enclose is an signed original of the Red Lake Band of Chippewa
Indians Self-Governance Multi-Year Funding Agreement for Calendar
Year 2005.  It is also being sent to the appropriate committees
of the Congress and to the other tribes served by the agency in
which you are located.  The Agreement will go into effect 90 days
following the date signed unless otherwise noted.

Sincerely,

William A. Sinclair, Director
Office of Self-Governance and
Self-Determination

Enclosure

# MULTI-YEAR FUNDING AGREEMENT FOR 2005-2010
## BETWEEN THE RED LAKE BAND OF CHIPPEWA INDIANS
## AND
## THE UNITED STATES OF AMERICA

### Section 1

**Negotiated agreement** - Pursuant to Title IV of P.L. 93-638, as amended, the Red Lake Band of Chippewa Indians (herein referred to as the "Tribe"), and the United States of America, through the Secretary of Interior (herein referred to as the "Secretary"), have negotiated the following Agreement for the assumption of responsibilities by the Tribe for the various programs, functions, services, and activities as specified in this document. This Agreement, which includes programs which are funded by or flow through the Bureau of Indian Affairs (herein referred to as the "BIA") for the benefit of the Tribe, includes all of the matters stated herein in addition to the following listed documents which are hereby incorporated herein by reference:

1. Self Governance 2005 Multi-Year Funding Agreement - Reprogramming Request and Footnotes, Pages 1-7.

2. Red Lake Tribal Council Resolution Number 202-99, Pages 1-2.

### Section 2

**Tribal Programs and Budget** - The Tribe reserves discretion to allocate such amounts of total funding to and between programs, functions, services, and activities enumerated in the attached REPROGRAMMING REQUEST as it sees fit and necessary so long as these funds are used consistent with Federal appropriations law. The Tribe assumes all operational responsibility for all programs, functions, services, and activities as reflected in the REPROGRAMMING REQUEST which are non-residual and not retained by the BIA. The Tribe has broad authority to consolidate and redesign the programs and to reallocate funding between programs without further approval from the Secretary unless otherwise indicated in this Agreement.

### Section 3

**Non-Base Budget Programs** - The programs, functions, services, and activities identified as Non-Recurring, Other Recurring - Competitive, Wildland Fire Management, and Construction will be separately determined and made a part of this Agreement. They include, but are not limited to:

Wetlands/Waterfowl Management
Fish Hatchery Maintenance
Noxious Weed Eradication
Forest Development
Forest Inventories/Plans
Water Management and Development
Environmental Management

1

All Indian Rights Protection Categories
Unresolved Hunting & Fishing Rights
Mineral Assessments
All Real Estate Services Categories

Other Non-Recurring funds not identified in this section may be separately negotiated and included in this Agreement as provided for in Section 9.

## Section 4

**Programs, Functions, Services, and Activities Retained By the BIA** - Any program, function, service, or activity not listed as transferred to the Tribe shall be assumed to be a retained function of the Secretary. In addition, the services related to any inherently federal functions will be available to self-governance tribes on the same basis as other tribes. In cases where there are shared responsibilities between the Tribe and the BIA, the respective roles of the parties will be specified in the endnotes to this Agreement or footnotes to the REPROGRAMMING REQUEST.

## Section 5

**Amount of Funds** - Subject only to Congressional action and the terms of this Agreement, the Secretary shall make available to the Tribe the total amount of funds negotiated as they are identified in the attached REPROGRAMMING REQUEST for Calender Year 2005.

## Section 6

**Rights to Other Direct Funding Reserved** - The Tribe also reserves its right to receive such additional amounts as may be made available for distribution to Tribes for pay costs, retirement cost adjustments, and inflationary cost adjustments, insofar as these funds have not been made available and distributed according to the attached REPROGRAMMING REQUEST.

## Section 7

**Contract Support** - The Tribe is eligible for contract support funding on the same basis as tribes which contract with the BIA under Title I of P.L. 93-638, as amended. The Tribe's contract support funding shall be added to this Agreement at the point when there is clear guidance from the BIA concerning the amount available. The Red Lake Band of Chippewa Indians reserves all of its legal rights to full Contract Support Cost funding, as mandated under the Indian Self-Determination and Education Assistance Act, as amended.

## Section 8

**Payment** - The Tribe chooses to receive all funding possible on an annual lump sum basis at the commencement of the Tribe's Calendar Year. Other funds will be transferred to the Tribe as soon as possible after the amounts due are known and deliverable.

2

**Section 9**

**Amendment or Modification of this Agreement** - Except as otherwise provided in this Agreement, the Compact between the Tribe and the Secretary, or by law, any modifications to this Agreement shall be in the form of a written amendment signed by the Tribe and the Secretary. It is recognized that there may be errors in calculation or other mistakes which may need to be renegotiated. Both parties agree to take corrective action when such errors are identified.

**Section 10**

**No Reduction in Programs, Services, Functions or Activities to Other Tribes** - Pursuant to Section 406 (a) of P.L. 93-638, as amended, nothing in this Agreement shall be construed to limit or reduce in any way the services, contracts, or funds that any other Indian tribe or tribal organization is eligible to receive under Federal law.

**Section 11**

**Subject to Availability of Funds** - All amounts identified in this Agreement are subject to Congressional action on appropriations and will be adjusted accordingly. Notification to the Tribe of such adjustments will occur as soon as practicable following the action.

**Section 12**

**Establishment of Self-Governance Base Budget** - The Tribe has elected to establish a self-governance base budget for its ninth year of operations under self-governance. This includes the actual amounts of funding in the TPA Tribe, TPA Agency, TPA Area (Area field operations), Other Recurring Programs, and Area Office Operations line items, which are base transferred from BIA budget accounts to the Self-Governance budget accounts. Where appropriate, the Secretary agrees to request these amounts for the Tribe in the President's Budget at the earliest opportunity. Non-recurring funds and any other one-time funding are not eligible to be included as part of the Tribe's base.

**Section 13**

**Title I Provisions** - Pursuant to Section 19 of P.L. 104-109, the Tribe has the right and option to incorporate any or all of the provisions of Title I of P.L. 93-638, as amended, into this Annual Funding Agreement. In exercising of the Tribe's rights and options under Section 19 of P.L. 104-109, the provisions identified below are incorporated into this Annual Funding Agreement and have the same force and effect as if included in Title IV of P.L. 93-638, as amended. In addition to the provisions identified below, the Tribe reserves the right to unilaterally amend this Section of the Annual Funding Agreement from time to time, at the option of the Tribe, to incorporate additional provisions of Title I of P.L. 93-638, as amended. The Tribe also reserves the right to unilaterally amend this Section of the Annual Funding Agreement from time to time, at the option of the Tribe, to remove such provisions identified in this Section to the extent such provisions are not independently applicable pursuant to Title IV of P.L. 93-638, as amended.

3

Section 102(a) and (b).  Declination Procedures.

Section 102(c).    Secretary's responsibility to provide liability insurance for the Tribe.

Section 102(e).    Hearing burden of proof allocation, and rank of decision-making Department official.

Section 103.    Grants to Indian tribal organizations.  All of section 103(c) not otherwise limited by Congressional Action or earmarking.

Section 105(k).    Tribe deemed an executive agency when carrying out contract, grant, or agreement.

Section 106(a), (b), (c), (d), (e), (f), (i), (j), (l), (m).  Funding and indirect cost, etc.

## Section 14

**Conflict Between Provisions of this Agreement and the Compact** - To the extent that provisions in this Agreement conflict with the Compact between the Tribe and the Secretary, this Agreement shall apply.

## Section 15

**Attributable Savings** - Any savings attributable to the operation of this Agreement will be used to provide additional services during the Calendar Year or may be expended in a manner to be determined by the Tribe in succeeding Calendar Years.  The Tribe and the Secretary agree to take every reasonable effort to identify such savings over the term of this Agreement.

## Section 16

**Other Available Funds** - Any funds provided in the preceding Calendar Year under a contract or agreement pursuant to P. L. 93-638, as amended, shall remain available until expended.

## Section 17

**Additional Funds** - If the Midwest Region Office of the BIA receives notice of the availability of any additional funding in any fiscal year for any purpose, including any unspent funds, that the Tribe is eligible to apply for or receive, then it must notify the Tribe as soon as possible about such funds so that the Tribe may access or apply for those funds.  The Midwest Region Office commits to keeping the Tribe informed of the existence of funding immediately upon learning of its existence.

## Section 18

**Agency Status** - The BIA shall not abolish or dismantle the Red Lake Agency from the BIA's organizational chart, nor with regard to Agency facilities, without the express written consent of the Tribe.  The BIA shall retain ownership of all Agency facilities and buildings, until such time as those facilities and buildings are brought up to appropriate standards and codes.  Until a mutually agreed upon transfer of Agency facilities and buildings from the BIA to the Tribe occurs, the Tribe, in accordance with P. L. 93-638, will operate and maintain those facilities and buildings using the FACCOM process.  All other BIA property, equipment, and supplies currently utilized at the Red Lake Agency will be expeditiously transferred to the Tribe.

4

## Section 19

**P.L. 102-477** - The Tribe elects to include its share of funds under the Indian Employment Training and Related Services Demonstration Project into this Agreement. To the extent this Agreement includes funds pursuant to P.L. 102-477, the Tribe agrees that such funds will be administered in accordance with the Tribe's approved plan, all statutory requirements, and applicable federal regulations that have been published in the Federal Register. With respect to programs operated under the P.L. 102-477 Plan, only those federal regulations which are in conflict with the provisions in P.L. 102-477 and those for which waivers have been specifically requested and formally approved in writing will be considered waived. All P.L. 102-477 Plan modifications should be submitted to the Division of Workforce Development, Office of Self Governance & Self Determination. They will be distributed to each federal agency whose programs are affected by the modifications and reviewed through the usual P.L. 102-477 inter-departmental review process. Advance funding for programs funded through this agreement that are derived from non-BIA agencies as a result of their inclusion in the Tribe's P.L. 102-477 plan are to be transferred to the Tribe based on the funding year inherent in those funds and as soon as those funds are available for transfer.

## Section 20

**Automated Information Technology Systems** - Prior to being granted access to DOI automated information technology systems, Tribal employees must successfully complete BIA trust automated technology systems training, the costs of which will be met by the BIA. Further, prior to being granted access to DOI automated information technology systems, the Tribe agrees its employees and employees of its contractors must be favorably screened by the BIA Personnel and Physical Security Office pursuant to OMB Circular No. A-130. The Tribe agrees to comply if background investigation and adjudication becomes necessary. Costs will be incurred by the BIA.

The Tribe agrees that records made or received by the Tribe which evidence the organization, functions, policies, decisions, procedures, operations or other activities undertaken in the performance of Federal Indian trust functions will be preserved and maintained in accordance with applicable Federal law. The Tribe and the Department of the Interior agree to work cooperatively in records creation, maintenance and disposition, and training activities, and to address trust records issues and activities in accordance with Executive Order # 13175 (Consultation and Coordination with Indian Tribal Governments) and the BIA Government-to-Government policy.

## Section 21

**Effective Date** - The effective date of this Agreement will be 90 days following the submission of this signed Agreement to the Congress. The planned effective date is January 1, 2005. This Agreement shall remain in effect until December 31, 2010. Terms of the Agreement and funding amounts will remain in effect unless changed by Congressional action, the promulgation of Federal regulations or an amendment to the multi-year funding agreement (MFA). The amount of funding received by the Tribe may be increased if additional funds become available. In subsequent years, modifications to the MFA and Reprogramming Request will be negotiated by October 1st. This Agreement will remain in effect in the event that the effective date of its successor Agreement is not on or before the expiration date of the Agreement.

5

### Section 22

**Reporting -** The Tribe agrees to provide applicable data and information to the BIA Midwest Regional Office pursuant to the Government Performance and Results Act of 1993 (P.L. 103-62). Before providing such information, the Tribe and BIA will consult to determine applicable data and information needed to meet the requirements of P.L. 103-62 and how such information will be assembled and reported.

### Section 23

**Motor Vehicle Operation Policy -** The Tribe certifies it will self-administer a motor vehicle operation policy that promotes the safe operation of motor vehicles while performing duties to implement the terms of this Agreement. The Tribe's policy is either comparable or superior to the March 19, 2004 Motor Vehicle Operation Policy for the Bureau of Indian Affairs issued by the Assistant Secretary.

THE RED LAKE BAND OF CHIPPEWA INDIANS

BY: _____     DATE: 10-20-04
Floyd Jourdain, Jr., Chairman

THE UNITED STATES OF AMERICA

BY: _____     DATE: 11/15/04
Director, Office of Self Governance & Self Determination

6

Self Governance 2005 Annual Funding Agreement - Office of Self Governance Reprogramming Request

Tribe:                    RED LAKE BAND OF CHIPPEWA INDIANS
Tribal OSG Compact Code:  OSG7409
Tribal BIA Org. Code:     F52409
BIA Regional Office:      MIDWEST REGION
BIA Field Office:         RED LAKE AGENCY

October 18
Page: 1

| LINE # | PROGRAM TITLE | COST CODE | (Info) TRIBAL SHARE | A OSG CUM. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Other Aid to Tribal Government - TPA/AGENCY | 39220 | 0 | 56,900 | 0 | 0 | 0 | 56,900 | |
| 6 | Other Aid to Tribal Government - TPA/AREA | 39220 | 0 | 364 | 2,097 | 0 | 0 | 2,461 | |
| 10 | Self-Governance Compacts - TPA/TRIBAL | 39240 | 0 | -104,130 | 0 | 0 | 0 | -104,130 | |
| 12 | Contract Support (Ongoing) - TPA/AREA | 39270 | 0 | 0 | 0 | 0 | 1,455,899 | 1,455,899 | 1 |
| 15 | Tribal Courts - TPA/AGENCY | 39280 | 0 | 246,900 | 0 | 0 | 17,000 | 263,900 | 2 |
| 19 | Social Services - TPA/AGENCY | 39310 | 0 | 220,200 | 0 | 0 | 0 | 220,200 | 3 |
| 20 | Social Services - TPA/AREA | 39310 | 0 | 2,333 | 5,000 | 0 | 0 | 7,333 | |
| 21 | Indian Child Welfare Act - TPA/TRIBAL | 39320 | 0 | 65,860 | 0 | 0 | 0 | 65,860 | |
| 24 | Welfare Assistance Grants - TPA/TRIBAL | 39330 | 0 | 0 | 0 | 0 | 1,061,958 | 1,061,958 | 4 |
| 25 | Housing Improvement Program - TPA/TRIBAL | 39370 | 0 | 50,100 | 0 | 0 | 123,020 | 173,120 | 5 |
| 28 | Scholarships - TPA/AGENCY | 39110 | 0 | 254,100 | 0 | 0 | 0 | 254,100 | 6 |
| 33 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39140 | 0 | 136,400 | 0 | 0 | 0 | 136,400 | |
| 38 | Law Enforcement - TPA/AGENCY | 39420 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 39 | Law Enforcement - TPA/AREA | 39420 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 41 | Community Fire Protection - TPA/AGENCY | 39430 | 0 | 42,500 | 0 | 0 | 0 | 42,500 | 7 |
| 45 | Job Placement and Training - TPA/AGENCY | 39535 | 0 | 469,900 | 0 | 0 | 0 | 469,900 | 8 |
| 48 | Economic Development - TPA/AGENCY | 39510 | 0 | 84,100 | 0 | 0 | 0 | 84,100 | |
| 49 | Economic Development - TPA/AREA | 39510 | 0 | 0 | 2,323 | 0 | 0 | 2,323 | |
| 50 | Road Maintenance - TPA/TRIBAL | 39550 | 0 | 427,307 | 0 | 0 | 96,723 | 524,030 | 9 |
| 60 | Forestry - TPA/AGENCY | 39630 | 0 | 645,700 | 0 | 0 | 0 | 645,700 | 10 |
| 61 | Forestry - TPA/AREA | 39630 | 0 | 67,000 | 0 | 0 | 150,000 | 217,000 | 10 |
| 63 | Water Resources - TPA/AGENCY | 39640 | 0 | 88,900 | 0 | 0 | 0 | 88,900 | 11 |
| 66 | Wildlife and Parks - TPA/AGENCY | 39650 | 0 | 256,600 | 0 | 0 | 0 | 256,600 | 12 |
| 72 | Trust Services, General - TPA/AGENCY | 39710 | 0 | 400 | 0 | 0 | 0 | 400 | |
| 73 | Trust Services, General - TPA/AREA | 39710 | 0 | 0 | 10,583 | 0 | 0 | 10,583 | |
| 75 | Other Rights Protection - TPA/AGENCY | 39720 | 0 | 1,100 | 0 | 0 | 0 | 1,100 | |
| 78 | Real Estate Services - TPA/AGENCY | 39770 | 0 | 43,600 | 0 | 0 | 0 | 43,600 | 13 |
| 79 | Real Estate Services - TPA/AREA | 39770 | 0 | 4,906 | 20,000 | 0 | 0 | 24,906 | |
| 86 | Environmental Quality Services - TPA/AREA | 39740 | 0 | 0 | 7,993 | 0 | 0 | 7,993 | |
| 94 | Executive Direction - TPA/AGENCY | 39810 | 0 | 93,300 | 0 | 0 | 0 | 93,300 | |
| 97 | Administrative Services - TPA/AGENCY | 39820 | 0 | 182,100 | 0 | 0 | 0 | 182,100 | |

12/06/2005  16:15    2186793691                RED LAKE AGENCY                      PAGE  10/15

| Line | Code | Description | (1) | (2) | (3) | (4) | (5) | Ref |
|---|---|---|---|---|---|---|---|---|
| 102 | 39901 | TPA General Increase - TPA/TRIBAL | 227,030 | 0 | 0 | 0 | 227,030 | 14 |
| 103 | 39902 | 638 Pay Costs - TPA/TRIBAL | 630,902 | 0 | 0 | 0 | 630,902 | 15 |
| 106 | 30800 | Area and Agency Technical Support - NON TPA | 7,810 | 0 | 0 | 0 | 7,810 | |
| 114 | 31950 | Fish Hatchery Operations - NON TPA | 46,000 | 0 | 0 | 0 | 46,000 | 16 |
| 115 | 31960 | Fish Hatchery Maintenance - NON TPA | 0 | 0 | 0 | 8,000 | 8,000 | 17 |
| 116 | 31970 | Tribal Management and Development - NON TPA | 174,000 | 0 | 0 | 70,000 | 244,000 | 18 |
| 120 | 31720 | Noxious Weed Eradication - NON TPA | 0 | 0 | 0 | 20,000 | 20,000 | 19 |
| 121 | 33900 | Forestry - NON TPA | 0 | 0 | 0 | 495,000 | 495,000 | 20 |
| 122 | 34020 | Water Mgmt. Planning & Pre-Develop - NON TPA | 0 | 0 | 0 | 80,000 | 80,000 | 21 |
| 130 | 34300 | Real Estate Services - NON TPA | 0 | 0 | 0 | 23,946 | 23,946 | 22 |
| 131 | 34730 | Environmental Management - NON TPA | 0 | 0 | 0 | 500,000 | 500,000 | 23 |
| 132 | 35000 | Central Office Operations - NON TPA | 0 | 0 | 0 | 0 | 0 | 24 |
| 152 | 36530 | Housing Development - NON TPA | 0 | 0 | 48,500 | 0 | 48,500 | |
| 154 | 36710 | Economic Development - NON TPA | 0 | 0 | 1,279 | 0 | 1,279 | |
| 155 | 36810 | Natural Resources, General - NON TPA | 0 | 0 | 14,604 | 0 | 14,604 | |
| 157 | 36830 | Forestry - NON TPA | 0 | 0 | 6,622 | 0 | 6,622 | |
| 158 | 38831 | Forest Marketing Assistance - NON TPA | 18,532 | 0 | 320 | 0 | 18,852 | |
| 164 | 36920 | All Other Indian Rights Protection - NON TPA | 2,359 | 0 | 2,421 | 0 | 4,780 | |
| 170 | 36200 | Administrative Services - NON TPA | 0 | 0 | 83,923 | 0 | 83,923 | |
| 174 | 36240 | Information Resources Technology - NON TPA | 9,806 | 0 | 30,169 | 0 | 39,975 | |
| 177 | 37700 | Law Enforcement Pttn. NON TPA | 0 | 0 | 5,283 | 4,576,753 | 4,582,036 | 25 |
| 183 | 37400 | Facilities Admin. (Operations) - NON TPA | 263,018 | 0 | 0 | 444,860 | 707,878 | 26 |
| 188 | 91700 | Facilities Improvement & Repair (M - NON TPA | 0 | 0 | 0 | 2,846,250 | 2,846,250 | 27 |
| 198 | 91720 | Preparedness - NON TPA | 0 | 0 | 0 | 480,465 | 480,465 | 28 |
| 199 | 92121 | Preparedness Program Mgmt (Indirec - NON TPA | 0 | 0 | 0 | 45,500 | 45,500 | 29 |
| 200 | 95200 | Child Care Block Grants - HHS NON TPA | 0 | 0 | 0 | 204,033 | 204,033 | 30 |
| 201 | 95300 | Child Care Development Fund - HHS NON TPA | 0 | 0 | 0 | 241,799 | 241,799 | 31 |
| 203 | 95520 | Native Employment Works (NEW) - HH - NON TPA | 0 | 0 | 0 | 134,691 | 134,691 | 32 |
| 204 | 95130 | Supplemental Youth Services-LABOR - NON TPA | 0 | 0 | 0 | 60,296 | 60,296 | 33 |
| 205 | 95140 | Comprehensive Services(Adult)-LABO -NON TPA | 0 | 0 | 0 | 205,688 | 205,688 | 34 |
| | | TOTAL | 4,715,897 | 0 | 241,117 | 13,341,881 | 18,298,895 | |

AUTHORIZED FINANCIAL OFFICERS:

_[signature]_
Bureau of Indian Affairs - Regional Office

Tribe    *See Signature on Next Page*

_[signature] Ken Reinfeld_
Office of Self Governance

12/06/2005  16:15    2186793691                RED LAKE AGENCY                          PAGE  11/15

| No. | Program | Code | | | | | Ref |
|-----|---------|------|---|---|---|---|-----|
| 102 | TPA General Increase - TPA/TRIBAL | 39901 | 0 | 227,030 | | | 227,030 | 14 |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39902 | 0 | 630,902 | | | 630,902 | 15 |
| 106 | Area and Agency Technical Support - NON TPA | 30800 | 0 | 7,810 | | | 7,810 | 16 |
| 114 | Fish Hatchery Operations - NON TPA | 31950 | 0 | 46,000 | | | 46,000 | |
| 115 | Fish Hatchery Maintenance - NON TPA | 31960 | 0 | | | 8,000 | 8,000 | 17 |
| 116 | Tribal Management and Development - NON TPA | 31970 | 0 | 174,000 | | 70,000 | 244,000 | 18 |
| 120 | Noxious Weed Eradication - NON TPA | 33720 | 0 | | | 20,000 | 20,000 | 19 |
| 121 | Forestry - NON TPA | 33900 | 0 | | | 495,000 | 495,000 | 20 |
| 122 | Water Mgmt. Planning & Pre-Develop - NON TPA | 34020 | 0 | | | 80,000 | 80,000 | 21 |
| 130 | Real Estate Services - NON TPA | 34300 | 0 | | | 23,946 | 23,946 | 22 |
| 131 | Environmental Management - NON TPA | 34730 | 0 | | | 500,000 | 500,000 | 23 |
| 132 | Central Office Operations - NON TPA | 35000 | 0 | | | 0 | 0 | 24 |
| 152 | Housing Development - NON TPA | 36530 | 0 | | 48,500 | | 48,500 | |
| 154 | Economic Development - NON TPA | 36710 | 0 | | 1,279 | | 1,279 | |
| 155 | Natural Resources, General - NON TPA | 36810 | 0 | | 14,604 | | 14,604 | |
| 157 | Forestry - NON TPA | 36830 | 0 | | 6,622 | | 6,622 | |
| 158 | Forest Marketing Assistance - NON TPA | 36831 | 0 | 18,532 | 320 | | 18,852 | |
| 164 | All Other Indian Rights Protection - NON TPA | 36920 | 0 | 2,359 | 2,421 | | 4,780 | |
| 170 | Administrative Services - NON TPA | 36200 | 0 | | 83,923 | | 83,923 | |
| 174 | Information Resources Technology - NON TPA | 36240 | 0 | 9,806 | 30,169 | | 39,975 | |
| 177 | Law Enforcement - NON TPA | 37700 | 0 | | | 0 | 0 | |
| 183 | Facilities Admin. (Operations) - NON TPA | 37400 | 0 | 263,018 | 5,283 | 4,576,753 | 4,592,036 | 25 |
| 188 | Facilities Improvement & Repair (N - NON TPA | 11700 | 0 | | | 444,860 | 707,878 | 26 |
| 198 | Preparedness - NON TPA | 92120 | 0 | | | 2,846,250 | 2,846,250 | 27 |
| 199 | Preparedness Program Mgmt (Indirec - NON TPA | 92121 | 0 | | | 480,465 | 480,465 | 28 |
| 200 | Child Care Block Grants - HHS - NON TPA | 95200 | 0 | | | 45,500 | 45,500 | 29 |
| 201 | Child Care Development Fund - HHS - NON TPA | 95300 | 0 | | | 204,033 | 204,033 | 30 |
| 203 | Native Employment Works (NEW) - HH - NON TPA | 95520 | 0 | | | 241,799 | 241,799 | 31 |
| 204 | Supplemental Youth Services-LABOR - NON TPA | 95130 | 0 | | | 134,691 | 134,691 | 32 |
| 205 | Comprehensive Services(Adult)-LABO - NON TPA | 95140 | 0 | | | 60,296 | 60,296 | 33 |
| | | | | | | 205,688 | 205,688 | 34 |
| | TOTAL | | 0 | 4,715,897 | 241,117 | 13,341,081 | 18,298,895 | |

AUTHORIZED FINANCIAL OFFICERS:

Bureau of Indian Affairs - Regional Office

Tribe

Office of Self Governance

1  Funds will be distributed using similar methodology as was used last calendar year and published in the Federal Register. The OSG and BIA commit to keeping the Tribe's Director of Finance and Self Governance Coordinator adequately informed in advance of deadlines for submission of contract support payment requests. The estimate is based on the negotiating its CY 2005 indirect cost rate and anticipates a substantial increase in the rate. The Red Lake Band of Chippewa Indians reserves all of its legal rights to full Contract Support Cost funding, as mandated under the Indian Self-Determination and Education Assistance Act.

2  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The Red Lake Band requests an additional $500,000 from the DOJ initiative for operation of Tribal Courts. The Tribe requests that the $17,000 received in CY 2003 for Court-related IIM and probate activities be continued and base-transferred in CY 2005, which will be used in accordance.

3  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. An estimated $83,336 of the amount in this line item will be used in accordance with the Tribe's approved P. L. 102-477 Plan.

4  Total funds will be distributed based upon current welfare assistance need as reflected in the quarterly analysis of needs. This amount includes Foster Care. An estimated $530,079 of the amount in this line item will be used in accordance with the Tribes approved P. L. 102-477 Plan for General Assistance.

5  Funds will be distributed based on HIP eligible applicant data. HIP funds shall be used in accordance with HIP regulations unless waived. The Red Lake Band asserts that the funding amount available for this line item has historically been insufficient and inadequate to meet the needs of the service population.

6  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The actual costs for the scholarships program in CY 2003 was $508,000, approximately twice the amount received. The amount in this line item, which has been base transferred to the Tribe, will be used in accordance with the Tribes approved P. L. 102-477 Plan.

7  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The actual cost to minimally protect the lives of Red Lake Band members with fire protection in CY 2003 was $310,192, greater than seven times the funding level. The balance of funds was taken from other Self Governance programs.

8  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The amount in this line item, which has been base transferred to the Tribe, will be used in accordance with the Tribe's approved P. L. 102-477 Plan.

9  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The Tribe desires that funds under this category be distributed including the historical base level of $427,307 and an additional estimated amount of $96,723 reflecting the BIAs actual maintenance needs estimate for Red Lake.

10 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The Red Lake Band and the BIA agree to have one forestry position as "residual" from the entire Red Lake Field Office. The estimated cost, which includes salary and benefits, was $87,416 in FY 2003. The BIA shall return to the Tribe at the end of the calendar year, any unspent funds pertaining to the residual forestry position. The BIA and OSG guarantee the Red Lake Band will be consulted with, and treated equitably, in the allocation of any funding increases to BIA's Forestry Program. The BIA and Tribe agree that $217,000 needs to be base-transferred to the Tribe under Forestry TPA/AGENCY, under FFS Cost Code 39630.

11 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet

the needs of the service population.

12  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population.

13  The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The BIA agrees to form a Working Group by the BLM and others to the Tribe to be held in trust for the Tribe. The Working Group shall consist of the BIA Midwest Region Director, The Chairman of the Tribe or his representatives, and a representative of the BLM.

14  This amount to be determined by Congressional appropriation.

15  This amount to be determined by Congressional appropriation. The BIA will make every effort to treat Red Lake Tribal employees the same as all other Tribal and Federal employees for purposes of pay cost adjustments in FY 2005. The BIA and OSG agree to make every possible effort to recover for the Tribe all 638 Pay Cost shortages for FY 2002-2004, which were legitimately due to the Tribe, but which were not received because of Administration oversight.

16  The Red Lake Band believes these dollars are inadequate and insufficient to effectively operate the program.

17  This dollar amount is an estimate. The actual dollar amount for the CY 2005 MFA will be obtained on the basis of an existing competitive process.

18  The Red Lake Band believes these dollars are inadequate and insufficient to effectively operate the program. This line item includes an estimate of $70,000 for Wetlands/Waterfowl Management. The actual amount for Wetlands/Waterfowl Management will be based on an existing, competitive process. The estimate for Wetlands/Waterfowl Management has been placed in this line item because the BIA has temporarily removed this program and funding from the budget. The Tribe asserts this is in violation of Executive Order # 13175, and notes the United States Congress specifically restored the program and funding in FY 2003 and FY 2004.

19  This dollar amount is an estimate. the actual dollar amount for the CY 2005 MFA will be based on an existing competitive process.

20  This amount is an estimate. This is a recent Bureau budget line item, and reflects the merger of three former budget line items, each with differing methods/formulas for funds distribution: Forest Development; Forest Management; Inventories & Plans; and Woodland Management. The actual amount will be based on specific forestry development projects, forest acres, and need for the Forest Development portion, and on the approved scheduled project amount for Forest Inventories/Plans portion in CY 2005. The BIA and OSG guarantee the Red Lake Band will be consulted with, and treated equitably, in the allocation of any funding from the BIA's Forestry Program. The Red Lake Band believes these dollars are inadequate and insufficient to effectively operate the program.

21  This dollar amount for the CY 2005 MFA will be based on an existing nationally competitive process. The BIA and OSG agree to work with the Red Lake Band to ensure that the Tribe is allowed to compete nationally on the same basis as other tribes.

22  This amount is an estimate. The BIA and OSG have agreed the Tribe should receive these funds.

23  This amount is requested in 2005 to assist with completing the Red Lake Sewage Lagoon upgrades.

24  The Red Lake Band hereby protests and objects to the decision to not distribute shares of the central office for FY 2005, and it is remarkably unfair that the Central Office budget has increased 37% in the last three years compared to the TPA budget increase of a paltry .3%. The Tribe disagrees with the Department of Interior in its assertion that Congress does not intend that Central Office shares should be distributed to tribes, but that to the contrary, past Congressional language in this area fully supported the distribution of Central Office shares to the tribes, until the BIA persuaded Congress and the Administration to freeze distributions in FY 1998 - 2004.

25  The Assistant Secretary - Indian Affairs and the Tribe agree that this amount represents original and historical base-transferred amounts of $1,413,500 from TPA Law Enforcement - Agency, $5,283 from TPA Law Enforcement Area, and $18,799 from Law Enforcement Area, in addition to $95,000 in base eligible funding from the FY 1999 Law Enforcement

Initiative, $94,000 in base eligible funding from the FY 2000 Law Enforcement Initiative, and $224,000 in base eligible funding from the FY 2001 Law Enforcement Initiative. The Assistant Secretary - Indian Affairs agrees to do everything in his power to ensure these amounts are not reduced, and that Self-Governance tribes are treated on an equal footing with BIA Law Enforcement with regard to any additional Law Enforcement funds distributions. The Red Lake Band requests an additional $1 million for operation of Law Enforcement. Any new law enforcement program funding is to be determined and added to the AFA based on national distribution methodology developed by the BIA. The OSG and BIA also agree that it will keep the Tribe closely informed about all activities pertaining to Public Safety and Justice, so that the Tribe can participate to the fullest degree. The OSG and BIA agree that the $1,555 million obtained in FY 2002 for detention operations associated with new facilities needs to be designated as base eligible funding in FY 2005, because this funding is for staffing the Tribes new detention facility, and the Tribe cannot staff this facility for just one year. The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes juvenile correction facility in CY 2005, and to request this amount in the next Presidents budget. With regard to any new initiatives pertaining to Homeland Security, it is mutually agreed that Red Lake Law Enforcement shall be eligible to participate at the same level as BIA Law Enforcement in any new programs and funding increases.

26   Historically there has been a deficit of O&M monies for Red Lake Agency facilities. Continuously funds were transferred from the Area to the Agency to negate the deficit. The BIA and the Red Lake Band hereby agree that if funds are available to cover future deficits for O&M monies, these funds will be made available to the Band, and in subsequent years such funds shall be transferred to the Tribes AFA base. Current base funding FFS Code 37400 (Operations) is a combination of both FFS Code 37400 (Operations) and FFS Code 37500 (Maintenance). The amount shown is an estimate. The actual amount will be determined from the FMIS O&M Allotment Formula. The Tribe has incurred a substantial increase in the need for O&M funds for maintaining the new detention facility, which consists of 55,760 square feet for which the BIA is responsible to maintain. The BIA reprogramming request amount of $444,860 is an estimate, and includes a general increase of $26,660, and $418,200 based on square footage for the detention and juvenile facilities, for the period of September 1, 2004 to December 31, 2005. The Tribe requests that funding be allocated to conform with the Tribes calendar year and the MFA. The OSG and BIA agree to assist the Tribe in obtaining $1 million from the FY 2005 O&M account for detention facility maintenance associated with new facilities recently funded by DOJ.

27   The Tribe requests the BIA restore funding to the Agency Water & Sewer Project # 93F01 in the amount of $2,846,250.00. This represents the original BIA project cost of $2,041,799.00 in 1996 adjusted for inflation at 3.5% per year to FY2005. The Tribe requests the completion of this project to restore design fire suppression flows to the southern portions of the Red Lake water system, prevent further contamination of houses on the sewer system and allow the Tribe to proceed with it's planned improvements to the Agency roads and Mn Hwy #1, the MnDot project may be jeopardized and the Agency project delayed indefinitely if the BIA's subsurface utilities are not replaced.

28   This dollar amount is an estimate. The actual dollar amount for the CY 2005 NFA will be based on a preexisting formula according to the National Fire Management Analysis System. The Tribe and the BIA agree that the Wildland Fire Management Memorandum of Agreement between the Red Lake Band of Chippewa Indians and the Bureau of Indian Affairs shall be the guiding document for wildland fire management at Red Lake. It is mutually agreed that a flexible and cooperative working relationship between the Tribe's fire program, the fire management officer at Bemidji, and the fire program at the BIA Midwest Region office will exist, so that adequate trust resource protection and management will be maintained. Pursuant to Section 8 of the Tribe's MFA, the BIA and OSG agree to make every effort to ensure funds are released to the Tribe at the beginning of the calendar year.

29   This dollar amount is an estimate. Red Lake's currently approved indirect cost rate is 9.47%. The Tribe is currently negotiating its CY 2005 indirect cost rate and anticipates a substantial increase in the rate.

30   Estimate of HHS Child Care Block Grant. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

31   Estimate of HHS Child Care Development Fund. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

32 Estimate of N.E.W. Program. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.
33 Estimate of Department of Labor Supplemental Youth Services. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.
34 Estimate of Department of Labor Comprehensive Adult Services. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

# EXHIBIT C



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Office of Law Enforcement Services
P.O. Box 66
Albuquerque, New Mexico 87103



IN REPLY REFER TO:
Office of the Director

NOV 2 0 2000

Honorable Bobby White Feather
Chairman, Red Lake Band of Chippewa Indians
P.O. Box 550
Red Lake, Minnesota  56671

Dear Chairman White Feather:

This is to acknowledge the request for transition money to assist you in completing your new detention facility. Currently, the Bureau of Indian Affairs (BIA), Office of Law Enforcement Services (OLES), does not have funding identified to assist you with your transition. However, we are committed to seeking funds for operating the facilities built under the Department of Justice grants.

Upon review of your budget request, we need some clarification on some of the items. The Transitional Specialist identified for construction was provided through the grant received by your Tribe from the Department of Justice. The program manager included as part of your grant is the position responsible for this activity. It was also our understanding that consultant fees were included in the grants.

Excluding these line items, it appears you will only need $35,500 for the first year of your transition. If these items were not provided in your grant, please contact us.

BIA-OLES also needs to know how you are planning on receiving these funds. Does the Tribe anticipate utilizing the 93-638 or compact process?

For FY 2001, the Congress appropriated $9 million for law enforcement and detention services in Indian Country. The Nation Congress of American Indians (NCAI) has requested to be a part of the new dollars distribution. The Assistant Secretary of Indian Affairs has agreed and we expect to begin the consultation process with NCAI this week. We will most certainly discuss your request with NCAI representatives.

If you have any further questions regarding this matter, please call William McClure, Detention Specialist at (505) 248-7937.

Sincerely,

Theodore Quasula, Director
Office of Law Enforcement Services

cc:  Don Cook, Project Manager
     Ms. Linda Bedeau, Planning Director
     Martin Hansford, Acting District 1 Commander
     William McClure, Detention Specialist

# EXHIBIT D

John Rever

Page 1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3       --------------------------------X

4       RED LAKE BAND OF CHIPPEWA          )

5       INDIANS,                           )

6                    Plaintiff,            ) Case No.

7       V                                  ) CA 06cv1826

8       UNITED STATES OF AMERICAN,         )

9       et al.,                            ) Pages 1-35

10                   Defendants.           )

11      --------------------------------X

12

13                   Deposition of JOHN N. REVER

14                        Washington, DC

15                     Friday, July 20, 2007

16

17

18

19                                         COPY

20

21      Job No:  182088

22      Reported by: Denise Vickery, RMR-CRR

**John Rever**

1                    MR. BAKER-SHENK:  Counsel, I have a

2    second copy.

3                    THE WITNESS:  Okay.

4    BY MR. BAKER-SHENK:

5         Q.  I really have a simple question, but I want

6    you to first identify for the record what has been

7    marked as Plaintiff's Exhibit C could you, please?

8         A.  Yes.  This appears to be a US Department of

9    Justice, Office Justice Programs letter dated November

10   25, 2003 from -- addressed to a Ms. Wanda, W-a-n-d-a,

11   Lyons, L-y-o-n-s, Administrator of the Corrections

12   Department, Red Lake Tribal Government, and signed by

13   Barry D. Roberts, Program Manager, which appears to

14   discuss the terms under which funds were provided

15   through the Department of Justice for -- apparently for

16   the purpose of constructing and designing correction

17   facilities.  That's a general description.

18        Q.  All right.  If you would turn then to the

19   second page.

20        A.  Uh-huh.

21        Q.  And in the second full paragraph, read the

22   first sentence, please.

John Rever

Page 30

1        A.   I hope I'm in the right place.

2        Q.   Yes.

3        A.   "The design and construction funding received

4    through the Red Lake grant is to be used for

5    construction -- corrections services only."

6        Q.   Okay.  So that is a condition it appears that

7    Justice is stating that the funds are to be used for

8    corrections services only.   The buildings are to be

9    used for corrections purposes only?

10       A.   That's what it appears to be.

11       Q.   Is that a fair reading?

12       A.   Yes.  Uh-huh.

13       Q.   Turning back to your office's provision of

14   operations and maintenance funding through the

15   self-governance funding agreement to this facility?

16       A.   Uh-huh.

17       Q.   Is the amount of operations and maintenance

18   funding different for a 20,000 square foot jail as

19   opposed to a 20,000 square foot warehouse?

20       A.   Yes, that would be -- it would be different

21   between the two simply because of the use of the

22   facility.

**U.S. Department of Justice**

Civil Division

RTBlades
145-7-1680

Telephone: (202) 616-8257
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

August 23, 2007

<u>BY HAND</u>

Esquire Deposition Services, LLC
1020 19th Street, NW
Suite 620
Washington, D.C.  20036
Telephone: (202) 429-0014

Re:    Red Lake Band of Chippewa Indians v. United States,
       No. CA 06cv1826 (D.D.C.)

Dear Sir or Madame:

Enclosed are the errata sheets and signature pages for the transcripts of the depositions of W. Patrick Ragsdale and John N. Rever, which were taken, respectively, on July 11 and July 20, 2007, in Washington, D.C., and reported by Ms. Denise Vickery, RMR-CRR.

If you have any questions or need any additional information, please let me know.  Thank you for your assistance and cooperation in this matter

Very truly yours,

Reginald T. Blades, Jr.
Senior Trial Counsel
Commercial Litigation Branch

Enclosures

cc:    Philip Baker-Shenk, Esquire (with enclosures)
       Jessica Roff, Esquire (with enclosures)

## John Rever

Page 32

```
1

2

3

4

5              ACKNOWLEDGMENT OF DEPONENT

6

7       I, JOHN N. REVER, do hereby acknowledge I have

8    read and examined the foregoing pages of testimony, and

9    the same is a true, correct and complete transcription

10   of the testimony given by me, and any changes and/or

11   corrections, if any, appear in the attached errata

12   sheet signed by me.

13

14

15   8/15/2007

16   Date                                JOHN N. REVER

17

18                                       City/County of  Fairfax
          Nisarin Primaswala             Commonwealth/State of  Virginia
19          NOTARY PUBLIC                The foregoing instrument was acknowledged
         Commonwealth of Virginia        before me this 15 day of  August
             Reg. # 7042323              2007 by  Nisarin Primaswala
         My Commission Expires           (Name of person seeking acknowledgement)
20          August 31, 2010
                                         [Notary signature]
21

22
```

John Rever

Page 35

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, NORTHWEST

2    SUITE 620

     WASHINGTON, D.C.   20036

3              ERRATA SHEET

     Case Name:  RED LAKE BAND OF CHIPPEWA INDIANS v. UNITED

4    STATES OF AMERICAN, et al.

     Witness Name:  JOHN N. REVER

5    Deposition Date:  July 20, 2007

     Job No.:  182088

6

     Page No.   Line No.   Change    CAPITALIZE CIVIL ENGINEER
7       6         21                  CORPS
8       6         6        electric engineer to electrical Engineering
9       6         6        CAPITALIZE BUSINESS ADMINISTRATE
10
11
12
13
14
15
16
17
18
19
20
21
22    Signature                              Date
                                             8/10/2007

# EXHIBIT E

Christopher Chaney

```
                                                        Page 1
 1

 2

             UNITED STATES DISTRICT COURT

 3        FOR THE DISTRICT OF COLUMBIA

 4   RED LAKE BAND OF            )

     CHIPPEWA INDIANS            )

 5     Plaintiff                 )Civil Action No.

     vs.                         )06-1826(CKK)

 6   UNITED STATES OF AMERICA,   )

     et al                       )

 7     Defendants                )

 8

 9                            COPY

10

11

12        Deposition of Christopher Chaney

13              Washington, D.C.

14             August 30, 2007

15

16

17

18

19

20

21   Reported by:  Bonnie L. Russo

22   JOB NO. 182850
```

Christopher Chaney

Page 47

1    juvenile programs -- are they addressing both

2    boys and girls?

3        A.    Yes.  As far as I'm aware.

4        Q.    Are there any trends in the funding

5    levels for BIA operated -- funded -- for BIA

6    funded detention programs since the September

7    2004 testimony of the inspector general, Earl

8    Devaney, that you looked at in Exhibit E?

9        A.    Yes.

10       Q.    What are those trends in funding

11   levels?

12       A.    Upward.  We have had significant

13   funding increases for Indian country detention

14   facilities for staffing and operation.  They

15   are -- I'll leave it at that.

16       Q.    And what were they for fiscal year

17   2005, which followed the first year following

18   Devaney's testimony?

19       A.    Off the top of my head, I don't

20   know.

21       Q.    What were the increases for fiscal

22   year 2006?

Christopher Chaney

Page 48

1      A.      Once again, off the top of my head I
2    don't know.
3      Q.      Do you know the current year
4    increases for 2007?
5      A.      For 2007, it was zero because the
6    budget -- president's budget request had money,
7    but there was politics that put us on a
8    continuing resolutions throughout 2000 --
9    fiscal year 2007 and we ended up Congress not
10   authorizing any funding increase for
11   corrections operations in 2007.
12     Q.      So the significant increase you just
13   testified to must have occurred in '05 and '06?
14     A.      There was significant increases in
15   '05 and '06, to the best of my recollection,
16   and there was a request for a significant
17   increase in '07 and '08.
18     Q.      And so in '07, as a result of
19   politics, you mentioned they simply funded at
20   the '06 levels --
21     A.      Yes.
22     Q.      -- which included an increase?  The

Christopher Chaney

Page 71

1       A.      Apparently, yes.

2       Q.      To your knowledge, in calendar year

3    2005 for which this footnote was directed, did

4    the band ever receive from the bureau

5    1,218,482, the figure listed there in Footnote

6    25, for program operations funding for the

7    tribe's juvenile corrections facility?

8       A.      I don't think so.

9       Q.      Did the BIA assist the tribe in

10    obtaining any funding for the operation of its

11    juvenile correction facility in calendar year

12    2005?

13       A.      I don't know because the calendar

14    year 2005 -- well, we operate on a fiscal year

15    basis and the fiscal year 2005 budget process

16    would have been too far gone to be able to make

17    a request for FY '05.

18       Q.      But whether it was making requests

19    of Congress or otherwise, did the BIA assist

20    the tribe in any way, that you're aware of,

21    while you were director that year in obtaining

22    any funding for operation of its juvenile

Christopher  Chaney

Page 72

1    correction facility during the calendar year

2    2005?

3        A.    Can you rephrase the question?

4        Q.    Yes.

5              The footnote reads "The BIA agrees

6    to assist the tribe in obtaining 1,218,482 for

7    operations funding for the tribe's juvenile

8    correction facility in calendar year 2005."

9              Do you know whether the BIA assisted

10   the tribe in obtaining that amount of money for

11   that purpose in 2005?

12       A.    Do I know, yes.

13       Q.    Did the BIA assist the tribe?

14       A.    No.

15       Q.    Okay.

16       A.    It was calendar year 2005 that the

17   issue came up as to whether or not this was,

18   indeed, a juvenile correction facility.

19       Q.    Okay.  You just testified that that

20   issue came up in late 2005?

21       A.    I testified that Mrs. Lavendar and

22   possibly Mrs. Baker went to the facility and

Christopher Chaney

Page 80

1      A.      Probably not.  I don't know for

2   sure.

3      Q.      Okay.  Was the amount of 1,218,482

4   requested in the next president's budget, and

5   whether that was fiscal 2006 or 7?

6      A.      Not to my knowledge.

7      Q.      It was not?

8      A.      It was not.

9      Q.      To your knowledge, did the band

10  receive from the BIA this amount of 1,218,482

11  for program operations funding for the tribe's

12  juvenile correction facility in calendar year

13  2005?

14     A.      No.  We would not have received

15  that.

16     Q.      And for calendar year 2006?

17     A.      No.

18     Q.      Let me give you what has been marked

19  as Plaintiff's G?

20             (Deposition Exhibit G was marked for

21  identification.)

22             BY MR. BAKER-SHENK:

Christopher Chaney

Page 89

1    prior to that time?

2         A.    The OFMC office was, yes.

3         Q.    Okay.  To your knowledge, Mr.

4    Chaney, did the president's budget request for

5    fiscal year 2007 contain a request for 1.2

6    million or 1.599 million for detention program

7    operations funding for the band's juvenile

8    detention facility Phase III?

9         A.    It did not.

10        Q.    And did the BIA receive, to your

11   knowledge, from BIA any such funds for such

12   purpose in calendar year 2007?

13        A.    No.

14        Q.    Did the BIA assist, to your

15   knowledge, the tribe in any way in obtaining

16   any funding for the operation of its juvenile

17   correction facility in calendar year 2007?

18        A.    Yes.

19        Q.    What did -- what were those efforts

20   that were made to assist the tribe in obtaining

21   such funding?

22        A.    One of the efforts that was made to



**U.S. Department of Justice**

Civil Division

RTBlades
145-7-1680

Telephone: (202) 616-8257
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

October 15, 2007

<u>BY HAND</u>

Esquire Deposition Services, LLC
1020 19th Street, NW
Suite 620
Washington, D.C.  20036
Telephone: (202) 429-0014

      Re:    Red Lake Band of Chippewa Indians v. United States,
              No. CA 06cv1826 (D.D.C.)

Dear Sir or Madame:

        Enclosed are the errata sheets and the signature page for the transcript of the deposition of Christopher Chaney, which was taken on August 30, 2007, in Washington, D.C., and reported by Ms. Bonnie L. Russo, Job No. 182850..

        If you have any questions or need any additional information, please let me know.  Thank you for your assistance and cooperation in this matter.

                    Very truly yours,

                    *Reginald T. Blades, Jr.*

                    Reginald T. Blades, Jr.
                    Senior Trial Counsel
                    Commercial Litigation Branch

Enclosures

cc:    Philip Baker-Shenk, Esquire (with enclosures)
       John Jasper, Esquire (with enclosures)

Christopher Chaney

Page 122

1          ACKNOWLEDGMENT OF DEPONENT

2     I, CHRISTOPHER CHANEY, do hereby acknowledge I

3     have read and examined the foregoing pages of

4     testimony, and the same is a true, correct and

5     complete transcription of the testimony given

6     by me, and any changes or corrections, if any,

7     appear in the attached errata sheet signed by

8     me.

9     10-11-07

10    Date              CHRISTOPHER CHANEY

11

12

13

14

15

16

17

18

19

20

21

22

Christopher Chaney

~~Page 125~~ *PAGE ONE OF TWO*

1       DEPOSITION ERRATA SHEET-
CASE CAPTION:  Red Lake Band vs. U.S.
2   DEPONENT:  Christopher Chaney
DEPOSITION DATE:  August 30, 2007
3       I have read the entire transcript of my
Deposition taken in the captioned matter or the
4   same has been read to me.  I request that the
changes noted on the following errata sheet be
5   entered upon the record for the reasons
indicated.  I have signed my name to the Errata
6   Sheet and the appropriate Certificate and
authorize you to attach both to the original
7   transcript.

PAGE/LINE       CHANGE              REASON
8   7 / 5    add "on" between "down" & "detail" - correction
9 / 10   change "correction" to "corrections" - correction
9   10 / 7   add comma after "enforcement" - clarification
31 / 15  add "been" between "all" & "done" - correction
10  33 / 9   change "planned" to "plan" - correction
35 / 11  change "DIOOLES" to "DOI OLES" - correction
11  36 / 1   change "DIOOLES" to "DOI OLES" - correction
38 / 18  add comma after "638" - clarification
12  43 / 8   change "BIALES" to "BIA LES" ~~& Correction~~ correction
45 / 4   change "--" to "tribe" - correction
13  46 / 11  change "marshall" to "Marshal's" - correction
46 / 14  change "technically" to "typically" - correction
14  48 / 14  delete "88" - correction
49 / 13  change "safeing" to "Safe Indian" - correction
15  51 / 12  change "families" to "facilities" - correction
51 / 18  change "not" to "no" - correction
16  51 / 20  delete "Art" - correction
51 / 22  change "OFC" to "OFMC" - correction
17  52 / 12  add "and" between "facilities" and "Construction" - correction
52 / 15  change "an" to "and" - correction
18  52 / 17  add "a" between "be" and "hazard" - correction
SIGNATURE _____ DATE 10-11-07
19           CHRISTOPHER CHANEY
20
21
22

Christopher Chaney

Page 125

1                    DEPOSITION ERRATA SHEET ─PAGE TWO OF TWO
   CASE CAPTION:  Red Lake Band vs. U.S.
2   DEPONENT:  Christopher Chaney
   DEPOSITION DATE:  August 30, 2007
3                    I have read the entire transcript of my
   Deposition taken in the captioned matter or the
4   same has been read to me.  I request that the
   changes noted on the following errata sheet be
5   entered upon the record for the reasons
   indicated.  I have signed my name to the Errata
6   Sheet and the appropriate Certificate and
   authorize you to attach both to the original
7   transcript.
   PAGE/LINE          CHANGE                REASON
8   53 / 2 - add "and" between "facilities" and "construction" - correction
   53 / 6 - change "look" to "lock" - correction
9   54 / 9 - change "their" to "other" - correction
   59 / 8 - add "and" between "hearing" and "where" - correction
10  63 / 9 - change "Gill" to "Gil" - correction
   63 / 11 - change "Gill" to "Gil" - correction
11  82 / 14 - change "Foredance" to "Fourdance" - correction
   88 / 5 - change "Gill" to "Gil" - correction
12  93 / 1 - change "addicted" to "addictive" - correction
   93 / 1 - delete "if" - correction
13  95 / 16 - change "Seeky" to "Sekei" - correction
   100 / 13 - change "making" to "make" - correction
14  112 / 22 - change "Foredance" to "Fourdance" - correction
   116 / 2 - change "Robert" to "Roberts"
15  _____
16  _____
17  _____
18  _____
   SIGNATURE_____  DATE 10-11-07
19              CHRISTOPHER CHANEY
20
21
22

# EXHIBIT F



# United States Department of the Interior

## BUREAU OF INDIAN AFFAIRS
Facilities Management & Construction Center
Albuquerque Plaza Office Tower
201 Third Street, NW
P.O. Box 1248
Albuquerque, New Mexico 87103

IN REPLY REFER TO:

105-40

NOV  9 1999

Memorandum

To:         Theodore R. Quasula, Director
            Office of Law Enforcement Services

From:       Director, Office of Facilities Management and Construction

Subject:    Red Lake Criminal Justice Complex - Pre-Architectural Programming Document

The Office of Facilities Management and Construction recently received the above subject document dated November 10, 1998. The executive summary identifies five components to the proposed criminal justice complex. They are the following: (1) Adult Detention component, (2) Juvenile Detention component, (3) Law Enforcement component, (4) Tribal Courts component, and (5) Juvenile Work Camp component. Attached is the referenced Pre-Architectural Program for your review and comment. Our summary analysis based on FY 2001 funding needs is also attached.

We understand the tribe has received a $574,870 grant from the Department of Justice and the tribe's project manager has indicated the funds will be used for the planning and design of the facility. These DOJ funds will supplement the design funds the OFMC has already provided to the tribe. If the BIA is involved in providing future construction funds for this project, funding will be limited to the adult detention center only since this is the only facility the BIA presently owns at this location. The new criminal justice complex will replace the existing BIA owned adult detention center.

Should you have any questions regarding this document, you may contact Mr. Norman Suazo or Mr. Robert Montoya of this office at 346-6508 or 6518.

L. W. Collins

Attachments (2)

cc:    Bob Kaefring, Midwest Region (w/sum analysis)

Prepared 10/28/99 by OFMC

## CRIMINAL JUSTICE COMPLEX - SUMMARY ANALYSIS
## BASED ON NOVEMBER 10, 1998 FINAL DOCUMENT

Red Lake Band of Chippewa Indians
Site size for criminal Justice Complex = 26.7 AC   Work Camp Site is 26.5 AC
Pre-Architectural Programing document prepared by EKM, Inc., Lafayette, CO

| (A) Component | (B) # of Beds | (C) Gross SF | (D) Estimated Total Cost in 2001-$$ | (E) Estimated Staff | (F) Total Operating Cost/yr 0.$$ | (G) Construction Estimate | (H) /SF | (I) Remarks |
|---|---|---|---|---|---|---|---|---|
| 1. Adult Detention | 42 | 25,534 | $5,849,000 | 32.7 | $1,248,000 | $139,262 | 229.07 | 28 Males  - 14 Females |
| 2. Juvenile Detention | 26 | 13,894 | $3,233,000 | 27.5 | $1,103,000 | $124,346 | 232.69 | 12 Males; 10 Females 4 Flex Housing |
| 3. Juvenile Work Camp | 24 | 12,611 | $1,858,000 | 29.3 | $1,185,000 | $49,375 | 147.33 | 24 Male Residents only to be housed in 4 buildings |
| 4. Law Enforcement | N/A | 8,862 | $1,485,000 | Not Indicated in Study | Not indicated in Study | N/A | 167.57 | Space for Administration & Patrol Services, Investigations, Communications Facility and Staff Support. |
| 5. Tribal Court | N/A | 8,088 | $1,359,000 | Not Indicated in Study | Not indicated in Study | N/A | 168.03 | Space for Judicial, Court Clerks, Prosecution, Public Defender and Probation. |
| 6. TOTALS | | | | | | | | |

C:\norm_a\QP\WP\FILES\Redlake.wk3

# EXHIBIT G

U.S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS

**Corrections Program Office**

**Grant**

PAGE 1 OF 2

| | |
|---|---|
| 1. RECIPIENT NAME AND ADDRESS (Including Zip Code)<br>Red Lake Band of Chippewa Indians<br>P.O. Box 550<br>Red Lake, MN 56671 | 4. AWARD NUMBER: 1999-IP-VX-0005 |
| | 5. PROJECT PERIOD: FROM  09/30/1999  TO  09/29/2003<br>  BUDGET PERIOD: FROM  09/30/1999  TO  09/29/2003 |
| | 6. AWARD DATE   09/30/2000       7. ACTION |
| 1A. GRANTEE IRS/VENDOR NO.<br>   410692383 | 8. SUPPLEMENT NUMBER        Supplemental<br>   03 |
| | 9. PREVIOUS AWARD AMOUNT            $ 574,870 |
| 3. PROJECT TITLE<br>   Correctional Facilities on Tribal Lands FY 2000 Discretionary Grants | 10. AMOUNT OF THIS AWARD          $ 8,841,213 |
| | 11. TOTAL AWARD                    $ 9,416,083 |

12. SPECIAL CONDITIONS

THE ABOVE GRANT PROJECT IS APPROVED SUBJECT TO SUCH CONDITIONS OR LIMITATIONS AS ARE SET FORTH
ON THE ATTACHED 2 PAGES.

13. STATUTORY AUTHORITY FOR GRANT

This project is supported under Violent Crime Control and Law Enforcement Act of 1994, as amended, Pub. L. 103-322

15. METHOD OF PAYMENT

PAPRS

| AGENCY APPROVAL | GRANTEE ACCEPTANCE |
|---|---|
| 16. TYPED NAME AND TITLE OF APPROVING OJP OFFICIAL<br><br>Mary Lou Leary<br>Acting Assistant Attorney General | 18. TYPED NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL<br><br>Bobby Whitefeather<br>Tribal Chairman |
| 17. SIGNATURE OF APPROVING OJP OFFICIAL | 19. SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL   19A. DATE<br><br>OCT 2 5 2000 |

| AGENCY USE ONLY | |
|---|---|
| 20. ACCOUNTING CLASSIFICATION CODES | 21. S40B000103 |

| FISCAL<br>YEAR | FUND<br>CODE | BUD.<br>ACT. | DFC. | DIV.<br>REG. | SUB. | POMS | AMOUNT |
|---|---|---|---|---|---|---|---|
| X | B | 54 | 27 | 00 | 00 | 00 | 8841213 |

OJP FORM 4000/2 (REV. 5-87) PREVIOUS EDITIONS ARE OBSOLETE.

OJP FORM 4000/2 (REV. 4-88)



|  |  |  |  |
|---|---|---|---|
| U.S. DEPARTMENT OF JUSTICE<br>OFFICE OF JUSTICE PROGRAMS<br><br>**Corrections Program Office** | **AWARD CONTINUATION SHEET**<br><br>**Grant** | PAGE 2 OF 2 |

| PROJECT NUMBER    1999-IP-VX-0005 | AWARD DATE    09/30/2000 |
|---|---|

### SPECIAL CONDITIONS

1. The recipient agrees to comply with the financial and administrative requirements set forth in the current edition of the Office of Justice Programs (OJP) Financial Guide.

2. The recipient acknowledges that failure to submit an acceptable Equal Employment Opportunity Plan (if recipient is required to submit one pursuant to 28 C.F.R. Section 42.302), that is approved by the Office for Civil Rights, is a violation of its Certified Assurances and may result in suspension or termination of funding, until such time as the recipient is in compliance.

3. The recipient agrees to comply with the organizational audit requirements of OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations, as further described in the current edition of the OJP Financial Guide, Chapter 19.

4. The indirect cost rate has been approved for budget purposes only, and drawdowns are limited to that rate until such time that the recipient submits a current Federally approved indirect cost rate negotiated agreement, approved by the cognizant Federal agency, and a Grant Adjustment Notice has been submitted removing this special condition.

5. All contracts under this award should be competitively awarded unless circumstances preclude competition. When a contract amount exceeds $100,000 and there has been no competition for the award, the recipient must comply with rules governing sole source procurement found in the current edition of the OJP Financial Guide.

6. Funds for renovation, expansion or construction awarded to the recipient or to subrecipients which require the letting of a contract amounting to $100,000 or more to a commercial organization or an individual shall require:
   (1) A bid guarantee equivalent to 5 percent of the bid price. The bid guarantee must consist of a firm commitment such as bid bond, certified check, or negotiable instrument accompanying a bid as assurance that the bidder will, upon acceptance of his bid, execute such contractual documents as may be required within the time specified after the forms presented to him/her.
   (2) A performance bond on the part of the contractor for 100 percent of the contract price. "Performance bond" means a bond executed in connection with a contract to secure fulfillment of all the contractor's obligations under such contract.
   (3) A payment bond on the part of the contractor for 100 percent of the contract price. A payment bond is one executed in connection with a contract to ensure payment as required by law of all persons supplying labor and material in the execution of the work provided for in the contract.

7. The recipient of these grant funds agrees to provide the Bureau of Indian Affairs (BIA) Facilities Management and Construction Center with the architecture and engineering documents at the twenty percent, forty percent, and sixty percent stages of development if the recipient intends to request future operational funding from the Bureau of Indian Affairs for the facility being developed. The Bureau of Indian Affairs will respond with any comments on the documents within 30 days to ensure that the future staffing and the building health and safety codes are in compliance with the BIA standards.

8. The recipient understands that OJP's award of all CPO tribal grant funds is contingent upon compliance with the National Environmental Policy Act and other related federal environmental laws, as implemented by OJP through regulation, 28 CFR part 91 subpart D, Environmental Impact Review Procedures for the VOI/TIS Grant Program, Interim Final Rule. The recipient understands that by accepting this grant it agrees to assist OJP in implementing the procedures of this regulation. The recipient also understands and agrees that as a result of implementing this regulation, the use of these grant funds for a particular project may be conditioned by OJP to modify the proposed project, to include selection of an alternative project site, in order to avoid or reduce identified potential adverse environmental impacts.

OJP FORM 4000/2 (REV. 4-88)



U.S. DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS

**Corrections Program Office**

| | |
|---|---|
| **GRANT MANAGER'S MEMORANDUM, PT. I: PROJECT SUMMARY** | |
| **Grant** | |

| PROJECT NUMBER | |
|---|---|
| 1999-IP-VX-0005 | PAGE 1 OF 1 |

This project is supported under Violent Crime Control and Law Enforcement Act of 1994, as amended, Pub. L. 103-322

| 1. STAFF CONTACT (Name, address & telephone number) | 2. PROJECT DIRECTOR (Name, address & telephone number) |
|---|---|
| Michael Dever<br>202-616-9188 | Linda Bedeau<br>P.O. Box 550<br>Red Lake, MN 56671<br>2186793361 |

| 3a. TITLE OF THE PROGRAM | 3b. POMS CODE (SEE INSTRUCTIONS ON REVERSE) |
|---|---|
| Correctional Facilities on Tribal Lands FY 2000 Discretionary Grants | 00 |

**4. TITLE OF PROJECT**

| 5. NAME & ADDRESS OF GRANTEE | 6. NAME & ADRESS OF SUBGRANTEE |
|---|---|
| Red Lake Band of Chippewa Indians<br>P.O. Box 550<br>Red Lake, MN 56671 | |

| 7. PROGRAM PERIOD | 8. BUDGET PERIOD |
|---|---|
| FROM:   09/30/1999   TO:   09/29/2003 | FROM:   09/30/1999   TO:   09/29/2003 |

| 9. AMOUNT OF AWARD | 10. DATE OF AWARD |
|---|---|
| $ 8,841,213 | 09/30/2000 |

| 11. SECOND YEAR'S BUDGET | 12. SECOND YEAR'S BUDGET AMOUNT |
|---|---|
| | |

| 13. THIRD YEAR'S BUDGET PERIOD | 14. THIRD YEAR'S BUDGET AMOUNT |
|---|---|
| | |

**15. SUMMARY DESCRIPTION OF PROJECT (See instruction on reverse)**

The Red Lake Band of Chippewa will use $8,841,213 to supplement the previous award amount of $574,870 to complete the design and construction of the adult and juvenile components of the regional criminal justice complex to be located on the Red Lake Band of Chippewa Reservation for the incarceration of offenders subject to tribal jurisdiction. The adult component of the facility will include 20 medium secure beds and 22 dormitory-style minimum secure beds. The juvenile component of the facility will include both medium secure and dormitory-style minimum secure beds with a capacity for 26 juveniles.

To assist in the implementation of the project, the Corrections Program Office will provide at no cost, technical assistance to address the Tribe's short term, interim, and long term needs to complete the planning, design and construction of the facility. The culmination of these efforts, Tribal and Federal, will result in a facility and program plan that meets all the requirements in the special conditions.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice

Office of Justice Programs

*Corrections Program Office*

Washington, D.C. 20531

**INTERNAL AWARD MEMORANDUM**                              Page    1  of   2

| | |
|---|---|
| Awarding Agency: Corrections Program Office | Award Number: 1999-IP-VX-0005 |

| |
|---|
| Name & Address of Recipient |
| Red Lake Band of Chippewa Indians <br> P.O. Box 550 <br> Red Lake, MN 56671 |

| | |
|---|---|
| Type:  Grant | Supplement: Yes |

| |
|---|
| Earmark: |

| | |
|---|---|
| Type of Organization: <br> Indian Tribe | Special Initiatives: <br> N/A |

| |
|---|
| Statutory Authority for Program  Violent Crime Control and Law Enforcement Act of 1994, as amended, Pub. L. 103-322 |

| | |
|---|---|
| CFDA Number: 16.596 | Vendor # |

| |
|---|
| Title of Program: Correctional Facilities on Tribal Lands FY 2000 Discretionary Grants |

| |
|---|
| Title of Project:  Correctional Facilities on Tribal Lands FY 2000 Discretionary Grants |

| | |
|---|---|
| Program Period: <br> From: 09/30/2000         To: 09/29/2003 | Budget Period: <br> From: 09/30/2000          To: 09/29/2003 |

| | |
|---|---|
| Amount of Award: $8,841,513 | Date of Award: |

| | |
|---|---|
| Project Director/Contact: <br> Linda Bedeau <br><br> P.O. Box 550 <br><br> Red Lake 56671 | Staff Contact: <br> Michael Dever <br><br> Corrections Program Office |

Project Description:

The Red Lake Band of Chippewa will use $8,841,213 to supplement the previous award amount of $574,870 to complete the design and construction of the adult and juvenile components of the regional criminal justice complex to be located on the Red Lake Band of Chippewa Reservation for the incarceration of offenders subject to tribal jurisdiction. The adult component of the facility will include 20 medium secure beds and 22 dormitory-style minimum secure beds. The juvenile component of the facility will include both medium secure and dormitory-style minimum secure beds with a capacity for 26 juveniles.

To assist in the implementation of the project, the Corrections Program Office will provide at no cost, technical assistance to address the Tribe's short term, interim, and long term needs to complete the planning, design and construction of the facility. The culmination of these efforts, Tribal and Federal, will result in a facility and program plan that meets all the requirements in the special conditions.

FOR INTERNAL USE ONLY - NOT FOR DISSEMINATION



**U.S. Department of Justice**

Office of Justice Programs

*Corrections Program Office*

Washington, D.C. 20531

**INTERNAL AWARD MEMORANDUM**                                     Page    2  of    2

| |
|---|
| Impact/Focus:  Indian |
| Evaluation:     National/Program Level |
| Evaluation funds have not yet been provided to the National Institute of Justice to conduct an evaluation of the Construction of Correctional Facilities on Tribal Lands Discretionary Grant Program. |
| Coordination: |
| OJP/CPO administers the Construction of Correctional Facilities in American Indian and Alaska Native Communities Discretionary Grant Program in coordination with other representative members of the Indian Country Law Enforcement Initiative (Initiative).  The goal of the Initiative is to improve how the federal government works with American Indian tribes.<br><br>The President directed the Secretary of the Interior and the Attorney General to work together on the four-year Initiative to significantly improve public safety in Indian Country.  A critical part of this Initiative is increased coordination among the Department components and other federal agencies that provide funding for law enforcement in Indian Country.<br><br>The Construction of Correctional Facilities on Tribal Lands review process was comprised of the following steps: establishment of review criteria based on the application kit;  appointment of panel members who were experts in their respective fields and collectively were able to address all variables related to the design and construction of correctional facilities for adult and juvenile populations as well as appropriate programming;  independent rating of each application by panel members;  and convening of panel members in Washington, D.C. to discuss their ratings and share their expertise to better inform the evaluation process.<br><br>Proposals were selected based on the review and assessments of the panel consisting of a representative from each of the following agencies: the Office of Tribal Justice, the Bureau of Prisons, the American Indian/Alaska Native Affairs Desk; the Bureau of Indian Affairs; an architectural consultant experienced in design and construction of correctional facilities;  a corrections consultant;  and a juvenile detention consultant. |
| Deliverables: |
| N/A |
| Special Issues |
| This section is optional - if there are no issues which need to be highlighted or raised, then it is not needed. If there are issues raised, please keep comments brief or in bullet format. |
| Program Section: |
| N/A |
| Budget/Financial Section: |
| N/A |

FOR INTERNAL USE ONLY - NOT FOR DISSEMINATION



**U.S. Department of Justice**

Office of Justice Programs

*Corrections Program Office*

*Washington, D.C. 20531*

| AWARD NOTIFICATION | Award Number: 1999-IP-VX-0005 | Page  1 of  1 |
|---|---|---|

| | |
|---|---|
| Name & Address of Recipient: Red Lake Band of Chippewa Indians<br>City & State:                    P.O. Box 550<br><br>                    Red Lake, MN 56671 | |
| Recipient Project Director/Contact:<br><br>Linda Bedeau | |
| Title of Program:  Correctional Facilities on Tribal Lands FY 2000 Discretionary Grants | |
| Title of Project    Correctional Facilities on Tribal Lands FY 2000 Discretionary Grants | |
| Amount of Award: $8,841,513 | Date of Award: |
| Awarding Agency  Corrections Program Office | Supplement: Yes |
| Statutory Authority for Program: Violent Crime Control and Law Enforcement Act of 1994, as amended, Pub. L. 103-322 | |
| Impact/Focus: Indian | CFDA Number: 16.596 |

Project Description:

The Red Lake Band of Chippewa will use $8,841,213 to supplement the previous award amount of $574,870 to complete the design and construction of the adult and juvenile components of the regional criminal justice complex to be located on the Red Lake Band of Chippewa Reservation for the incarceration of offenders subject to tribal jurisdiction.  The adult component of the facility will include 20 medium secure beds and 22 dormitory-style minimum secure beds.  The juvenile component of the facility will include both medium secure and dormitory-style minimum secure beds with a capacity for 26 juveniles.

To assist in the implementation of the project, the Corrections Program Office will provide at no cost, technical assistance to address the Tribe's short term, interim, and long term needs to complete the planning, design and construction of the facility.  The culmination of these efforts, Tribal and Federal, will result in a facility and program plan that meets all the requirements in the special conditions.

DOJ Contact:

**FOR INTERNAL USE ONLY - NOT FOR DISSEMINATION**



**U.S. Department of Justice**

Office of Justice Programs

Office of the Assistant Attorney General            *Washington, D.C. 20531*

Hon. Bobby Whitefeather
Red Lake Band of Chippewa Indians
P.O. Box 550
Red Lake, MN 56671

Dear Hon. Whitefeather:

I am pleased to inform you that the Office of Justice Programs has approved the application for funding under the Correctional
Facilities on Tribal Lands FY 2000 Discretionary Grants in the amount of $8,841,513 for Red Lake Band of Chippewa
Indians.

Enclosed you will find the Grant Award and Special Conditions documents.  This award is subject to all
administrative and financial requirements, including the timely submission of all financial and progammatic
reports, resolution of all interim audit findings, and the maintenance of a minimum level of cash-on-hand.
Should you not adhere to these requirements, you will be in violation of the terms of this agreement and
the award will be subject to termination for cause or other administrative action as appropriate.

If you have questions regarding this award, please contact:

- Program Questions, Michael Dever, Program Manager at 202-616-9188; and

- Financial Questions, the Office of the Comptroller, Customer Service Center (CSC) at
  (800) 458-0786, or you may contact the CSC at *askoc@ojp.usdoj.gov.*

Congratulations, and we look forward to working with you.

Sincerely,

Mary Lou Leary
Acting Assistant Attorney General

Enclosures

**U.S. Department of Justice**

Office of Justice Programs

Office for Civil Rights

*Washington, D.C. 20531*

Hon. Bobby Whitefeather
Red Lake Band of Chippewa Indians
P.O. Box 550
Red Lake, MN 56671

Dear Hon. Whitefeather:

Congratulations on your recent award. Because you have submitted Certified Assurances that your agency is in compliance with applicable civil rights laws, this office has determined that you have met this requirement in the Department of Justice regulations governing recipients of Federal financial assistance (see 28 C.F.R. section 42.204, Applicants' Obligations). As Director of the Office for Civil Rights (OCR), Office of Justice Programs, I would like to offer you my assistance in completing the conditions of these Assurances, specifically Nos. 13, 14, and 15, as the grant goes forward.

As you know, equal opportunity for the participation of women and minority individuals in employment and services provided under programs and activities receiving Federal financial assistance is required by law. Therefore, if there has been a federal or state court or administrative agency finding of discrimination against your agency, please forward a copy of such order or consent decree, as required by Assurance No. 14, to OCR at the U.S. Department of Justice, Office of Justice Programs, Office for Civil Rights, 810 Seventh Street, N.W., Room 8136, Washington, D.C. 20531.

*Additional Instructions For Grantees Receiving $500,000 Or More:*

1.  In accordance with Assurance No. 15, each grantee that receives $500,000 or more (or $1,000,000 in an 18- month period), and has 50 or more employees, must submit an Equal Employment Opportunity Plan (EEOP) within 60 days from the date of this letter to OCR at the above address.

2.  Alternatively, the grantee may choose to complete an EEOP Short Form, in lieu of sending its own comprehensive EEOP, and return it to OCR within 60 days of the date of this letter. This easy-to-follow EEOP Short Form reduces paperwork and preparation time considerably and will ensure a quicker OCR review and approval. The Seven-Step Guide to the Design and Development of an EEOP will assist you in completing this requirement. The Seven-Step Guide and EEOP Short Form may be downloaded from OCR's home page on the Internet (http://www.ojp.usdoj.gov/ocr/).

3.  Please be reminded that the above requirements apply to primary grantees and to each of their subgrantees or contractors that meet the criteria outlined in this letter. Therefore, all primary grantees should apprise subgrantees of these responsibilities and those meeting the criteria should send their EEOPs or EEOP Short Forms directly to the Office for Civil Rights within 60 days of the date of their award.

---

[1] If you have already submitted an EEOP as part of another award from the Office of Justice Programs (OJP) or the Office of Community Oriented Policing Services (COPS) within the past two years, or if you have certified that no EEOP is required, it is not necessary for you to submit another at this time. Simply send a copy of the letter you received from OCR showing that your EEOP or certification is acceptable along with a cover letter that references the new grant award.

NOTE: If agency has under 50 employees, regardless of amount of award, no EEOP is required; however, grantee must return applicable portion of Certification Form to OCR within 60 days. This Certification Form may also be downloaded from OCR's home page on the Internet.

PURSUANT TO THE SPECIAL CONDITION REGARDING EEOPs GOVERNING THIS AWARD, RECIPIENT ACKNOWLEDGES THAT FAILURE TO SUBMIT AN ACCEPTABLE EEOP IS A VIOLATION OF ITS CERTIFIED ASSURANCES AND MAY RESULT IN SUSPENSION OF DRAWDOWN OF FUNDS UNTIL EEOP HAS BEEN APPROVED BY THE OFFICE FOR CIVIL RIGHTS.

*Additional Instructions For Grantees Receiving $25,000 Or More, But Under $500,000:*

4.   Pursuant to Department of Justice regulations, each grantee that receives $25,000 or more and has 50 or more employees is required to maintain an Equal Employment Opportunity Plan (EEOP) on file for review by OCR upon request. (However, if the grantee is awarded $1,000,000 in an eighteen (18) month period, it must submit an acceptable EEOP to OCR.) Please complete the applicable section of the Certification Form and return it to OCR within 60 days of the date of this letter.

NOTE: If agency has under 50 employees, regardless of amount of award, no EEOP is required; however, grantee must return applicable portion of Certification Form to OCR within 60 days.

*Additional Instructions For Grantees Receiving Under $25,000:*

5.   A recipient of under $25,000 is not required to maintain or submit an Equal Employment Opportunity Plan (EEOP) in accordance with Assurance No. 15. No Certification is required.

*Instructions for All Grantees:*

6.   In addition, all recipients, regardless of their type, the monetary amount awarded, or the number of employees in their workforce, are subject to the prohibitions against discrimination in any funded program or activity. Therefore, OCR investigates complaints by individuals or groups alleging discrimination by a recipient of OJP funding; and may require all recipients, through selected compliance reviews, to submit data to ensure their services are delivered in an equitable manner to all segments of the service population and their employment practices[2] are in compliance with equal employment opportunity requirements.

If you have any questions, please call OCR at (202) 307-0690. Additional information and technical assistance on the civil rights obligations of grantees can be found at: http://www.ojp.usdoj.gov/ocr/.

Sincerely,

Inez Alfonzo Haller
Director, Office for Civil Rights

cc:    Grant Manager
       Financial Analyst

---

[2] The employment practices of certain Indian tribes are not covered by Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e



U.S. Department of Justice

Office of Justice Programs

*Corrections Program Office*

<hr/>

*Washington, D.C. 20531*

**Memorandum To:** Official Grant File

**From:**              Patricia Malak, OJP/CPO

**Subject:**          Categorical Exclusion for Red Lake Band of Chippewa Indians


The Construction of Correctional Facilities on Tribal Lands Discretionary Grant Program administered through the Corrections Program Office provides funds to build or expand prison capacity for the incarceration of offenders subject to tribal jurisdiction.  As you have been informed previously, all grant-funded projects involving construction, expansion, renovation, or other activities are subject to the National Environmental Policy Act and related federal environmental impact review requirements, hereafter referred to as NEPA.

The Corrections Program Office issued on March 1, 2000, "Program Guidance on Environmental Protection Requirements" to assist the tribes, states, territories, and the District of Columbia in complying with NEPA requirements.

# EXHIBIT H



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Office of Law Enforcement Services
P.O. Box 66
Albuquerque, New Mexico 87103



IN REPLY REFER TO:
*Division of Corrections*

December 14, 2005

MEMORANDUM

To:        Chris Chaney, Deputy Bureau Director
           Office of Law Enforcement Services

From:      Guillermo Rivera, Associate Director - Detention

Subject:   Red Lake Juvenile Detention Center
           Red Lake, Minnesota


This is to address the proposed Red Lake Juvenile facility currently in question as it pertains to funding by the Bureau of Indian Affairs. The following issues were considered in my recommendation:

- Red Lake has not been identified as a high crime area.
- In addition to the March 21, 2005 shooting at the high school other crime data submitted by the Red Lake Tribe reveals an increase in juvenile arrests by over 49%, truancy rates at 50%, and approximately 50% of charges are substance abuse related.
- Tribal documentation supports the building of a correctional complex that included a Juvenile Detention facility <u>and</u> a Juvenile Minimum security facility. The proposed Red Lake Juvenile facility was identified as Phase 3 of this project/complex in the Tribes documentation.
- The District I Supervisor verified that a funding request was in place, however language in various tribal correspondence documents reflected the facility as a "work camp" which confused the issue regarding the mission of the facility.
- Another factor that the tribe has not considered or addressed in any format is the issue of staffing. Recruitment and retention of staff throughout Indian Country is difficult and problematic. On December 15, 2005, Red Lake staff verified continuing issues with recruitment and retention of correctional officer and cook positions.
- The District I Supervisor states the Tribe has not fully utilized all current available (18) juvenile beds and questions the feasibility of opening another juvenile facility when the current beds are not fully utilized. The 2003 jail statistics as reported by the Bureau of Justice Statistics reflects the number of Red Lake juveniles held in custody as of June 30, 2003, was 14, in an 18-bed facility.
- On December 15, 2005, Red Lake staff verified juvenile overpopulation primarily on the weekends, ranging from 6-10 juveniles.

Federal Indian Policy places both a legal and moral duty on the Bureau of Indian Affairs to fulfill the Federal Trust Responsibility. This is supported in a letter from Kevin Grover dated April 22, 1998, to Tribal Leaders where Mr. Grover states, "The BIA will continue to be responsible for requesting funds for staffing and physical facility operations and maintenance requirements for new facilities, including those facilities constructed through DOJ grant funds, as well as existing BIA-owned detention facilities within our budgeted requests", however, based on the factors stated above and the unavailability of funding for fiscal years 2006 and 2007, funding of this facility is not supported.

# EXHIBIT I

Kenneth D. Reinfeld, Ph.D.

Page 1

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3

4    RED LAKE BAND OF CHIPPEWA )

5    INDIANS,                  )

6           Plaintiff,         )

7              v.              ) Case No.

8    UNITED STATES OF AMERICA, )  CA 06cv1826

9    et al.,                   )

10          Defendants.        )

11              - - - - - - -

12

13      DEPOSITION OF KENNETH D. REINFELD, Ph.D.

14

15           Tuesday, August 21, 2007

16

17

18

19

20

21   Reported by:  Lori G. Mackenzie, RPR

22   Job No:  182089

Kenneth D. Reinfeld, Ph.D.

Page 17

```
 1                  Do you know if Red Lake Detention

 2    Facility Phase III was one of the additional 17

 3    that were to be completed in 2005 that Secretary

 4    Anderson references here?

 5            A.    I do not know if -- no.

 6            Q.    But, you do know that it was built

 7    by, like these others, by grant from the

 8    Department of Justice, correct?

 9            A.    Yes.

10            Q.    And when your assistant secretary,

11    to whom you report, take direction from, tells

12    the Congress on September of 2004 "funding for

13    staffing operating and maintaining these

14    facilities is provided by the BIA," as the

15    negotiator for the department at a funding

16    agreement, you take this as department policy,

17    don't you?

18            A.    I'm not clear what you mean by this.

19            Q.    Okay.  What I meant by this was that

20    underlined bolded sentence, "funding for staffing

21    operating and maintaining these facilities is

22    provided by the BIA"?
```

**Kenneth D. Reinfeld, Ph.D.**

Page 19

```
 1          A.      I am.

 2          Q.      Dr. Reinfeld, what has been marked

 3   as Plaintiff's Exhibit C would you confirm that

 4   this is an April 7, 2000 letter from the Deputy

 5   Director of the Office of Justice, Program

 6   Corrections Program Office of the U.S. Department

 7   of Justice to Norman Suazo (ph), Director of the

 8   BIA Office Facilities Management and

 9   Construction?

10          A.      Yes.

11          Q.      And in the first sentence of that

12   letter from Justice to Interior, what projects

13   does it reference as being funded by the

14   Department of Justice?

15          A.      Correctional facility construction

16   projects.

17          Q.      And are they referenced in this

18   letter as identified in an attachment?

19          A.      Yes.

20          Q.      And if you would turn to the second

21   page which is attached, do you find the Red Lake

22   Band of Chippewa Justice Complex listed among the
```

Kenneth D. Reinfeld, Ph.D.

Page 20

```
 1    others funded there?

 2         A.    Yes.

 3         Q.    Thank you.

 4                    (Plaintiff's Exhibit D

 5                    marked for identification.)

 6    BY MR. BAKER-SHENK:

 7         Q.    I want to ask you to look at what is

 8    being marked as Plaintiff's Exhibit Number D, and

 9    ask you to confirm that this is the testimony of

10    the Inspector General for the Department of the

11    Interior, Mr. Earl Devaney (ph) before the U.S.

12    Committee, U.S. Senate Committee on Finance on

13    September 21, 2004?

14         A.    Yes.

15         Q.    This would be the same hearing as

16    your assistant secretary testified at in

17    Plaintiff's Exhibit B?

18         A.    Yes.

19         Q.    And if you would turn to page, if

20    you would look at the top, it's a fax, 9 of 11.

21              If you would turn to Page 9 of 11 as

22    numbered by the fax print, would you look at the
```

**Kenneth D. Reinfeld, Ph.D.**

Page 36

1    judgment.  I don't have the knowledge.

2         Q.    All right.  Did you ever state to

3    the tribe or to tribal representatives that in

4    your view the building that is known as Phase III

5    of the facility certainly is a juvenile detention

6    facility and not a work camp?

7         A.    I'm not qualified to really voice

8    that opinion.

9         Q.    My question, though, Dr. Reinfeld is

10   did you ever so state to the tribal

11   representatives that in your view this is a

12   juvenile detention facility not a work camp?

13        A.    Yes.

14        Q.    Now, the footnote in question

15   appears as Footnote Number 25 in the calendar

16   year 2005 Reprogramming Request, which is being

17   marked as Plaintiff's Exhibit G.

18                        (Plaintiff's Exhibit G

19                         marked for identification.)

20   BY MR. BAKER-SHENK:

21        Q.    And I'm going to hand that to you

22   and counsel and ask you to familiarize yourself

Kenneth D. Reinfeld, Ph.D.

Page 38

1    of what appears to be funding numbers.

2                  And if you would look at 10 of 15,

3    who is the Office of Self-Governance signatory of

4    that -- is that authorized financial officer?

5                  Is that your signature?

6         A.    Yes.

7         Q.    And there's no date listed here, but

8    would this be simultaneously executed when the

9    director signs the preceding funding agreement?

10        A.    It would be prior to.

11        Q.    Prior to.  All right.  And what is

12   your authorized -- as an authorized financial

13   officer, what does your signature indicate?

14        A.    It indicates that the information on

15   this spreadsheet was negotiated.

16        Q.    And by you on behalf of the United

17   States?

18        A.    Yes.

19        Q.    And has your approval as presented?

20        A.    It just indicates that that's what

21   was negotiated.

22        Q.    Okay.  All right.  Likewise, if you

Kenneth D. Reinfeld, Ph.D.

Page 39

1    turn then to Page 14 of 15 on the flow-through

2    footnote that flows through from page 13,

3    numbered 25, but flows through onto Page 14, do

4    you see the sentence that, it's really the last

5    sentence, or the next to the last sentence of

6    that footnote that begins:  "The BIA agrees to

7    assist the tribe in obtaining 1.2 million," do

8    you see that sentence?

9         A.    Yes.

10        Q.    You negotiated all of these

11   footnotes including that sentence and everything

12   else in this set of agreements, correct?

13        A.    Yes.

14        Q.    All right.  And this was reviewed

15   then after you signed it as "this reflects

16   accurately what we've negotiated."

17             It's reviewed by your director of

18   the Office of Self-Governance --

19        A.    Yes.

20        Q.    -- and he executes.  Who else is

21   part of that review and approval process above

22   you, if I can say in the, is it a surname

Kenneth D. Reinfeld, Ph.D.

Page 41

1      Q.     All right.  Did the Band receive,

2   from the BIA, $1,218,482 for operations funding

3   for the tribe's juvenile correction facility in

4   CY 2005, as referenced in Footnote 25?

5      A.     No.

6      Q.     Did the BIA assist the tribe in

7   obtaining any funding for the operation of its

8   juvenile correction facility program in 2005?

9      A.     I do not know.

10     Q.     Did you make any efforts to assist

11  the tribe in obtaining funding?

12     A.     No.

13     Q.     And you know of no other efforts

14  that may or may not have been made; is that

15  right?

16     A.     That's correct.

17     Q.     All right.  Directing your attention

18  to that sentence in Footnote 25, do you

19  understand the phrase, and I quote:  "To request

20  this amount in the next president's budget"?

21     A.     Yes.

22     Q.     Okay.  And what do you understand

## Kenneth D. Reinfeld, Ph.D.

Page 42

1    that to mean, which president's budget?

2          A.     The next possible president's

3    budget.

4          Q.     Which --

5          A.     The next, you know, the next budget

6    formulation process.

7          Q.     And this was written in the fall of

8    2004, correct?

9          A.     It was signed November 15th, 2004.

10         Q.     Okay.  To cover the calendar year

11   2005 of operations?

12         A.     Yes.

13         Q.     And the reference was made to next

14   president's budget request would be when, which

15   one?

16         A.     It's too late for the 2006 budget

17   given the date.

18         Q.     How is that?

19         A.     The president's budget is still at

20   OMB and passbacks are given around Thanksgiving.

21               And this funding agreement was not

22   agreed to in enough time to make it into the 2006

**Kenneth D. Reinfeld, Ph.D.**

Page 43

1    budget formulation.

2          Q.    You're saying on November 15th, for

3    example, of 2004, it's just too late --

4          A.    Yes.

5          Q.    -- to get into the 2006, FY 2006

6    budget request, that's too late?

7          A.    Yes.

8          Q.    If you're negotiating in let's say

9    September, fall of 2004, is it too late to get in

10   September of 2004 to get into the next

11   president's budget request?

12         A.    No.

13         Q.    Do you know if the President's

14   Budget Request to Congress for Fiscal 2006, did

15   that contain a request for $1,218,482?

16         A.    I do not know.

17         Q.    But, you do know that they did not

18   get the money; is that right?

19         A.    Yes.

20         Q.    How do you know that?

21         A.    It was still an issue in the next

22   negotiation.

Kenneth D. Reinfeld, Ph.D.

Page 44

1          Q.    Okay.  Is there a BIA policy,

2    funding policy that you're aware of that would

3    not provide program funding for a juvenile work

4    camp program?

5          A.    No.  Let me say, I'm not aware that

6    there is.

7          Q.    Okay.

8                      (Plaintiff's Exhibit H

9                      marked for identification.)

10   BY MR. BAKER-SHENK:

11         Q.    I want to give you what has been

12   marked as Plaintiff's Exhibit H, and ask you to

13   identify that for the record, please.

14         A.    This is the Red Lake's 2006

15   Reprogramming Request.

16         Q.    Okay.  And here at the top

17   right-hand they're numbered Pages 6 through 6.

18                On Page 4 of 6 -- I'm sorry, let me

19   back myself up.

20                Page 2 of 6, who are the signatories

21   that are listed there as authorized financial

22   officers?

**Kenneth D. Reinfeld, Ph.D.**

Page 45

1          A.      Terry ~~Verdon~~ Virden (ph), Floyd Jordane

2    (ph), Ken Reinfeld.

3          Q.      And you are signing for the Office

4    of Self-Governance?

5          A.      Yes.

6          Q.      And here, as in the 2005, this

7    reflects items you negotiated?

8          A.      Yes.

9          Q.      Okay.  And listed below there are

10   Footnotes, if you go to Page 4 of 6 you find

11   Footnote 25 again.

12               Is the typed version identical in

13   substance to the 2005 footnote?

14         A.      Similar.

15         Q.      Similar.  And with respect to the

16   sentence that we covered earlier in 2005, does it

17   appear in typed form in the 2006?

18         A.      It was crossed out.

19         Q.      But, it's typed and then crossed

20   out, you anticipated my next question.

21               And who crossed that out?

22         A.      I did.

Kenneth D. Reinfeld, Ph.D.

Page 46

1    Q.    And there's a handwritten note in

the margin.    Could you read that?

2

3    A.    "These sentences are not agreed to

4    by the Secretary."

5    Q.    And the letters, the initials KR, is

6    that your initial -- is that your hand note?

7    A.    Yes.

8    Q.    And it's dated when?

9    A.    01/19/06.

10    Q.    All right.    Now, describe for me the

11    process in time these -- was this sentence that

12    is crossed out, actually there are two sentences

13    crossed out, one dealing with the same item we

14    raised in 2005, and the other one is a high

15    crimes-related.

16        Ignoring the other one on high

17    crimes and focusing only on the first lineout,

18    could you describe when that discussion and then

19    negotiation occurred on the 2006 -- let me

20    rephrase that.

21        When was the 2006 negotiation

22    commenced?

Kenneth D. Reinfeld, Ph.D.

Page 49

```
 1    time frame here whether your seeing it and lining

 2    it out was after funds were transferred under the

 3    agreement or before?

 4          A.    No.  Before it became effective.

 5          Q.    Okay.  When did you sign this on

 6    Page 2 of 6?

 7          A.    January 19th, 2006.

 8          Q.    So, on the same day that you signed

 9    the signature page on Page 2 you added the note

10    on Page 4?

11          A.    Yes.

12          Q.    On that date, okay.  And okay --

13    with your indulgence.

14                Let me ask, were you instructed,

15    Dr. Reinfeld, by some officer holding line

16    authority over your position to line that out, or

17    was there internal discussion prior to you lining

18    this out?

19                I need to hear you describe a little

20    bit more the context for this unusual lineout of

21    a footnote sentence.

22          A.    I knew there was not agreement on
```

## Kenneth D. Reinfeld, Ph.D.

Page 70

1          A.      Yes.

2          Q.      Referring back to what was marked as

3    Exhibit H, and on Exhibit H on Page 3 of 6,

4    Footnote Number 15, give you an opportunity to

5    peruse Footnote 15.

6                  And when you have done so, please

7    let me know.  I have a question for you.

8          A.      Okay.

9          Q.      All right.  Dr. Reinfeld, in

10   Footnote 15 on Page 3 of 6 of this Exhibit H,

11   which is the 2006 Funding Agreement, there is

12   referenced "a detailed pay cost analysis report

13   to be provided to the tribe by BIA and OSG by

14   April 1, 2006."

15                 Do you see that reference?

16         A.      Yes.

17         Q.      And there's a description of the

18   detail or analysis to be included in that report

19   that follows there in this footnote; is that

20   right?

21         A.      Yes.

22         Q.      Was that report, detailed pay cost

## Kenneth D. Reinfeld, Ph.D.

Page 71

1    analysis, provided to the tribe by OSG and BIA?

2         A.    OSG did not.   I don't know whether

3    it was provided.

4         Q.    Okay.  So, your statement is that

5    OSG did not provide that detailed pay cost

6    analysis by April 1.

7         A.    Yes.

8         Q.    Nor to this date it has not been

9    provided by OSG, correct?

10        A.    That's correct.

11        Q.    Your statement is you don't know if

12   BIA did?

13        A.    Correct.

14        Q.    All right.  In the last sentence of

15   Footnote 15, if I could direct your attention to

16   that, could you read that, please?

17        A.    "The BIA agrees to restore the full

18   amount due plus interest at the current prompt

19   pay rate" -- or is it the next one.

20        Q.    The --

21        A.    "The BIA further agrees these

22   amounts shall be base transferred" --



**U.S. Department of Justice**

Civil Division

RTBlades
145-7-1680

Telephone: (202) 616-8257
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

September 26, 2007

BY HAND

Esquire Deposition Services, LLC
1020 19th Street, NW
Suite 620
Washington, D.C.  20036
Telephone: (202) 429-0014

      Re:    Red Lake Band of Chippewa Indians v. United States,
           No. CA 06cv1826 (D.D.C.)

Dear Sir or Madame:

    Enclosed are the errata sheet and the signature page for the transcript of the deposition of Kenneth D. Reinfeld, Ph.D., which was taken on August 21, 2007, in Washington, D.C., and reported by Ms. Lori G. Mackenzie, RPR.

    If you have any questions or need any additional information, please let me know.  Thank you for your assistance and cooperation in this matter.

               Very truly yours,

               *Reginald T. Blades, Jr.*

               Reginald T. Blades, Jr.
               Senior Trial Counsel
            Commercial Litigation Branch

Enclosures

cc:    Philip Baker-Shenk, Esquire (with enclosures)
       John Jasper, Esquire (with enclosures)

Kenneth D. Reinfeld, Ph.D.

1    ACKNOWLEDGEMENT OF DEPONENT

2    I, KENNETH D. REINFELD, Ph.D., do hereby

3    acknowledge I have read and examined the

4    foregoing pages of testimony, and the same is a

5    true, correct and complete testimony given by me,

6    and any changes or corrections, if any, appear in

7    the attached errata sheet signed by me.

8

9    *Kenneth D. Reinfeld*                    09/12/07

10    Kenneth D. Reinfeld, Ph.D.              Date

11    Subscribed and sworn to before me, in my presence, this
       13th day of September, 2007, a Notary Public
12    in and for the DC/FEU of Washington, D.C.:

                *Alicia C Lee*
13    Notary Public
      My commission expires January 14, 2009

14

15

16

17

18

19

20

21

22

Kenneth D. Reinfeld, Ph.D.

Page 79

1    ESQUIRE DEPOSITION SERVICES

     1020 19TH STREET, N.W., SUITE 620

2    WASHINGTON, D.C.    20006

     (202) 429-0014

3

                    ERRATA SHEET

4

     Case:  RED LAKE BAND OF CHIPPEWA INDIANS V. USA

5    Witness:  KENNETH D. REINFELD, Ph.D.

     Date Taken:  August 21, 2007

6    Job No.:  182089

7    Page No.       Line No.       Change

                                   "masters" should read "masters"
8       9             9
                                   "philosophy" should read "doctor of philosophy degree"
9       9             11
                                   "Swazo" should read "Swazo"
10     19             7
                                   "EIG" should read "DIG"
11     21             13
                                   "Verdon" should read "Vinder"
12     45             1
                                   "mu" should read "my"
13     45             20
                                   "not" should be deleted
14     50             19
                                   "OG-S" should read "OTS"
15     56             12
                                   "Region's" should read "Regions"
16     59             13

17

18

19

20

21    *Kenneth D. Reinfeld*                    09/13/07
      Kenneth D. Reinfeld, Ph.D.              Date
                                   Subscribed and sworn to before me, in my presence, this
22                                 13th day of September, 2007, a Notary Public
                                   in and for the DOTTU of Washington DC.
                                                    *Alicia Cole*
                                                    Notary Public
                                                    My commission expires January 14, 2009

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA INDIANS,       )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )       Civil Action No.
                                         )       1:06CV01826 (CK-K)
UNITED STATES OF AMERICA, et al.,        )
                                         )
            Defendants.                  )

DEFENDANTS' RESPONSES TO
PLAINTIFF'S FIRST REQUESTS FOR ADMISSION

      Pursuant to Rule 36 of the Federal Rules of Civil Procedure,
defendants provide the following responses to plaintiff's first
requests for admission.

OBJECTION TO DEFINITIONS:

      We object to the definitions contained in plaintiff's first
requests for admission to the extent that they seek to impose
upon defendants any requirements beyond those established by the
Federal Rules of Civil Procedure or the local Rules of this
Court.  Further, we specifically object to, and do not accept,
the definition of "Facility" as "the Tribe's new juvenile
detention facility", definition D, because what constitutes the
Tribe's juvenile detention facility and whether a particular
building qualifies as a detention facility are underlying issues
in this matter that cannot be resolved by plaintiff's unilateral
imposition of a definition.

23. Admit that the Contract Disputes Act, 41 U.S.C. § 601 et seq. and the implementing regulations thereto (collectively, the "CDA") are made applicable to the Agreement pursuant to 25 U.S.C. § 450m-1(d) and 458ff(c).

Response:

Defendants object to this request as improperly requesting a pure legal conclusion.

24. Admit that the document attached to the Complaint as Exhibit E and attached hereto is a true and accurate copy of a letter dated February 17, 2006, from Philip Baker-Shenk, Holland & Knight LLP, sent to and received by Ken Reinfeld, Acting Director, Office of Self-Governance and Self-Determination, U.S. Department of the Interior, tendering the Red Lake Band of Chippewa Indians' Contract Disputes Act Claim for Breach of the Multi-Year Funding Agreement.

Response:

Defendants object to this request to the extent that it improperly requests a pure legal conclusion based upon plaintiff's characterization of its counsel's letter; otherwise, and without waiving any objection, defendants admit that Exhibit E is a true and accurate copy of counsel's letter.

25. Admit that the Tribe's claim for breach of the Agreement has been duly submitted to the BIA in accordance with the CDA by means of the document attached to the Complaint as Exhibit E and attached hereto.

Response:

Defendants object to this request as improperly requesting a pure legal conclusion. To the extent that this request may be deemed a request for an application of law to fact, defendants admit that counsel's letter was submitted to the Department.

26. Admit that the document attached to the Complaint as Exhibit F and attached hereto is a true and accurate copy of a letter dated June 15, 2006, from Patrick Ragsdale, Director, Bureau of Indian Affairs, to the Honorable Floyd Jourdain, Jr., Chairman, Red Lake Band of Chippewa Indians.

Response:

Admit.

27. Admit that the document attached to the Complaint as Exhibit G and attached hereto is a true and accurate copy of a facsimile dated October 13, 2006, from Ken Reinfeld, U.S. Department of the Interior, Office of the Secretary, Office of Self-Governance, to Lisa Spears, Red Lake Band of Chippewa Indians.

<u>Response</u>:

Defendants object to this request as vague and ambiguous, particularly the terms "failure", "availability", and "an essential term of the Compact".  Defendants object to this request further as improperly requesting a pure legal conclusion. To the extent that the request may be deemed a request for an application of law to fact, defendants object upon the basis that the pertinent facts have not been established so that any application of law to fact can be made.  Without waiving any objection, defendants deny the request.


37.  Admit that the Tribe did not receive any of the approximately $200,000 in FY 2006 year-end funds that were distributed through the BIA Office of Trust Responsibilities, Division of Natural Resources, to be used for wildlife and parks and noxious weed eradication purposes.

<u>Response</u>:

     Admit.


38.  Admit that the document attached to the Complaint as Exhibit I and attached hereto is a true and accurate copy of the 2006 Request for Reprogramming.

<u>Response</u>:

     Admit.

# EXHIBIT K

**W. Patrick Ragsdale**

```
                                                    Page 1
 1                 UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3   -------------------------------X

 4   RED LAKE BAND OF CHIPPEWA        )

 5   INDIANS,                         )

 6              Plaintiff,            ) Case No.

 7   V                               ) CA 06cv1826

 8   UNITED STATES OF AMERICAN,       )

 9   et al.,                         ) Pages 1-73

10              Defendants.           )

11   -------------------------------X

12

13            Deposition of W. PATRICK RAGSDALE

14                   Washington, DC

15              Wednesday, July 11, 2007

16

17

18

19                                    COPY

20

21   Job No:  181865

22   Reported by: Denise Vickery, RMR-CRR
```

**W. Patrick Ragsdale**

Page 39

1    have butchered it.    Did they -- did the Red Lake Band

2    receive from BIA a program operations funding for the

3    operation of a detention program within Phase III

4    building?

5         A.  No.

6         Q.  Okay.  They did not receive that in calendar

7    year '05?

8         A.  That's correct.

9         Q.  And did the Bureau assist the tribe in

10   obtaining any funding -- any of that funding 1.2

11   million and change for the operation of its juvenile

12   correction facility, Phase III?

13        A.  For the one that was not funded?

14        Q.  That's correct.

15        A.  My understanding is we provided technical

16   assistance and advice and recommendations to inquire to

17   other federal funding -- other federal agencies to try

18   to acquire funding for that particular facility.

19        Q.  And when was that technical assistance

20   accorded the tribe?

21        A.  It would have been sometime after I became

22   aware that the facility was not funded.

**W. Patrick Ragsdale**

Page 40

1    Q.  Sometime --

2    A.  Although --

3    Q.  -- after Mr. Seki's call?

4    A.  Right.

5    Q.  Okay.

6    A.  Although we did certify and we did provide

7    operations and maintenance funding for the facility

8    through Mr. Rever's program.

9    Q.  That would be facility operation's maintenance

10   money?

11   A.  Uh-huh.

12   Q.  But as to detention program services?

13   A.  Not for staffing and operations.

14   Q.  Okay.

15   A.  They did not receive any money.

16   Q.  All right.   So, were any efforts made in

17   calendar year 2005?   You just said you believe those

18   efforts were made after you took a call from Mr. Seki

19   in April or May of 2006.   So I guess I'm asking:  Were

20   any efforts made, to your knowledge, in calendar

21   year -- within calendar year 2005?

22   A.  Not to my knowledge.

W. Patrick Ragsdale

Page 63

1                    (A brief recess was taken.)

2    BY MR. BAKER-SHENK:

3        Q.   Thanks.    Changing topics, there's another

4    piece of the claim that the tribe raised which deals

5    with year-end funds which were allocated at the end of

6    fiscal year 2006.    Are you familiar with the complaint

7    allegation involving $200,000 in end-of-year fund

8    distribution by the regional office?

9        A.   This is with respect to the trust funds?

10       Q.   This is with respect to trust responsibility.

11   Actually --

12       A.   Right.

13       Q.   -- Division of Natural Resource funds?

14       A.   Yes. I call it wildlife funds but --

15       Q.   Okay.   Wildlife and parks, yes.

16       A.   Yes, that came to my attention, and I inquired

17   as to why the self-governance tribes were not or

18   alleged to not have been eligible to receive those

19   funds.   Yes.

20       Q.   That's the allegation, yes.   Were

21   self-governance tribes eligible for distribution in the

22   Midwest regional conference?

**W. Patrick Ragsdale**

Page 64

1    A.  Self-governance tribes were eligible for

2  funds, but my understanding is is that the money had to

3  be obligated within a very short period of time and the

4  Bureau's mechanism through the Office of

5  Self-Governance could not mechanically do that.   So

6  the self-governance tribes were excluded from that --

7  from that potential allocation.

8    Q.  Are you aware of the provision -- any

9  provision to the contrary in the funding agreement or

10  compact?

11    A.  I'm aware of the statutory requirements and

12  the funding compact that says to the contrary, that

13  self-governance tribes shall not be denied the

14  opportunity to participate in any additional funding as

15  any other tribe or Bureau operation program would be

16  eligible for.

17    Q.  So you don't dispute that they were eligible

18  to receive money?

19    A.  No, I do not dispute that at all.

20    Q.  You don't dispute that they weren't informed

21  of the available --

22    A.  I don't -- I don't know.   I don't know.

**W. Patrick Ragsdale**

Page 65

1      Q.  Okay.

2      A.  They apparently became informed because they

3  brought the complaint to me.

4      Q.  Yes, I should say informed in a timely manner.

5      A.  Yeah.

6      Q.  Yes, they later learned.  You don't dispute

7  they didn't get that money?

8      A.  No, I don't.

9      Q.  Or a share of that money?

10     A.  I don't.

11     Q.  Who made that decision that it go to Title I

12 only?  I'm sorry, I should say that more clearly.  If I

13 can rephrase the question.

14     A.  Okay.  Go ahead.

15     Q.  Who made the decision in the regional office

16 or the central office that these funds, end-of-year

17 funds could be distributed only to Title I contract

18 tribes?

19     A.  The answer is I do not know.  I do not

20 believe that it was probably brought to the attention

21 of the Assistant Secretary or to the Director of Indian

22 Affairs or whoever my predecessor was.  I'm not exactly



**U.S. Department of Justice**

Civil Division

RTBlades
145-7-1680

Telephone: (202) 616-8257
Facsimile: (202) 307-0972

*Washington, D.C. 20530*
August 23, 2007

BY HAND

Esquire Deposition Services, LLC
1020 19th Street, NW
Suite 620
Washington, D.C.   20036
Telephone: (202) 429-0014

Re:    Red Lake Band of Chippewa Indians v. United States,
No. CA 06cv1826 (D.D.C.)

Dear Sir or Madame:

Enclosed are the errata sheets and signature pages for the transcripts of the depositions of W. Patrick Ragsdale and John N. Rever, which were taken, respectively, on July 11 and July 20, 2007, in Washington, D.C., and reported by Ms. Denise Vickery, RMR-CRR.

If you have any questions or need any additional information, please let me know.  Thank you for your assistance and cooperation in this matter.

Very truly yours,

Reginald T. Blades, Jr.
Senior Trial Counsel
Commercial Litigation Branch

Enclosures

cc:    Philip Baker-Shenk, Esquire (with enclosures)
Jessica Roff, Esquire (with enclosures)

## W. Patrick Ragsdale

Page 70

1

2

3

4

5                ACKNOWLEDGMENT OF DEPONENT

6

7        I, W. PATRICK RAGSDALE, do hereby acknowledge I

8   have read and examined the foregoing pages of

9   testimony, and the same is a true, correct and complete

10  transcription of the testimony given by me, and any

11  changes and/or corrections, if any, appear in the

12  attached errata sheet signed by me.

13

14

15   8-15-07

16   Date                                    W. PATRICK RAGSDALE

17

18

19        Subscribed and sworn to before me, in my presence, this
         15th day of August, 2007, a Notary Public
20       in and for the DOIFEU of Washington, DC.

21                       Notary Public
         My commission expires January 14, 20 09

22

W. Patrick Ragsdale

Page 73

1   ESQUIRE DEPOSITION SERVICES

    1020 19TH STREET, NORTHWEST

2   SUITE 620

    WASHINGTON, D.C.   20036

3                        ERRATA SHEET

    Case Name:  RED LAKE BAND OF CHIPPEWA INDIANS v. UNITED

4   STATES OF AMERICAN, et al.

    Witness Name:  W. PATRICK RAGSDALE

5   Deposition Date:  July 11, 2007

    Job No.:  181865

6

    Page No.  Line No.   Change

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      Signature                                Date

# EXHIBIT L




# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

January 24, 2006

Honorable Floyd Jourdain, Jr.
Chairman, Red Lake Band of Chippewa
    Indians
P.O. Box 550
Red Lake, Minnesota 56671

Dear Chairman Jourdain:

Enclose is a sign original of the Red Lake Band of Chippewa
Indians' Multi-Year Funding Agreement for 2005 - 2010 between the
Red Lake Band of Chippewa Indians and the United States of
America.

Sincerely,

Ken Reinfeld

Kenneth Reinfeld, Acting Director
Office of Self-Governance

Enclosure



RECEIVED
JAN 3 0 2006
RED LAKE TRIBAL CHAIRMAN
RED LAKE MN 56671

# FOURTH AMENDMENT TO THE
## MULTI-YEAR FUNDING AGREEMENT FOR 2005-2010
### BETWEEN THE RED LAKE BAND OF CHIPPEWA INDIANS
### AND
### THE UNITED STATES OF AMERICA

### Section 1

**Negotiated agreement** · Pursuant to Title IV of P.L. 93-638, as amended, the Red Lake Band of Chippewa Indians (herein referred to as the "Tribe"), and the United States of America, through the Secretary of Interior (herein referred to as the "Secretary"), have negotiated the following Agreement for the assumption of responsibilities by the Tribe for the various programs, functions, services, and activities as specified in this document. This Agreement, which includes programs which are funded by or flow through the Bureau of Indian Affairs (herein referred to as the "BIA") for the benefit of the Tribe, includes all of the matters stated herein in addition to the following listed documents which are hereby incorporated herein by reference:

1. Self Governance 2005 Multi-Year Funding Agreement - Reprogramming Request and Footnotes, Pages 1-7.

2. Red Lake Tribal Council Resolution Number 202-99, Pages 1-2.

3. Indian Reservation Roads (IRR) Stewardship Agreement (Pages 1-15), with attachments including Indian Reservation Roads and Bridges Program (IRR) Matrix (Pages 1-2), and FY 2006 Funding Control Schedule. The recently enacted highway authorization bill, Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETY-LU), requires modifications to Title 23 U.S.C. Until these modifications have been finalized, the parties agree to wait to discuss those portions of the AFA and IRR stewardship Agreement which would be applicable. Further discussions will be held within 120 days after publication of the final modifications in the Federal Register or provisions have been codified.

### Section 2

**Tribal Programs and Budget** - The Tribe reserves discretion to allocate such amounts of total funding to and between programs, functions, services, and activities enumerated in the attached REPROGRAMMING REQUEST as it sees fit and necessary so long as these funds are used consistent with Federal appropriations law. The Tribe assumes all operational responsibility for all programs, functions, services, and activities as reflected in the REPROGRAMMING REQUEST which are non-residual and not retained by the BIA. The Tribe has broad authority to consolidate and redesign the programs and to reallocate funding between programs without further approval from the Secretary unless otherwise indicated in this Agreement. The Tribe agrees not to reallocate funding provided under the Indian Reservation Roads (IRR) program for purposes other than IRR activities.

### Section 3

**Non-Base Budget Programs** - The programs, functions, services, and activities identified as Non-Recurring, Other Recurring - Competitive, Wildland Fire Management, and Construction will be separately determined and made a part of this Agreement. They include, but are not limited to:

Wetlands/Waterfowl Management

1

Fish Hatchery Maintenance
Noxious Weed Eradication
Forest Development
Forest Inventories/Plans
Water Management and Development
Environmental Management
All Indian Rights Protection Categories
Unresolved Hunting & Fishing Rights
Mineral Assessments
All Real Estate Services Categories
Indian Reservation Roads Program

Other Non-Recurring funds not identified in this section may be separately negotiated and included in this Agreement as provided for in Section 9.

## Section 4

**Programs, Functions, Services, and Activities Retained By the BIA** - Any program, function, service, or activity not listed as transferred to the Tribe shall be assumed to be a retained function of the Secretary. In addition, the services related to any inherently federal functions will be available to self-governance tribes on the same basis as other tribes. In cases where there are shared responsibilities between the Tribe and the BIA, the respective roles of the parties will be specified in the endnotes to this Agreement or footnotes to the REPROGRAMMING REQUEST.

## Section 5

**Amount of Funds** - Subject only to Congressional action and the terms of this Agreement, the Secretary shall make available to the Tribe the total amount of funds negotiated as they are identified in the attached REPROGRAMMING REQUEST for Calendar Years 2005 - 2010.

## Section 6

**Rights to Other Direct Funding Reserved** - The Tribe also reserves its right to receive such additional amounts as may be made available for distribution to Tribes for pay costs, retirement cost adjustments, and inflationary cost adjustments, insofar as these funds have not been made available and distributed according to the attached REPROGRAMMING REQUEST.

## Section 7

**Contract Support** - The Tribe is eligible for contract support funding on the same basis as tribes which contract with the BIA under Title I of P.L. 93-638, as amended. The Tribe's contract support funding shall be added to this Agreement at the point when there is clear guidance from the BIA concerning the amount available. The Red Lake Band of Chippewa Indians reserves all of its legal rights to full Contract Support Cost funding, as mandated under the Indian Self-Determination and Education Assistance Act, as amended.

## Section 8

**Payment** - The Tribe chooses to receive all funding possible on an annual lump sum basis at the commencement of the Tribe's Calendar Year. Other funds will be transferred to the Tribe as soon as possible after the amounts due are known and deliverable.

## Section 9

**Amendment or Modification of this Agreement** - Except as otherwise provided in this Agreement, the Compact between the Tribe and the Secretary, or by law, any modifications to this Agreement shall be in the form of a written amendment signed by the Tribe and the Secretary. It is recognized that there may be errors in calculation or other mistakes which may need to be renegotiated. Both parties agree to take corrective action when such errors are identified. The Tribe and the Secretary reserve the right to amend this agreement as required to incorporate the provisions of Section 1119(g)(4) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law 109-59, for the operation of the Indian Reservation Roads Program on the Red Lake Indian Reservation.

## Section 10

**No Reduction in Programs, Services, Functions or Activities to Other Tribes** - Pursuant to Section 406 (a) of P.L. 93-638, as amended, nothing in this Agreement shall be construed to limit or reduce in any way the services, contracts, or funds that any other Indian tribe or tribal organization is eligible to receive under Federal law.

## Section 11

**Subject to Availability of Funds** - All amounts identified in this Agreement are subject to Congressional action on appropriations and will be adjusted accordingly. Notification to the Tribe of such adjustments will occur as soon as practicable following the action.

## Section 12

**Establishment of Self-Governance Base Budget** - The Tribe has elected to establish a self-governance base budget for its tenth year of operations under self-governance. This includes the actual amounts of funding in the TPA Tribe, TPA Agency, TPA Area (Area field operations), Other Recurring Programs, and Area Office Operations line items, which are base transferred from BIA budget accounts to the Self-Governance budget accounts. Where appropriate, the Secretary agrees to request these amounts for the Tribe in the President's Budget at the earliest opportunity. Non-recurring funds and any other one-time funding are not eligible to be included as part of the Tribe's base.

## Section 13

**Title I Provisions** - Pursuant to Section 19 of P.L. 104-109, the Tribe has the right and option to incorporate any or all of the provisions of Title I of P.L. 93-638, as amended, into this Annual Funding Agreement. In exercising of the Tribe's rights and options under Section 19 of P.L. 104-109, the provisions identified below are incorporated into this Annual Funding Agreement and have the same force and effect as if included in Title IV of P.L. 93-638, as amended. In addition to the provisions

3

identified below, the Tribe reserves the right to unilaterally amend this Section of the Annual Funding Agreement from time to time, at the option of the Tribe, to incorporate additional provisions of Title I of P.L. 93-638, as amended. The Tribe also reserves the right to unilaterally amend this Section of the Annual Funding Agreement from time to time, at the option of the Tribe, to remove such provisions identified in this Section to the extent such provisions are not independently applicable pursuant to Title IV of P.L. 93-638, as amended.

| | |
|---|---|
| Section 102(a) and (b). | Declination Procedures. |
| Section 102(c). | Secretary's responsibility to provide liability insurance for the Tribe. |
| Section 102(e). | Hearing burden of proof allocation, and rank of decision-making Department official. |
| Section 103. | Grants to Indian tribal organizations. All of section 103(c) not otherwise limited by Congressional Action or earmarking. |
| Section 105(k). | Tribe deemed an executive agency when carrying out contract, grant, or agreement. |
| Section 106(a), (b), (c), (d), (e), (f), (i), (j), (l), (m). | Funding and indirect cost, etc. |

## Section 14

**Conflict Between Provisions of this Agreement and the Compact** - To the extent that provisions in this Agreement conflict with the Compact between the Tribe and the Secretary, this Agreement shall apply.

## Section 15

**Attributable Savings** - Any savings attributable to the operation of this Agreement will be used to provide additional services during the Calendar Year or may be expended in a manner to be determined by the Tribe in succeeding Calendar Years. The Tribe and the Secretary agree to take every reasonable effort to identify such savings over the term of this Agreement.

## Section 16

**Other Available Funds** - Any funds provided in the preceding Calendar Year under a contract or agreement pursuant to P. L. 93-638, as amended, shall remain available until expended.

## Section 17

**Additional Funds** - If the Midwest Region Office of the BIA receives notice of the availability of <u>any</u> additional funding in any fiscal year for any purpose, including any unspent funds, that the Tribe is eligible to apply for or receive, then it must notify the Tribe as soon as possible about such funds so that the Tribe may access or apply for those funds. The Midwest Region Office <u>commits</u> to keeping the Tribe informed of the existence of funding immediately upon learning of its existence.

## Section 18

**Agency Status** - The BIA shall not abolish or dismantle the Red Lake Agency from the BIA's organizational chart, not with regard to Agency facilities, without the express written consent of the Tribe. The BIA shall retain ownership of all Agency facilities and buildings, until such time as those facilities and buildings are brought up to appropriate standards and codes. Until a mutually agreed

4

upon transfer of Agency facilities and buildings from the BIA to the Tribe occurs, the Tribe, in accordance with P. L. 9::-638, will operate and maintain those facilities and buildings using the FACCOM process. All other BIA property, equipment, and supplies currently utilized at the Red Lake Agency will be expediti usly transferred to the Tribe.

## Section 19

**P.L. 102-477** - The Trit e elects to include its share of funds under the Indian Employment Training and Related Services D :monstration Project into this Agreement. To the extent this Agreement includes funds pursuant 10 P.L. 102-477, the Tribe agrees that such funds will be administered in accordance with the Tri e's approved plan, all statutory requirements, and applicable federal regulations that have bc n published in the Federal Register. With respect to programs operated under the P.L. 102-477 Plan, only those federal regulations which are in conflict with the provisions in P.L. 102-477 and those for which waivers have been specifically requested and formally approved in writing will be consider d waived. All P.L. 102-477 Plan modifications should be submitted to the Division of Workforce Development, Office of Self Governance & Self Determination. They will be distributed to each fede al agency whose programs are affected by the modifications and reviewed through the usual P.L. 02-477 inter-departmental review process. Advance funding for programs funded through this agr eement that are derived from non-BIA agencies as a result of their inclusion in the Tribe's P.L. 102-47 7 plan are to be transferred to the Tribe based on the funding year inherent in those funds and as soor as those funds are available for transfer.

## Section 20

**Automated Informati on Technology Systems** - Prior to being granted access to DOI automated information technology systems, Tribal employees must successfully complete BIA trust automated technology systems tra t ing, the costs of which will be met by the BIA. Further, prior to being granted access to DOI automatt d information technology systems, the Tribe agrees its employees and employees of its contra ctors must be favorably screened by the BIA Personnel and Physical Security Office pursuant to OMB Circular No. A-130. The Tribe agrees to comply if background investigation and adjudication becon es necessary. Costs will be incurred by the BIA.
The Tribe agrees that re cords made or received by the Tribe which evidence the organization, functions, policies, dec sions, procedures, operations or other activities undertaken in the performance of Federal Indian trust unctions will be preserved and maintained in accordance with applicable Federal law. The Tribe and the Department of the Interior agree to work cooperatively in records creation, maintenance a rd disposition, and training activities, and to address trust records issues and activities in accordance with Executive Order # 13175 (Consultation and Coordination with Indian Tribal Governments) ai l the BIA Government-to-Government policy.

## Section 21

**Effective Date** - The ef fective date of this Agreement will be 90 days following the submission of this signed Agreement to th Congress. The planned effective date is January 1, 2005. This Agreement shall remain in effect u til December 31, 2010. Terms of the Agreement and funding amounts will remain in effect unless changed by Congressional action, the promulgation of Federal regulations or an amendment to the mult -year funding agreement (MFA). The amount of funding received by the Tribe may be increased if ad itional funds become available. In subsequent years, modifications to the MFA and Reprogramming R quest will be negotiated by October 1st. This Agreement will remain in effect in the event that the eff ctive date of its successor Agreement is not on or before the expiration date of

the Agreement.

## Section 22

**Reporting** – The Tribe agrees to provide applicable data and information to the BIA Midwest Regional Office pursuant to the Government Performance and Results Act of 1993 (P.L. 103-62). Before providing such information, the Tribe and BIA will consult to determine applicable data and information needed to meet the requirements of P.L. 103-62 and how such information will be assembled and reported.

THE RED LAKE BAND OF CHIPPEWA INDIANS

BY: _____    DATE: 1-19-06
Floyd Jourdain, Jr., Chairman

THE UNITED STATES OF AMERICA

BY: _____    DATE: 01/23/06
Acting Director, Office of Self Governance & Self Determination

Self Governance 2006 Annual Funding Agreement - Reprogramming Request

Office of Self Governance

January 18
Page: 1

Tribe: RED LAKE BAND OF CHIPPEWA INDIANS
Tribal OSG Compact Code: CSGT409
Tribal BIA Org. Code: FS2409
BIA Regional Office: MIDWEST REGION
BIA Field Office: RED LAKE AGENCY

| LINE # | PROGRAM TITLE | COST CODE | (Info) TRIBAL SHARE | A OSG CUR. BASE | B OSG SHORTFALL BASE | C OSG SHORTFALL REQUEST | D BIA REPROGRAM REQUEST | E=A+B+C+D TOTAL AFA | FN |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Other Aid to Tribal Government - TPA/AGENCY | 39220 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | |
| 6 | Other Aid to Tribal Government - TPA/AREA | 39220 | 0 | 364 | 2,097 | 0 | 0 | 2,461 | |
| 10 | Self-Governance Compacts - TPA/TRIBAL | 39240 | 0 | -173,544 | 0 | 0 | 0 | -173,544 | 1 |
| 12 | Contract Support (Ongoing) - TPA/AREA | 39270 | 0 | 0 | 0 | 0 | 2,335,940 | 2,335,940 | 2 |
| 15 | Tribal Courts - TPA/AGENCY | 39280 | 0 | 246,900 | 0 | 0 | 0 | 246,900 | 3 |
| 18 | Social Services - TPA/AGENCY | 39310 | 0 | 220,200 | 0 | 0 | 0 | 220,200 | |
| 20 | Social Services - TPA/AREA | 39310 | 0 | 2,333 | 5,000 | 0 | 0 | 7,333 | |
| 21 | Indian Child Welfare Act - TPA/TRIBAL | 39320 | 0 | 65,860 | 0 | 0 | 0 | 65,860 | 4 |
| 24 | Welfare Assistance Grants - TPA/TRIBAL | 39330 | 0 | 0 | 0 | 0 | 1,125,880 | 1,125,880 | 5 |
| 25 | Housing Improvement Program - TPA/TRIBAL | 39370 | 0 | 50,100 | 0 | 0 | 123,020 | 173,120 | 6 |
| 28 | Scholarships - TPA/AGENCY | 39110 | 0 | 254,100 | 0 | 0 | 0 | 254,100 | |
| 33 | Johnson-O'Malley Educational Assis - TPA/TRIBAL | 39140 | 0 | 136,400 | 0 | 0 | 0 | 136,400 | 7 |
| 38 | Law Enforcement - TPA/AGENCY | 39410 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 39 | Law Enforcement - TPA/AREA | 39420 | 0 | 42,500 | 0 | 0 | 0 | 42,500 | |
| 41 | Community Fire Protection - TPA/AGENCY | 39430 | 0 | 469,900 | 0 | 0 | 0 | 469,900 | |
| 45 | Job Placement and Training - TPA/AGENCY | 39535 | 0 | 84,100 | 0 | 0 | 0 | 84,100 | |
| 49 | Economic Development - TPA/AREA | 39510 | 0 | 0 | 2,323 | 0 | 0 | 2,323 | |
| 50 | Economic Development - TPA/TRIBAL | 39510 | 0 | 427,307 | 0 | 0 | 101,520 | 528,827 | 9 |
| 60 | Road Maintenance - TPA/TRIBAL | 39550 | 0 | 645,700 | 0 | 0 | 0 | 645,700 | 10 |
| 61 | Forestry - TPA/AGENCY | 39630 | 0 | 214,916 | 0 | 0 | 0 | 214,916 | 11 |
| 63 | Forestry - TPA/AREA | 39630 | 0 | 88,900 | 0 | 0 | 0 | 88,900 | 12 |
| 66 | Water Resources - TPA/AGENCY | 39640 | 0 | 256,600 | 0 | 0 | 0 | 256,600 | |
| 72 | Wildlife and Parks - TPA/AGENCY | 39650 | 0 | 400 | 0 | 0 | 0 | 400 | |
| 73 | Trust Services, General - TPA/AGENCY | 39710 | 0 | 0 | 10,583 | 0 | 0 | 10,583 | |
| 73 | Trust Services, General - TPA/AREA | 39710 | 0 | 1,100 | 0 | 0 | 0 | 1,100 | |
| 79 | Other Rights Protection - TPA/AGENCY | 39720 | 0 | 43,600 | 0 | 0 | 0 | 43,600 | |
| 73 | Real Estate Services - TPA/AGENCY | 39770 | 0 | 4,906 | 20,000 | 0 | 0 | 24,906 | 13 |
| 79 | Real Estate Services - TPA/AREA | 39770 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 86 | Environmental Quality Services - TPA/AREA | 39740 | 0 | 0 | 7,993 | 0 | 0 | 7,993 | |
| 87 | Executive Direction - TPA/AGENCY | 39810 | 0 | 93,300 | 0 | 0 | 0 | 93,300 | |
| 94 | Administrative Services - TPA/AGENCY | 39820 | 0 | 182,100 | 0 | 0 | 0 | 182,100 | |
| 102 | TPA General Increase - TPA/TRIBAL | 39901 | 0 | 227,030 | 0 | 0 | 0 | 227,030 | 14 |
| 103 | 638 Pay Costs - TPA/TRIBAL | 39902 | 0 | 650,874 | 0 | 0 | 128,776 | 779,650 | 15 |
| 106 | Area and Agency Technical Support - NON TPA | 10800 | 0 | 7,810 | 0 | 0 | 0 | 7,810 | 16 |
| 114 | Fish Hatchery Operations - NON TPA | 11950 | 0 | 46,000 | 0 | 0 | 0 | 46,000 | 17 |
| 115 | Fish Hatchery Maintenance - NON TPA | 31960 | 0 | 174,000 | 0 | 0 | 70,000 | 244,000 | 18 |
| 116 | Tribal Management and Development - NON TPA | 31970 | 0 | 0 | 0 | 0 | 5,000 | 5,000 | 19 |
| 120 | Noxious Weed Eradication - NON TPA | 33720 | 0 | 0 | 0 | 0 | 24,000 | 24,000 | 20 |
| 121 | Forestry - NON TPA | 33960 | 0 | 0 | 0 | 0 | 487,500 | 487,500 | 21 |
| 122 | Water Mgmt. Planning & Pre-Develop - NON TPA | 34020 | 0 | 0 | 0 | 0 | 30,000 | 30,000 | 22 |
| 129 | Real Estate Services - NON TPA | 34300 | 0 | 0 | 0 | 0 | 23,946 | 23,946 | 23 |
| 130 | Environmental Management - NON TPA | 34730 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 131 | Central Office Operations - NON TPA | 35000 | 0 | 0 | 0 | 0 | 500,000 | 500,000 | 24 |

Notes in reference to 25

| No. / Item | Code | | | | | Note |
|---|---|---|---|---|---|---|
| 151 Housing Development - NON TPA | 36530 | 0 | 0 | 0 | 48,500 | 25 |
| 153 Economic Development - NON TPA | 36710 | 0 | 0 | 0 | 1,279 | 26 |
| 154 Natural Resources, General - NON TPA | 36810 | 0 | 0 | 0 | 14,604 | 26 |
| 156 Forestry - NON TPA | 36830 | 0 | 0 | 0 | 6,622 | 27 |
| 157 Forest Marketing Assistance - NON TPA | 36931 | 18,532 | 320 | 0 | 18,352 | 28 |
| 163 All Other Indian Rights Protection - NON TPA | 36920 | 2,359 | 2,421 | 0 | 4,780 | 29 |
| 169 Administrative Services - NON TPA | 36200 | 0 | 0 | 0 | 83,923 | |
| 173 Information Resources Technology - NON TPA | 36240 | 9,306 | 30,169 | 0 | 39,975 | |
| 176 Law Enforcement - NON TPA | 37700 | 5,283 | 0 | 4,348,975 | 4,554,258 | 25 |
| 182 Facilities Admin. (Operations) - NON TPA | 37400 | 0 | 0 | 171,120 | 344,837 | 26 |
| 184 Detention Center Admin (Operations - NON TPA | 37490 | 173,717 | 0 | 632,182 | 811,086 | 27 |
| 187 Facilities Improvement & Repair (M - NON TPA | 11700 | 178,904 | 0 | 2,945,369 | 2,945,369 | 28 |
| 197 Preparedness - NON TPA | 92120 | 0 | 0 | 936,537 | 936,537 | 29 |
| | | 0 | 0 | 91,500 | 91,500 | |
| 199 Child Care Block Grants - HHS - NON TPA | 95200 | 0 | 0 | 132,572 | 132,572 | 31 |
| 260 Child Care Development Fund - HHS - NON TPA | 95300 | 0 | 0 | 301,305 | 301,305 | 31 |
| 202 Native Employment Works (NEW) - HH - NON TPA | 95520 | 0 | 0 | 134,691 | 134,691 | 32 |
| 203 Supplemental Youth Services-LABOR - NON TPA | 95130 | 0 | 0 | 69,052 | 69,052 | 33 |
| 204 Comprehensive Services(Adult)-LABO - NON TPA | 95140 | 0 | 0 | 207,372 | 207,372 | 34 |
| 206 Tribal Transportation Planning - NON TPA | 93600 | 0 | 0 | 55,000 | 55,000 | 35 |
| 207 Indian Reservation Roads - NON TPA | 93100 | 0 | 0 | 2,957,883 | 2,957,883 | 36 |
| TOTAL | | 4,903,974 | 241,117 | 18,203,640 | 23,348,731 | |

AUTHORIZED FINANCIAL OFFICERS:

_[signature]_
Bureau of Indian Affairs - Regional Office

_[signature]_
Tribe

_[signature]_
Office of Self Governance

1 Funds will be distributed using similar methodology as was used last calendar year and published in the Federal Register. The OSG and BIA commit to keeping the Tribe's Director of Finance and Self Governance Coordinator adequately informed in advance of deadlines for submission of contract support payment requests. The estimate is based on the Tribe's indirect cost rate of 14.66%, a fixed carry forward rate approved by the cognizant agency. The Tribe is currently negotiating its CY 2006 indirect cost rate and anticipates a substantial increase in the rate. The Red Lake Band of Chippewa Indians reserves all of its legal rights to full Contract Support Cost funding, as mandated under the Indian Self-Determination and Education Assistance Act.

2 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The Red Lake Band requests an additional $500,000 to meet existing operations costs for Tribal Courts.

3 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. An estimated $93,336 of the amount in this line will be used in accordance with the Tribe's approved P. L. 102-477 Plan.

4 Total funds will be distributed based upon current welfare assistance need as reflected in the current mid-year analysis of funds Report. This amount includes Foster Care. An estimated $562,940 of the amount in this line item will be used for General Assistance in accordance with the Tribes approved P. L. 102-477 Plan.

5 Funds will be distributed based on HIP eligible applicant data. HIP funds shall be used in accordance with HIP regulations unless waived. The Red Lake Band asserts that the funding amount available for this line item has historically been insufficient and inadequate to meet the needs of the service population.

6 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet

the needs of the service population. The actual costs for the scholarships program in CY 2003 was $509,000, approximately twice the amount received. The amount in this line item, which has been base transferred to the Tribe, will be used in accordance with the Tribe's approved P. L. 102-477 Plan.

7 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The actual cost to minimally protect the lives of Red Lake Band members with fire protection in CY 2004 was $326,957, about eight times the funding level. The balance of the funds was taken from other Self Governance programs.

6 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The amount in this line item, which has been base transferred to the Tribe, will be used in accordance with the Tribe's approved P. L. 102-477 Plan.

9 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The Red Lake Band desires that funds under this category be distributed reflecting the BIA's actual maintenance historical base level of $427,307 and an additional estimated amount of $101,520 ...

10 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population. The Red Lake Band and the BIA agree to have one forestry position as "residual" the needs of the service population. The estimated cost, which includes salary and benefits, was $96,126 in FY 2005. The BIA from the entire Red Lake Agency. The Red Lake Band agrees to form a Working Group to identify, assess title status of, survey, shall return to the Tribe at the end of the calendar year, any unspent funds pertaining to the residual forestry position. The BIA and OSG agree to guarantee the Red Lake Band will be consulted with, and treated equitably, in the allocation establish the value of and transfer lands held by the BLM and others to the BIA or the Tribe or his representatives, and a Working Group shall consist of the BIA Midwest Region Director, The Chairman of the Tribe or the Tribe or his representative of the BLM.

11 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population.

12 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population.

13 The Red Lake Band asserts that the funding amount available for this line item is insufficient and inadequate to meet the needs of the service population.

14 This amount to be determined by Congressional appropriation.

15 This amount to be determined by Congressional appropriation. The BIA will make every effort to treat Red Lake Tribal employees the same as all other Tribal and Federal employees for purposes of pay cost adjustments in FY 2006. The BIA and OSG agree to make every possible effort to recover for the Tribe the unfunded $38 Pay Cost shortages for FY 2003-2005, which were legitimately due to the Tribe, but which were not received because of Administration oversight and/or internal errors or omissions. Further, the BIA and OSG agree to provide to the Tribe by April 1, 2006, a detailed Pay Cost analysis for the years 2003-2006, showing what the Tribe was eligible to receive each year based upon Pay Cost data the Tribe provided, the actual amount received, and the total amounts received each year for Self Governance tribes, Enforcement. The analysis will separately show the shortfall or unfunded amount. This analysis will include raw contracting tribes, and BIA programs, as well as the total amounts the BIA was eligible to receive for these programs based upon data it compiled. The above information has been requested by the Tribe to verify whether Red Lake, other Self Governance tribes, contracting tribes, noted that the Tribe has proposed the above footnote language be applied to of Pay Costs for the years 2003-2006. It is trying to get more Pay Cost information on CY 2002, and agrees that Pay Costs CY 2002. The BIA Midwest Region Director is failed to provide $30,900 in base eligible Pay rate of this information to the Tribe if it failed it available. The BIA agrees to the current Prompt Pay rate of to the Tribe in CY 2003. The BIA further agrees these amounts are $34,465 (2003), $33,236 (2001), $31,424 (2005), 4.3%, to the Tribes CY 2006 MFA. The estimated restoration amounts shall be base transferred in CY 2006. and $29,651 (2006).

16 The Red Lake Band believes these dollars are inadequate and insufficient to effectively operate the program.

17 This dollar amount is an estimate. The actual dollar amount for the CY 2006 MFA will be obtained on the basis of an existing competitive process.

18 The Red Lake Band believes that an estimate of $70,000 for Wetlands/Waterfowl Management has been the actual amount for Wetlands/Waterfowl Management. The estimate for Wetlands/Waterfowl Management will be Management will be based on an existing, competitive process. The estimate for funding from the budget. The Tribe placed in this line because the BIA has temporarily removed this program and funding from the budget. The Tribe asserts this line is in violation of Executive Order #13175, and notes the United States Congress specifically restored the program and funding in FY 2003 - FY 2006.

19 This dollar amount is an estimate. The actual dollar amount for the CY 2006 MFA will be based on an existing competitive process.

These sentences are not agreed to by the Secretary KR 01/18/06

20  This amount is an estimate. This is a recent Bureau budget line item, and reflects the merger of three former budget line items, each with differing methods/formulas for funds distribution for forestry development projects, inventories & Plans, and Woodland Management. The actual amount will be based on specific forestry development projects, forest acres, and need for the Forest Development portion, and on the Red Lake Band will be consulted with, and treated inventories/Plans portion in CY 2006. The BIA and OSG guarantee this Program. The Red Lake Band believes these dollars equitably, in the allocation of any funding from the BIA's Forestry Program. The BIA and OSG are inadequate and insufficient to effectively operate the program.

21  The actual dollar amount for the CY 2006 MFA will be based on an existing nationally competitive process. The BIA and OSG agree to work with the Red Lake Band to ensure that the Tribe is allowed to compete nationally on the same basis as other tribes.

22  This amount is an estimate. The BIA and OSG have agreed the tribe should receive these funds.

23  This amount is requested in 2006 to assist with completing the Red Lake Sewage Lagoon upgrades.

24  The Red Lake Band hereby protests and objects to the decision to not distribute shares of the central office for FY 2006 ... to temporarily freeze ... and ... the last three years compared to the TPA budget increase of a paltry .3%. The Tribe disagrees with the Department of Interior in its decision that the TPA budget increase of a paltry .3%. The Tribe disagrees with the Department of Interior in its decision that Central Office shares should be distributed to tribes, but that to the contrary, first Congress does not intend that Central Office fully supported the distribution of Central Office shares to the tribes, until the Congressional language in this area administration to freeze distributions in FY 1998 - 2006.

25  The Assistant Secretary of Indian Affairs and the Tribe agree that this amount represents original and historical BIA persuaded Congress and Indian Affairs and the Tribe agree that this amount represents original and historical base-transferred Enforcement Area, and $1,413,500 from TPA Law Enforcement - Agency, $5,283 from TPA Law Enforcement Area, and Enforcement Area, in addition to $95,000 in base eligible funding from the FY 1999 Law Enforcement $18,799 from the FY 2001 Law Enforcement Initiative, and $3224,000 in base eligible funding from FY 2000 Law Enforcement Initiative. The Assistant Secretary - Indian Affairs agrees to do everything in Initiative, $94,000 in base eligible funding from the FY 2001 Law Enforcement Initiative. The Assistant Secretary - Indian Affairs agrees to do everything in his power to ensure these amounts are not reduced, and that Self-Governance tribes are treated on an equal footing with BIA power to ensure these amounts are not reduced, and that Self-Governance tribes are treated on an equal footing with BIA Law Enforcement with regard to any additional Law Enforcement funds distributions. The Red Lake Band requests an additional $1 million for operation of Law Enforcement. Any new law enforcement program funding is to be determined and added to the AFA based on national distribution methodology developed by the BIA. The OSG Justice, so that the Tribe can will keep the Tribe closely informed about all activities pertaining to Public Safety funding obtained in FY 2002 for detention participate to the fullest degree. The OSG and BIA agree that the $1,535 million in base eligible funding in FY 2006, because this operations associated with new facilities needs to be designated as base eligible funding on an annual basis. BIA ~~will agree~~ funding is for staffing the Tribes new detention facility on an annual basis. ~~facility ~ in CY 2006, and further agree~~ ~~to request $1,500,000 for operations funding for the Tribes' juvenile detention facility. It is the position of the President in CY 2006 budget. With~~ ~~regard to any new initiatives pertaining to Homeland Security, it is mutually agreed that Red Lake Law Enforcement shall~~ be eligible to participate at the same level as BIA Law Enforcement ~~and that the Tribe shall receive~~ ~~and OSG agree that the Red Lake Reservation no longer high crime area, and this BIA proposing incident at Red Lake~~ ~~High School.~~

26  Historically there has been a deficit of O&M monies for Red Lake Agency facilities. Continuously funds were transferred from the Area to the Agency to negate the deficit. The BIA and the Red Lake Band hereby agree that if funds are available to cover future deficits for O&M monies, these funds will be made available to the Band, and in subsequent years such funds shall be transferred to the Tribes AFA base. Current base funding FFS Code 37400 (Operations) is a combination of both FFS Code 37400 (Operations) and FFS Code 37500 (Maintenance). The amount shown is an estimate. The actual amount will be determined using the FNIS O&M Allocation Formula. The Tribe has incurred a substantial increase in the need for O&M funds for maintaining the new detention facility, which consists of 55,750 square feet for which BIA is responsible to maintain. The BIA reprogramming request total amount of $1,155,923 is an estimate, and includes $344,837 for Agency Facilities O&M, and $811,086 for Detention Facilities O&M. Of this amount, $162,217 represents funds not provided for the period of October 1 - December 31, 2005. Facilities operations and maintenance funding for the Tribes adult and juvenile detention facilities shall be included in this Agreement and transferred to the Tribe based on the funding year inherent in those funds and as soon as those funds are known and available for transfer. The funding will be allocated to conform with the Tribes calendar year and the MFA.

27  The Tribe requests the original BIA project cost of $2,041,799.00 in 1996 adjusted for inflation at 3.5% per year to CY2006. The Tribe requests funding to the Agency Water & Sewer Project # 93F01 in the amount of $2,945,869.00. The Tribe requests the completion of this project to restore design fire suppression flows and allow the Tribe portions of the Red Lake water system, prevent further contamination of houses on the sewer system and allow the Tribe to proceed with it's planned improvements to the Agency roads and MN Hwy #1. The Nabdt project may be jeopardized and the Agency project delayed indefinitely if the BIA's subsurface utilities are not replaced because

28  This dollar amount is an estimate. The actual dollar amount for the CY 2006 MFA will be based on a preexisting formula

according to the National Fire Management Analysis System. The Tribe and the BIA agree that the Wildland Fire Management Memorandum of Agreement between the Red Lake Band of Chippewa Indians and the Bureau of Indian Affairs shall be the guiding document for wildland fire management at Red Lake. It is mutually agreed that a flexible and cooperative working relationship between the Tribe's fire program, the fire management officer at Bemidji, and the fire program at the BIA Midwest Region office will exist, so that adequate trust resource protection and management will be maintained. Pursuant to Section 8 of the Tribe's MFA, the BIA and OSG agree to make every effort to ensure funds are released to the Tribe at the beginning of the calendar year.

29 This dollar amount is an estimate. Red Lake's currently approved indirect cost rate is 14.66%. The Tribe is currently negotiating its CY 2006 indirect cost rate and anticipates a substantial increase in the rate.

30 Estimate of JHS Child Care Block Grant. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

31 Estimate of HHS Child Care Development Fund. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

32 Estimate of H.E.W. Program. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

33 [illegible] P. L. 102-477 plan

34 Estimate of Department of Labor Comprehensive Adult Services. Funds will be used in accordance with the Tribe's approved P. L. 102-477 plan.

35 This line represents Tribal Transportation Planning MGM-TPA, and is an estimate.

36 This amount is an estimate. Highway Trust funds will be received and expended by the Tribe in accordance with 25 CFR part 170. Section 17 of the AFA shall apply to this program. The Tribe and the Secretary reserve the right to amend this AFA at any time to implement Section 1119(r)(4) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act-A Legacy for Users (SAFETY-LU), Public Law 109-59, and enter into an agreement directly with the Federal Highway Administration for the operation of the Tribes IRR program.

# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA )
INDIANS, )
                                        )
              Plaintiff, )
                                        )
      v.                               )    Civil Action No. 1:06CV01826 (CKK)
                                        )
UNITED STATES OF AMERICA, et al., )
                                        )
              Defendants )

## DECLARATION OF DAVID CONNER

I, David Conner, have personal knowledge of the facts set forth below and am competent to make this declaration:

1. I am the Department of Natural Resources Administrative Officer for the Red Lake Band of Chippewa Indians (the "Tribe").  I have been employed in this or similar positions for the Tribe for the past 21 years.

2. At all times relevant to this Declaration, I have been a member of the Tribe's Self-Governance Negotiating Committee and served as the Tribe's lead staff negotiator under the direction of the Tribe's Chairman.

3. I am familiar with the Multi-Year Funding Agreement for 2005-2010 between the Tribe and the United States and the associated "Self Governance 2005 Annual Funding Agreement - Reprogramming Request" ("2005 Reprogramming Request") that set forth, by line item and program title, the funds to be provided by the United States to the Tribe for Calendar Year 2005.

4. The $4,582,036 listed in Line # 177 of the 2005 Reprogramming Request for "Law Enforcement – NON TPA" included the $1,218,482 for operations funding for the Tribe's juvenile correction facility in Calendar Year 2005 that is referenced in footnote 25.

5. The Tribe never received any of the $1,218,482 from the United States for operations funding for the Tribe's juvenile correction facility in Calendar Year 2005 or thereafter.

6. In January 2006 the Tribe and the Bureau of Indian Affairs ("BIA") completed bilateral negotiations on a Fourth Amendment to the Multi-Year Funding Agreement for 2005-2010 ("Fourth Amendment") and an associated "Self Governance 2006 Annual Funding Agreement - Reprogramming Request" ("2006 Reprogramming Request").  Pursuant to standard procedure for executing such documents, the Tribe's Chairman executed the Fourth Amendment and the 2006 Reprogramming Request on January 19, 2006, after negotiations were concluded, and then submitted them to the BIA for execution.

7. As submitted by the Tribe to the BIA, there were no typewritten sentences in footnote 25 to the 2006 Reprogramming Request that were struck out by hand.

8. After receiving the executed 2006 Reprogramming Request from the Tribe, Kenneth Reinfeld, the Acting Director of the Office of Self-Governance, evidently struck out by hand two sentences in footnote 25 and added the hand-written notation that "These sentences are not agreed to by the Secretary."  The two sentences were the final sentence to the footnote and the sentence stating that "The BIA agrees to assist the Tribe in obtaining $1,218,482 for operations funding for the Tribes juvenile correction facility in CY 2006, and further agrees to request $1,599,225 for operation of the Tribes juvenile corrections facility in the President's FY 2007 budget."  Mr. Reinfeld subsequently

executed the Fourth Amendment and the 2006 Reprogramming Request on or about

January 23, 2006, and sent them back to the Tribe.

9.  The Tribe never agreed to the unilateral changes to footnote 25 to the 2006

Reprogramming Request made by Mr. Reinfeld.

10. The Department of the Interior has never provided a detailed pay cost analysis for the

years 2003-2006 to the Tribe pursuant to footnote 15 of the 2006 Reprogramming

Request.

Pursuant to the requirements of 28 U.S.C. § 1746(b), I declare under penalty of perjury

that the foregoing is true and correct, this 18th day of June, 2008.

David Conner

# 5408232_v4

# EXHIBIT N

FROM SELF GOVERNANCE                    (MON) 6. 19'06 14:33/ST. 14:33/NO. 4861



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS

IN REPLY REFER TO:                                           JUN 15 2006
Law Enforcement Services

Honorable Floyd Jourdain, Jr.
Chairman, Red Lake Band of Chippewa Indians
P.O. Box 550
Red Lake, Minnesota 56671

Dear Chairman Jourdain:

Thank you and the Red Lake Council membership for the opportunity to participate in
your special event to celebrate the restoration of your fishery resource and for the
opportunity to visit with you and your staff providing essential public safety services.

The Bureau of Indian Affairs (BIA) Office of Law Enforcement Services (OLES) is
committed to promoting effective and efficient law enforcement programs within Indian
country. It is my understanding that Special Agent Fourdance has verified that the Tribe
has attended to the technical inspection report and properly addressed those concerns and
recommendations.

The present funding allocation for Red Lake law enforcement and detention services is as
follows:
Law Enforcement ..............$1,731,777
Detention Services............$1,555,000
Detention Facilities O&M ...$268,125

I am pleased to inform you that effective this fiscal year, we will increase Red Lake
Tribe's base funding allocation for law enforcement and detention services $275,000 per
year on the conditions that:

1. The additional funds may only be used only for law enforcement and detention
   purposes without any reduction of other law enforcement funds from your current
   multi-year funding agreement (MYFA) or successor MYFA.

2. The Tribe provides adequate assurance that it will cooperate with Federal law
   enforcement agencies including participation with the Federal Bureau of
   Investigations (FBI) in the Safe Trails Task Force program and by seeking
   Federal special law enforcement commissions through OLES. In this regard, Mr.
   Chaney, Mr. Fourdance and I are willing to meet with you and appropriate law
   enforcement officials to address any concerns about issues of sovereignty or
   jurisdiction which you may have. It is my understanding that self-governance
   contract negotiations are scheduled for September 7, 2006, in Red Lake, MN;
   which may be a very opportune time for this discussion.   I believe this is a

FROM SELF GOVERNANCE                    (MON) 6. 19' 06 14:34/ST. 14:33/NO. 4861712977 P  2

vital requirement to ensure effective law enforcement in Indian country because
criminals do not honor boundaries and only with the cooperation of all
governments will we be able to effectively provide essential public safety services
to our citizens.

3.  In accordance with regulatory provisions the Tribe considers increasing the
    salaries of law enforcement and detention services personnel. Additionally,
    regular in-service training should be increased and scheduled for law enforcement
    and detention personnel on an annual basis.

4.  The Tribe provides assurance that non-law enforcement Tribal government
    employees and elected leadership will have in place the appropriate protocols to
    ensure that the integrity of law enforcement investigations and law enforcement
    sensitive information is not compromised. The responsibility of the tribal
    governing body is to provide oversight for law enforcement without direct
    involvement in the operation.

We have received your legal counsel's letter dated February 17, 2006, regarding the
Tender of Contract Disputes Act Claim for Breach of the MYFA. At this time, we can
not agree to your request for additional funding to provide for staffing and operations at
the new detention facility. It is not possible to provide this funding without decreasing
allocations for other law enforcement operations nationwide which would adversely
impact other tribes. However, in compliance with the MYFA, I am instructing OLES to
make a renewed effort to assist the Tribe in finding sources for operational funding
($1,218,482) for the Tribe's new juvenile facility. In addition, I have asked our detention
services personnel to provide you with technical assistance to formulate a program
mission for your new facility. Please feel free to contact Ms. Greta Baker, Supervisory
Corrections Specialist for District I, at (605) 226-7470.

Finally, I want to say that I was impressed with the dedication and professionalism of
your staff and it is our desire to provide the financial resources to strengthen public safety
services. We look forward to discussing this and any other matters with you that concern
the public safety program on the Red Lake Indian Reservation. Please share this letter
and my thanks with your Council members.

                                        Sincerely,

                                        Director, Bureau of Indian Affairs

cc:     Associate Director of Operations
        Midwest Regional Director,
        Special Agent in Charge, District I

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA INDIANS,    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )    Civil Action No.
                                      )    1:06CV01826 (CK-K)
UNITED STATES OF AMERICA, et al.,     )
                                      )
            Defendants.               )
                                      )

DEFENDANTS' RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, defendants provide the following responses to plaintiff's first interrogatories.

OBJECTION TO DEFINITIONS AND INSTRUCTIONS:

We object to the definitions and instructions contained in plaintiff's first set of interrogatories to the extent that they seek to impose upon defendants any requirements beyond those established by the Federal Rules of Civil Procedure or the local Rules of this Court.

you relied for your response.

RESPONSE:

Defendants object to the term "detention program funding" as vague, ambiguous, and overly broad. Defendants object to this interrogatory further as vague and ambiguous because the interrogatory fails to connect the first phrase, requesting description of attempts to obtain funding, with the second phrase, requesting identification of acts of assistance. Without waiving any objections, defendants respond that, as he testified in his August 30, 2007 deposition in this matter, Chris Chaney, then Deputy Director of the Office of Justice Services, explored obtaining funding from the State of Minnesota and private sources, but not for "detention program funding" because the BIA had already determined that the facility was not a detention facility.


Interrogatory No. 4:

Please describe with specificity what the persons identified in your response to interrogatory #2 understood to mean the reference in Footnote 25 of the 2005 Request for Reprogramming to "the next Presidents budget", and identify each document upon which you relied for your response.

-5-

Please describe with specificity whether the Defendants
requested such funding in the next President's budget,
providing the details of that request and identifying each
document upon which you relied for your response.  If the
Defendants did not request such funding in the next
President's budget, please describe with specificity all
bases for not requesting such funding and identify each
document upon which you relied for your response.

RESPONSE:

As Ken Reinfeld and others testified in their recent
depositions in this matter, the next President's Budget would be
for 2007.

Defendants did not request funding in the next President's
budget.  As explained in the deposition testimony, by the time
the agreement went into effect, the opportunity to submit for
2006 had passed, and as a result of the determination that the
facility did not qualify for detention facility funding, no
request was made for 2007.  In any event, none of the
individuals, identified in response to Interrogatory number 2,
who signed, surnamed, negotiated, or reviewed the 2005
reprogramming request possessed authority to place a specific
funding request into the President's budget.

-6-

judgment and recommendations of his professional staff experts to

determine whether the facility qualified as a detention facility.

BIA corrections experts Guillermo Rivera, Valerie Lavender, and

Greta Baker advised that the facility was not suitable for

detention.  The building was not constructed to detain anyone.

There were no bars on windows or suitable fences, and inmates

would be free to come an go.


Interrogatory No. 7:

    Please identity with specificity all FY 2006 year-end funds

    which were distributed to which Indian tribes in the Midwest

    BIA Region, and describe with specificity the means and date

    by which the Department informed the Tribe of the

    availability of those FY 2006 year-end funds, and identify

    each document upon which you relied for your response.

RESPONSE:

    A total of $85,000 in FY 2006 year-end funds were

distributed within the Midwest Region to the following:  Lac du

Flambeau; Great Lakes Indian Fish and Wildlife Commission; Bad

River; White Earth; 1854 Authority.  As Terrance Virden, BIA

Midwest Regional Director, testified in his September 21, 2007

deposition in this matter, the Tribe was informed of the

distribution of year-end funds some time after the funds had been
distributed.

Interrogatory No. 8:

> Please describe with specificity the amount of pay cost
> increases the Department believes the Tribe properly should
> have received in order for the Tribe to be fully funded for
> its pay costs for FY 2006 and the bases and calculations for
> your determination of such amount, and identify each
> document upon which you relied for your response.

RESPONSE:

The Bureau is in the process of conducting a review of the
calculation and distribution of pay cost increases for fiscal
years 2003 through 2006. Upon review of the estimated pay cost
increases effective in FY 2006, the Bureau believes that an error
was made and that the Red Lake Band of Chippewa Indians will be
owed an additional distribution. The amount of the distribution,
however, has not been determined. The ability to produce quickly
this calculation has been complicated by, among other reasons,
the number of years involved, turnover of personnel, and office
moves. The distribution will be based upon a fair share of
appropriated funds for available pay. The Department anticipates

-10-

that it will be able to provide the determination and the
additional funds within 60 days.

Interrogatory No. 9:

    Please describe with specificity the processes Defendants
    used for FY 2003 through FY 2006 and the Office of Self
    Governance used prior to FY 2003 to collect pay cost
    information for tribally operated and BIA operated programs,
    formulate budget requests for pay costs, and allocate pay
    cost appropriations to tribes and BIA programs.
    Specifically include in your response to the preceding
    whether Defendants or the Office of Self Governance
    collected information which took into account the cost of
    fringe benefits paid by tribes and BIA programs for each
    such year, describing with specificity the types of fringe
    benefits included, if any.

RESPONSE:

    The BIA Office of Self Governance, collected base salary
information from 1997 to 1999 and used a pro rata method to
distribute pay costs to self-governance tribes.  From 2000 to
2002, the Office of Self Governance collected net TPA base
information by reducing welfare assistance, housing improvement
program, road maintenance, non-recurring programs, and Central

-11-

# EXHIBIT P

# THE BUDGET MESSAGE OF THE PRESIDENT

Over the previous four years, we have acted to restore economic growth, win the War on Terror, protect the homeland, improve our schools, rally the armies of compassion, and promote ownership. The 2006 Budget will help America continue to meet these goals. In order to sustain our economic expansion, we must continue pro-growth policies and enforce even greater spending restraint across the Federal Government. By holding Federal programs to a firm test of accountability and focusing our resources on top priorities, we are taking the steps necessary to achieve our deficit reduction goals.

Our Nation's most critical challenge since September 11, 2001, has been to protect the American people by fighting and winning the War on Terror. Overseas and at home, our troops and homeland security officials are receiving the funding needed to protect our homeland, bring terrorists to justice, eliminate terrorist safe havens and training camps, and shut down their financing.

In Afghanistan and Iraq, we are helping establish democratic institutions. Together with our coalition partners, we are helping the Afghan and Iraqi people build schools, establish the rule of law, create functioning economies, and protect basic human rights. And while the work is dangerous and difficult, America's efforts are helping promote societies that will serve as beacons of freedom in the Middle East. Free nations are peaceful nations and are far less likely to produce the kind of terrorism that reached our shores just over three years ago.

To ensure our security at home, the 2006 Budget increases funding for anti-terrorism investigations; border security; airport and seaport security; nuclear and radiological detection systems and countermeasures; and improved security for our food supply and drinking water.

This Budget also promotes economic growth and opportunity. We must ensure that America remains the best place in the world to do business by keeping taxes low, promoting new trade agreements with other nations, and protecting American businesses from litigation abuse and overregulation. To make sure the entrepreneurial spirit remains strong, the Budget includes important initiatives to help American businesses and families cope with the rising cost of health care. This Budget funds important reforms in our schools, and promotes homeownership in our communities. In addition, the 2006 Budget supports the development of technology and innovation throughout our economy.

The 2006 Budget also affirms the values of our caring society. It promotes programs that are effectively providing assistance to the most vulnerable among us. We are launching innovative programs such as Cover the Kids, which will expand health insurance coverage for needy children. We are funding global initiatives with unprecedented resources to fight the HIV/AIDS pandemic, respond to natural disasters, and provide humanitarian relief to those in need. The 2006 Budget continues to support domestic programs and policies that fight drug addiction and homelessness and promote strong families and lives of independence. And in all our efforts, we will continue to build working relationships with community organizations, including faith-based organizations, which are doing so much to bring hope to Americans.

1

In every program, and in every agency, we are measuring success not by good intentions, or by dollars spent, but rather by results achieved. This Budget takes a hard look at programs that have not succeeded or shown progress despite multiple opportunities to do so. My Administration is pressing for reforms so that every program will achieve its intended results. And where circumstances warrant, the 2006 Budget recommends significant spending reductions or outright elimination of programs that are falling short.

This Budget builds on the spending restraint we have achieved, and will improve the process by which the Congress and the Administration work together to produce a budget that remains within sensible spending limits. In every year of my Administration, we have brought down the growth in non-security related discretionary spending. This year, I propose to go further and reduce this category of spending by about one percent, and to hold the growth in overall discretionary spending, including defense and homeland security spending, to less than the rate of inflation. I look forward to working closely with the Congress to achieve these reductions and reforms. By doing so, we will remain on track to meet our goal to cut the deficit in half by 2009.

Our greatest fiscal challenges are created by the long-term unfunded promises of our entitlement programs. I will be working with the Congress to develop a Social Security reform plan that strengthens Social Security for future generations, protects the benefits of today's retirees and near-retirees, and provides ownership, choice, and the opportunity for today's young workers to build a nest egg for their retirement.

In the past four years, America has faced many challenges, both overseas and at home. We have overcome these challenges not simply with our financial resources, but with the qualities that have always made America great: creativity, resolve, and a caring spirit. America has vast resources, but no resource is as abundant as the strength of the American people. It is this strength that will help us to continue to prosper and meet any challenge that lies before us.

GEORGE W. BUSH

February 7, 2005

# EXHIBIT Q



OFFICE OF
**MANAGEMENT AND BUDGET**

**Testimony of OMB Director Joshua B. Bolten**
**President's FY 2006 Budget Request**
**Committee on the Budget**
**United States House of Representatives**

**February 8, 2005**

Chairman Nussle, Ranking Member Spratt, and distinguished members of the Committee, the President's 2006 Budget, which was transmitted to the Congress on Monday, meets the priorities of the Nation and builds on the progress of the last four years.

We are funding our efforts to defend the homeland from attack. We are transforming our military and supporting our troops as they fight and win the Global War on Terror. We are helping to spread freedom throughout the world. We are promoting high standards in our schools, so that our children gain the skills they need to succeed. We are promoting the pro-growth policies that have helped to produce millions of new jobs and restore confidence in our economy.

Over the past four years, the President and Congress rose to meet historic challenges: a collapsing stock market, a recession, the revelation of corporate scandals and, of course, the terrorist attacks of September 11th.

To meet the economy's significant challenges, in each year of the first term, Congress and the President enacted major tax relief that fueled recovery, business investment, and job creation.

Recent economic indicators support the case for tax relief. Since the recession year of 2001, economic growth has increased in each of the following three years. A primary goal of this Budget is to assure that our economic growth continues.

A strengthening economy produces rising tax revenues. Last year, after declining three years in a row, federal revenue grew by nearly $100 billion. Reflecting strong continued growth, we project that federal revenues will grow by an even larger figure this year.

The President and Congress have also devoted significant resources to rebuild and transform our military, and to protect our homeland. In the first term, the defense budget grew by more than a third, the largest increase since the Reagan Administration. To make our homeland safer, he worked with Congress to create the Department of Homeland Security and nearly triple funding for homeland security government-wide.

While committing these necessary resources to protecting America, the President and Congress have focused on spending restraint elsewhere in the Budget. Working together, we have succeeded in bringing down the rate of growth in non-security discretionary spending each year of the President's first term. In the last Budget year of the previous Administration, non-security discretionary spending grew by 15 percent. In 2005, such spending will rise only about 1 percent. Because of this increased spending restraint, deficits are below what they otherwise would have been.

In order to sustain our economic expansion, we must exercise even greater spending restraint than in the past. When the Federal government focuses on its priorities, and limits the resources it takes from the private sector, the result is a stronger, more productive economy.

The President's Budget proposes that enhanced restraint. The 2006 Budget proposes a reduction in the non-security discretionary category of the Budget. This is the first proposed cut in this non-security spending since the Reagan Administration.

The Budget proposes more than 150 reductions, reforms, and eliminations in non-defense discretionary programs, saving about $20 billion in 2006 alone.

As a result of this enhanced restraint, overall discretionary spending, even after significant increases in defense

and homeland security, will grow by only 2.1 percent – less than the projected rate of inflation, which is 2.3 percent. In other words, under the President's 2006 Budget, overall discretionary spending will see a reduction in real terms.

In addition, the Budget also proposes savings from an additional set of reforms in mandatory programs, saving about $137 billion over the next 10 years.

As you well know, both mandatory and discretionary categories of spending are inherently difficult to control, but mandatory programs are especially difficult because of their "auto-pilot" feature. The Administration looks forward to working with the Congress on a package of mandatory savings.

We will also work with Congress on budget process reforms. Last year, I transmitted to Congress, on behalf of the Administration, proposed legislation to establish statutory budget enforcement controls. We plan to transmit a similar set of proposed statutory controls to establish caps on discretionary spending, a pay-as-you-go requirement for mandatory spending only, and a new enforcement mechanism to control long-term unfunded obligations. The President's Budget also proposes that Congress include these budget enforcement mechanisms and associated reforms in the FY 2006 Budget resolution.

In addition, the Administration proposes other enforcement and budget process reforms, such as the line-item veto, a Results Commission, and a Sunset Commission. These reforms would put in place the tools we need to enforce spending restraint and would bring greater accountability and transparency to the budgeting process.

This Budget restrains spending in a responsible way by focusing on priorities, principles, and performance. We were guided by three major criteria in evaluating programs:

First: Does the program meet the Nation's priorities? The Budget increases funding to strengthen our Armed Forces, improve the security of our homeland, promote economic opportunity, and foster compassion.

Second: Does the program meet the President's principles for the use of taxpayer resources? If an appropriate Federal role could not be identified in a program's mission, the Budget generally proposes to reduce or eliminate its funding.

Third: Does the program produce the intended results? The Bush Administration is comprehensively measuring the effectiveness of the government's programs – and the results are helping us make budgeting decisions. As a part of the President's Management Agenda, the Program Assessment Rating Tool, or PART, was developed to measure the performance of Federal programs. Roughly 60 percent of all Federal programs have undergone the PART, and those scores figured into the budgeting process.

By holding government spending to these accountability standards, by focusing on our priorities, and by maintaining pro-growth economic policies, we are making progress in bringing down the size of the deficit in 2006 and beyond.

Last year's Budget initially projected a deficit of 4.5 percent of Gross Domestic Product (GDP) in 2004, or $521 billion. The President set out to cut this deficit in half by 2009. Largely because economic growth generated stronger revenues than originally estimated, and because the Congress delivered the spending restraint called for by the President, the 2004 deficit came in $109 billion lower than originally estimated.

At 3.6 percent of GDP, the actual 2004 deficit, while still too large, was well within historical range and smaller than the deficits in nine of the last 25 years.

We project the 2005 deficit to come in at 3.5 percent of GDP or $427 billion. If we maintain the policies of economic growth and spending restraint reflected in this Budget, the deficit is expected to decline in 2006 and each of the next four years. In 2006, we project the budget deficit to fall to 3.0 percent of GDP, or $390 billion. In 2007, the deficit is projected to fall further to 2.3 percent of GDP, or $312 billion.

By 2009, the deficit is projected to be cut by more than half from its originally estimated 2004 peak—to just 1.5 percent of GDP, which is well below the 40-year historical average deficit of 2.3 percent, and lower than the deficit level in all but seven of the last 25 years.

The Administration intends to submit shortly a supplemental appropriations request of approximately $81 billion,

primarily to support operations in Iraq and Afghanistan for the remainder of the fiscal year. The 2006 Budget's spending and deficit projections fully reflect the outlay effects of this supplemental request, as well as the prior $25 billion supplemental bill already enacted by the Congress. However, the Budget does not reflect the effect of undetermined but anticipated supplemental requests for ongoing operations in Iraq and Afghanistan beyond 2005.

The published version of the 2006 Budget also does not reflect the effects of transition financing associated with the President's proposal to create personal retirement accounts as part of a comprehensive plan to permanently fix Social Security. As the Administration announced last week, the type of personal accounts the President is proposing will require approximately $664 billion in transition financing over the next ten years, with an additional $90 billion in related debt service. This transition financing would result in a deficit in 2009 and 2010 of 1.7 percent of GDP, which is still consistent with the president's goal to cut the deficit in half by 2009, and still well below the 40-year historical average.

It's important to remember that this transition financing does not have the same impact on national savings, and thus on the economy, as does traditional borrowing. Every dollar the government borrows to fund the transition to personal accounts is fully offset by an increase in savings represented by the accounts themselves. In addition, the transition financing does not represent new debt—these are obligations that the government already owes in the form of future benefits.

Perhaps most important, comprehensive Social Security reform that includes personal accounts will eliminate the system's current $10.4 trillion in unfunded obligations. Those of us who devote our time to thinking about fiscal policy all share a common interest in averting this danger. There is no task as vital to fiscal policymakers this year than removing those unfunded obligations by enacting comprehensive Social Security reform.

Confronting these long-term obligations, combined with our near-term deficit reduction efforts, will help assure a strong economy both now and in the future.

I look forward to working with the committee and Congress on this Budget, which meets the priorities of the Nation in a fiscally responsible way.

# EXHIBIT R

## FY 2006 Bureau of Indian Affairs Budget
(Dollars in Thousands)

| FINAL<br>Activities, Subactivities,<br>Program Element, Subelements | FY 2004 Enacted | FY 2005 Enacted | TOTAL UNCONTR. & RELATED CHANGES | TOTAL PROGRAM CHANGES | FY 2006 PRESIDENT'S BUDGET REQUEST | Change from FY 2005 |
|---|---|---|---|---|---|---|
| **RESOURCES MANAGEMENT** | | | | | | |
| Natural Resources | 1,393 | 1,371 | 27 | 0 | 1,398 | 27 |
| Agriculture | 556 | 546 | 17 | 0 | 563 | 17 |
| Forestry | 1,071 | 1,057 | 36 | 0 | 1,093 | 36 |
| Forest Marketing Assistance | 158 | 155 | 0 | 0 | 155 | 0 |
| Water Resources | 623 | 614 | -34 | 0 | 580 | -34 |
| Wildlife and Parks | 372 | 365 | 15 | 0 | 380 | 15 |
| Minerals and Mining | 1,235 | 1,211 | 23 | 0 | 1,234 | 23 |
| SUBTOTAL, RESOURCES MANAGEMENT | 5,408 | 5,319 | 84 | 0 | 5,403 | 84 |
| **TRUST SERVICES** | | | | | | |
| Trust Services | 2,379 | 2,686 | -123 | 1,200 | 3,763 | 1,077 |
| All Other Indian Rights Protection | 233 | 165 | 3 | 0 | 168 | 3 |
| Real Estate Services | 7,172 | 7,058 | 449 | 0 | 7,507 | 449 |
| Land Titles & Records Offices | 12,064 | 11,896 | 141 | 1,600 | 13,637 | 1,741 |
| Land Records Improvement | 2,067 | 2,029 | 10 | 0 | 2,039 | 10 |
| Environmental Quality Services | 218 | 215 | 47 | 0 | 262 | 47 |
| SUBTOTAL, TRUST SERVICES | 24,133 | 24,049 | 527 | 2,800 | 27,376 | 3,327 |
| **GENERAL ADMINISTRATION** | | | | | | |
| Executive Direction & EEO | 2,700 | 2,760 | 247 | -261 | 2,746 | -14 |
| Administrative Services | 14,925 | 0 | 0 | 0 | 0 | 0 |
| Personnel Services | 3,777 | 0 | 0 | 0 | 0 | 0 |
| Safety Management | 787 | 778 | -21 | 0 | 757 | -21 |
| Facilities Management | 3,766 | 3,545 | -3,545 | 0 | 0 | -3,545 |
| Information Resources Technology | 2,862 | 0 | 0 | 0 | 0 | 0 |
| SUBTOTAL, GENERAL ADMINISTRATION | 28,817 | 7,083 | -3,319 | -261 | 3,503 | -3,580 |
| **TOTAL, REGIONAL OFFICE OPERATIONS** | 63,685 | 41,362 | -2,311 | 2,539 | 41,590 | 228 |
| **** SPECIAL PROGRAMS/POOLED OVERHEAD ****** | | | | | | |
| **EDUCATION** | | | | | | |
| Post Secondary Schools | 14,743 | 14,605 | 663 | 0 | 15,268 | 663 |
| Special Higher Education Scholarships | 1,508 | 1,731 | 0 | 500 | 2,231 | 500 |
| SUBTOTAL, EDUCATION | 16,251 | 16,336 | 663 | 500 | 17,499 | 1,163 |
| **PUBLIC SAFETY AND JUSTICE** | | | | | | |
| Indian Police Academy | 2,347 | 2,328 | 50 | 0 | 2,378 | 50 |
| Law Enforcement | 170,148 | 177,735 | 636 | 11,516 | 189,887 | 12,152 |
| SUBTOTAL, PUBLIC SAFETY AND JUSTICE | 172,495 | 180,063 | 686 | 11,516 | 192,265 | 12,202 |
| **COMMUNITY DEVELOPMENT** | | | | | | |
| Indian Arts & Crafts Board | 1,048 | 0 | 0 | 0 | 0 | 0 |
| United Tribes Technical College | 2,963 | 3,451 | 0 | -3,451 | 0 | -3,451 |
| United Sioux Tribe Development Corp. | 444 | 444 | 0 | -444 | 0 | -444 |
| National Ironworkers Training Program | 515 | 508 | 0 | -508 | 0 | -508 |
| Alaska Native Aviation Training Program | 741 | 740 | 0 | -740 | 0 | -740 |
| Yuut Elitnauviat People's Learning Center | 0 | 0 | 0 | 0 | 0 | 0 |
| Western Heritage Center Distance Learning & Training | 1,235 | 1,233 | 0 | -1,233 | 0 | -1,233 |
| Crownpoint Institute of Technology | 1,308 | 1,726 | 0 | -1,726 | 0 | -1,726 |
| SUBTOTAL, COMMUNITY DEVELOPMENT | 8,254 | 8,102 | 0 | -8,102 | 0 | -8,102 |
| **RESOURCES MANAGEMENT** | | | | | | |
| Indian Integrated Resources Info Pgm (IIRIP) | 1,290 | 1,269 | 0 | 0 | 1,269 | 0 |
| SUBTOTAL, RESOURCES MANAGEMENT | 1,290 | 1,269 | 0 | 0 | 1,269 | 0 |
| **GENERAL ADMINISTRATION** | | | | | | |
| Related Support Services: | | | | | | |
| Intra-Governmental Payments | 17,350 | 19,057 | 550 | 0 | 19,607 | 550 |
| Workers Compensation | 9,440 | 9,982 | 446 | 0 | 10,428 | 446 |
| Unemployment Compensation | 6,758 | 6,953 | 2,422 | 0 | 9,375 | 2,422 |
| Employee Displacement Costs | 2,206 | 222 | 0 | 0 | 222 | 0 |
| Facilities Management: | | | | | | |
| GSA Rentals | 21,256 | 22,211 | 506 | -542 | 22,175 | -36 |
| Direct Rentals | 4,814 | 4,736 | 0 | 1,500 | 6,236 | 1,500 |
| [National Indian Training Center] | | | | [1,500] | | |
| Technical Training | 158 | 156 | 4 | 0 | 160 | 4 |



# EXHIBIT S

**FY 2007 Bureau of Indian Affairs Budget**
**(Dollars in Thousands)**

| ACTIVITIES / Subactivities / Program Elements | FY 2005 ENACTED | FY 2006 ENACTED | TOTAL FIXED COSTS & RELATED CHANGES | PROGRAM CHANGES | FY 2007 PRESIDENT'S BUDGET REQUEST | | TPA | CENTRAL | REGIONAL | OTHER PROGRAMS/ PROJECTS | UTB [Unified Trust Bdgt] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | FY 2007 Request (OIP) | | |
| Trust - Real Estate Services Oversight (UTB) | 23,073 | 24,368 | -8,077 | 0 | 16,291 | | 0 | 4,290 | 12,001 | 0 | 16,291 |
| Central Oversight (UTB) | 13,114 | 13,006 | -8,716 | | 4,290 | | | 4,290 | | | 4,290 |
| Regional Oversight (UTB) | 9,959 | 11,362 | 639 | | 12,001 | | | | 12,001 | | 12,001 |
| **Total, Trust-Real Estate Services** | 135,543 | 141,842 | 1,667 | -9,140 | 152,649 | | 55,480 | 29,949 | 28,025 | 39,195 | 136,141 |
| **EDUCATION** | | | | | | | | | | | |
| Elementary and Secondary (forward funded) | 449,721 | 457,750 | 3,348 | -3,746 | 457,352 | | 0 | 0 | 0 | 457,352 | 0 |
| ISEP Formula Funds | 348,073 | 350,062 | 4,806 | | 354,868 | | | | | 354,868 | |
| ISEP Program Adjustments | 1,145 | 5,116 | -1,905 | | 3,211 | | | | | 3,211 | |
| Student Transportation | 39,444 | 42,738 | 321 | | 43,059 | | | | | 43,059 | |
| Early Childhood Development | 15,355 | 15,281 | 126 | -3,263 | 12,154 | | | | | 12,154 | |
| Administrative Cost Grants | 45,704 | 44,553 | 0 | -493 | 44,060 | | | | | 44,060 | |
| Elementary/Secondary Programs | 76,218 | 75,887 | 654 | -15,741 | 60,800 | | 0 | 0 | 0 | 60,800 | 0 |
| Facilities Operations | 55,976 | 55,812 | 633 | | 56,445 | | | | | 56,445 | |
| Residential Education Placement Program | 3,732 | 3,704 | 21 | | 3,725 | | | | | 3,725 | |
| Juvenile Detention Education | 0 | 0 | 0 | 630 | 630 | | | | | 630 | |
| Johnson-O'Malley Assistance Grants (TPA) | 16,510 | 16,371 | 0 | -16,371 | 0 | | | | | | |
| Post Secondary Programs | 101,267 | 104,010 | -25 | -824 | 103,161 | | 30,786 | 0 | 0 | 72,375 | 0 |
| Haskell and SIPI | 14,605 | 15,043 | 413 | | 15,456 | | | | | 15,456 | |
| Tribal Colleges and Universities | 53,141 | 55,545 | 0 | -824 | 54,721 | | | | | 54,721 | |
| Tribal Colleges and Universities Supplements ( | 1,299 | 1,292 | 0 | | 1,292 | | 1,292 | | | | |
| Scholarships and Adult Education (TPA) | 30,491 | 29,932 | -438 | | 29,494 | | 29,494 | | | | |
| Special Higher Education Scholarships | 1,731 | 2,198 | 0 | | 2,198 | | 0 | | | 2,198 | |
| Education Management | 10,566 | 8,783 | 6,559 | 2,500 | 17,842 | | 0 | 13,542 | 0 | 4,300 | 0 |
| Education Program Management | 10,566 | 8,783 | 2,259 | 2,500 | 13,542 | | | 13,542 | | | |
| Education IT | 0 | 0 | 4,300 | | 4,300 | | | | | 4,300 | |
| **Total, Education** | 637,772 | 646,430 | 10,536 | -17,811 | 639,155 | | 30,786 | 13,542 | 0 | 594,827 | 0 |
| **PUBLIC SAFETY AND JUSTICE** | | | | | | | | | | | |
| Law Enforcement | 180,063 | 193,377 | 2,263 | 5,980 | 201,620 | | | | | 201,620 | |
| Criminal Investigations and Police Services | 35,605 | 37,979 | 0 | 1,786 | 39,765 | | | | | 39,765 | |
| Detention/Corrections | 43,825 | 55,567 | 382 | 2,714 | 58,663 | | | | | 58,663 | |
| Inspections/Internal Affairs | 1,187 | 1,180 | 0 | | 1,180 | | | | | 1,180 | |
| Law Enforcement Projects | 97,118 | 96,308 | 1,846 | | 98,154 | | | | | 98,154 | |
| Indian Police Academy | 2,328 | 2,343 | 35 | | 2,378 | | | | | 2,378 | |
| Tribal Justice Support | 0 | 0 | 0 | 1,480 | 1,480 | | | | | 1,480 | |
| Tribal Courts (TPA) | 12,378 | 12,291 | -182 | | 12,109 | | 12,109 | | | | |
| Tribal Courts IIM Initiative | 5,384 | 5,330 | 0 | -5,330 | 0 | | 0 | | | | |
| Fire Protection (TPA) | 1,222 | 1,144 | 0 | -1,144 | 0 | | 0 | | | | |
| **Total, Public Safety and Justice** | 199,047 | 212,142 | 2,081 | -494 | 213,729 | | 12,109 | 0 | 0 | 201,620 | 0 |
| **COMMUNITY and ECONOMIC DEVELOPMENT** | | | | | | | | | | | |
| Job Placement and Training (TPA) | 8,566 | 8,396 | 71 | | 8,467 | | 8,467 | | | | |
| Economic Development (TPA) | 4,879 | 4,407 | -6 | | 4,401 | | 4,401 | | | | |
| Road Maintenance (TPA) | 26,967 | 27,386 | 552 | -2,602 | 25,336 | | 25,336 | | | | |
| Community Development | 11,554 | 10,148 | 0 | -10,148 | 0 | | | | | 0 | |
| Community Development Oversight | 778 | 1,445 | 19 | -493 | 971 | | 0 | 0 | 971 | 0 | |
| Central Oversight | 0 | 493 | 0 | -493 | 0 | | | 0 | | 0 | |
| Regional Oversight | 778 | 952 | 19 | | 971 | | | | 971 | | |
| **Total, Community and Economic Development** | 52,744 | 51,782 | 636 | -13,243 | 39,175 | | 38,204 | 0 | 971 | 0 | |
| **EXECUTIVE DIRECTION and ADMINISTRATIVE SERVICES** | | | | | | | | | | | |
| Assistant Secretary Support | 16,556 | 8,941 | 576 | 500 | 10,017 | | 10,017 | | | | |
| Executive Direction | 17,674 | 16,171 | 635 | | 16,806 | | 11,378 | 2,181 | 3,249 | 0 | 0 |
| Executive Direction (TPA) | 11,412 | 11,085 | 291 | | 11,376 | | 11,376 | | | | |
| Executive Direction (Central) | 3,502 | 2,380 | -199 | | 2,181 | | | 2,181 | | | |
| Executive Direction (Regional) | 2,760 | 2,706 | 543 | | 3,249 | | | | 3,249 | | |
| Administrative Services | 42,329 | 49,603 | -360 | 0 | 49,243 | | 13,003 | 35,443 | 797 | 0 | 0 |
| Administrative Services (TPA) | 13,513 | 13,141 | -138 | | 13,003 | | 13,003 | | | | |
| Administrative Services (Central) | 28,038 | 35,717 | -274 | | 35,443 | | | 35,443 | | | |
| Administrative Services (Regional-Safety) | 778 | 745 | 52 | | 797 | | | | 797 | | |
| Information Resources Technology (UTB) | 58,092 | 57,431 | -4,066 | | 53,365 | | | | | | 53,365 |
| IT General Program | | | | | | | | | | | |
| IT Projects | | | | | | | | | | | |
| Personnel Services | 23,176 | 28,936 | 516 | 0 | 29,452 | | 0 | 10,052 | 0 | 19,400 | 0 |
| Centralized Personnel | 5,863 | 9,049 | 1,003 | | 10,052 | | | 10,052 | | | |
| Labor-Related Payments and Training | 17,313 | 19,887 | -487 | | 19,400 | | | | | 19,400 | |
| Facilities Management | 20,719 | 23,741 | -47 | 0 | 23,694 | | 0 | 0 | 0 | 23,694 | 0 |
| Regional Facilities Management | 3,545 | 3,622 | 83 | | 3,705 | | | | | 3,705 | |
| Operations and Maintenance | 17,174 | 20,119 | -130 | | 19,989 | | | | | 19,989 | |
| Intra-Governmental Payments | 19,057 | 19,319 | 3,280 | | 22,599 | | | | | 22,599 | |
| Rentals (GSA/Direct) | 26,947 | 27,993 | 841 | 4,243 | 33,077 | | | | | 33,077 | |
| **Total, Executive Direction and Administration** | 224,550 | 232,135 | 1,375 | 4,743 | 238,253 | | 24,379 | 111,058 | 4,046 | 98,770 | 53,365 |
| **TOTAL OIP** | 1,926,091 | 1,962,190 | 23,737 | -19,333 | 1,966,594 | | 754,060 | 163,442 | 44,497 | 1,004,595 | 291,496 |

# EXHIBIT T

**INDIAN AFFAIRS FY 2009 BUDGET REQUEST**
(Dollars in thousands)

| ACTIVITIES / Subactivities / Program Elements | FY 2007 OPERATING PLAN | FY 2008 ENACTED | FIXED COSTS & RELATED CHANGES | TOTAL PROGRAM CHANGES | FY 2009 PRESIDENTS BUDGET REQUEST | TPA | CENTRAL | REGIONAL | OTHER PROGRAMS/ PROJECTS | UTB |
|---|---|---|---|---|---|---|---|---|---|---|
| **PUBLIC SAFETY AND JUSTICE** | | | | | | | | | | |
| Law Enforcement | 204,454 | 228,137 | 2,109 | -669 | 229,577 | 0 | 3,521 | 0 | 226,056 | 0 |
| Criminal Investigations and Police Services | 133,254 | 137,275 | 1,036 | -163 | 138,148 | | | | 138,148 | |
| Detention/Corrections | 49,698 | 64,023 | 710 | -85 | 64,648 | | | | 64,648 | |
| Inspections/Internal Affairs | 1,227 | 3,189 | 17 | -19 | 3,187 | | | | 3,187 | |
| Tribal Law Enforcement & Special Initiatives | 10,953 | 13,817 | 740 | 465 | 15,022 | | | | 15,022 | |
| [Meth Initiative] | [2,600] | [6,338] | | | [6,338] | | | | [6,338] | |
| [IMARS] | [2,172] | [1,700] | | [967] | [2,667] | | | | [2,667] | |
| [Southwest Borderlands] | | | | [1,000] | [1,000] | | | | [1,000] | |
| Indian Police Academy | 3,407 | 3,627 | 32 | -70 | 3,589 | | | | 3,589 | |
| Tribal Justice Support | 1,498 | 1,457 | 5 | 0 | 1,462 | | | | 1,462 | |
| Law Enforcement Program Management | 4,417 | 4,749 | -431 | -797 | 3,521 | | 3,521 | | | |
| Tribal Courts (TPA) | 12,013 | 14,338 | 170 | -2,461 | 12,047 | 12,047 | | | | |
| Fire Protection (TPA) | 1,144 | 1,181 | 6 | -37 | 1,150 | 1,150 | | | | |
| **Total, Public Safety and Justice** | 217,611 | 243,656 | 2,285 | -3,167 | 242,774 | 13,197 | 3,521 | 0 | 226,056 | 0 |
| | | | | | | | | | | |
| **COMMUNITY AND ECONOMIC DEVELOPMENT** | | | | | | | | | | |
| Job Placement and Training (TPA) | 8,444 | 7,925 | -61 | 1,000 | 8,864 | 8,864 | | | | |
| Economic Development (TPA) | 4,733 | 4,531 | -45 | -993 | 3,493 | 3,493 | | | | |
| Road Maintenance (TPA) | 27,565 | 25,576 | 470 | -13,018 | 13,028 | 13,028 | | | | |
| Community Development Oversight | 1,492 | 1,404 | 385 | -3 | 1,786 | 0 | 958 | 828 | 0 | 0 |
| Central Oversight | 534 | 591 | 367 | 0 | 958 | | 958 | | | |
| Regional Oversight | 958 | 813 | 18 | -3 | 828 | | | 828 | | |
| **Total, Community and Economic Development** | 42,234 | 39,436 | 749 | -13,014 | 27,171 | 25,385 | 958 | 828 | 0 | 0 |
| | | | | | | | | | | |
| **EXECUTIVE DIRECTION AND ADMINISTRATIVE SERVICES** | | | | | | | | | | |
| Assistant Secretary Support | 9,895 | 10,235 | 639 | 0 | 10,874 | | 10,874 | | | |
| Executive Direction | 16,538 | 18,179 | 907 | -104 | 18,982 | 13,747 | 2,019 | 3,216 | 0 | 0 |
| Executive Direction (TPA) | 11,180 | 12,635 | 1,174 | -62 | 13,747 | 13,747 | | | | |
| Executive Direction (Central) | 2,166 | 2,183 | -157 | -7 | 2,019 | | 2,019 | | | |
| Executive Direction (Regional) | 3,192 | 3,361 | -110 | -35 | 3,216 | | | 3,216 | | |
| Administrative Services | 46,632 | 49,736 | 1,158 | -154 | 50,740 | 13,398 | 36,504 | 838 | 0 | 0 |
| Administrative Services (TPA) | 12,745 | 13,052 | 403 | -57 | 13,398 | 13,398 | | | | |
| Administrative Services (Central) | 35,126 | 35,861 | 734 | -91 | 36,504 | | 36,504 | | | |
| Administrative Services (Regional-Safety) | 761 | 823 | 21 | -6 | 838 | | | 838 | | |
| Information Resources Technology (UTB) | 53,199 | 52,866 | 593 | 6,276 | 59,735 | | | | 59,735 | 59,735 |
| Personnel Services | 33,266 | 28,906 | 380 | 1,764 | 31,050 | 0 | 10,531 | 0 | 20,519 | 0 |
| Centralized Personnel | 10,965 | 9,244 | 223 | 1,064 | 10,531 | | 10,531 | | | |
| Labor-Related Payments and Training | 22,301 | 19,662 | 157 | 700 | 20,519 | | | | 20,519 | |
| [Employee Displacement] | [1,181] | 0 | | [700] | [700] | | | | | |
| Facilities Management | 24,418 | 24,081 | 381 | 971 | 25,433 | 0 | 0 | 0 | 25,433 | 0 |
| Facilities and Safety Management | 4,646 | 3,821 | 78 | 986 | 4,885 | | | | 4,885 | |
| Operations and Maintenance | 19,772 | 20,260 | 303 | -15 | 20,548 | | | | 20,548 | |
| Intra-Governmental Payments | 22,664 | 22,445 | 4,188 | 0 | 26,633 | | | | 26,633 | |
| Rentals (GSA/Direct) | 35,458 | 33,927 | 853 | 2,100 | 36,880 | | | | 36,880 | |
| **Total, Executive Direction & Administrative Svcs** | 244,070 | 240,375 | 9,099 | 10,853 | 260,327 | 27,145 | 59,928 | 4,054 | 169,200 | 59,735 |
| | | | | | | | | | | |
| **TOTAL, BUREAU OF INDIAN AFFAIRS** | 1,330,311 | 1,358,197 | 20,142 | -54,029 | 1,324,310 | 685,258 | 100,332 | 42,876 | 495,844 | 300,672 |
| | | | | | | | | | | |
| **BUREAU OF INDIAN EDUCATION** | | | | | | | | | | |
| Elementary and Secondary (forward funded) | 458,310 | 479,895 | 7,066 | -11,367 | 475,594 | 0 | 0 | 0 | 475,594 | 0 |
| ISEP Formula Funds | 351,817 | 358,341 | 6,467 | -252 | 364,556 | | | | 364,556 | |
| ISEP Program Adjustments | 7,533 | 3,205 | 61 | 0 | 3,266 | | | | 3,266 | |
| Education Program Enhancements | | 12,108 | 0 | -6,891 | 5,217 | | | | 5,217 | |
| Student Transportation | 42,833 | 47,844 | 322 | -1,254 | 46,912 | | | | 46,912 | |
| Early Childhood Development (FACE) | 12,067 | 15,024 | 216 | -2,970 | 12,270 | | | | 12,270 | |
| Administrative Cost Grants | 44,060 | 43,373 | 0 | 0 | 43,373 | | | | 43,373 | |
| Elementary/Secondary Programs | 72,390 | 74,621 | 530 | -13,822 | 61,329 | 0 | 0 | 0 | 61,329 | 0 |
| Facilities Operations | 56,047 | 56,504 | 493 | -25 | 56,972 | | | | 56,972 | |
| Residential Education Placement Program | 3,713 | 3,715 | 22 | 0 | 3,737 | | | | 3,737 | |
| Juvenile Detention Education | 630 | 620 | 0 | 0 | 620 | | | | 620 | |
| Johnson-O'Malley Assistance Grants (TPA) | 12,000 | 13,782 | 15 | -13,797 | 0 | | | | | |
| Post Secondary Programs | 108,619 | 111,749 | 416 | -11,393 | 100,772 | 24,935 | 0 | 0 | 75,837 | 0 |
| Haskell and SIPI | 15,676 | 16,005 | 428 | 419 | 16,852 | | | | 16,852 | |
| Tribal Colleges and Universities | 54,721 | 56,821 | 0 | 0 | 56,821 | | | | 56,821 | |
| Tribal Colleges and Universities Supplements (TPA) | 4,588 | 1,272 | 0 | 0 | 1,272 | 1,272 | | | | |
| Tribal Technical Colleges | 2,004 | 5,906 | 0 | -5,906 | 0 | | | | 0 | |
| Scholarships and Adult Education (TPA) | 29,432 | 29,581 | -12 | -5,906 | 23,663 | 23,663 | | | | |
| Special Higher Education Scholarships | 2,198 | 2,164 | 0 | 0 | 2,164 | | | | 2,164 | |
| Education Management | 18,593 | 23,347 | 215 | 2,723 | 26,285 | 0 | 18,928 | 0 | 7,357 | 0 |
| Education Program Management | 13,595 | 17,293 | 212 | 1,423 | 18,928 | | 18,928 | | | |
| [Employee Displacement-Ed] | | | | [1,500] | | | | | | |
| Education IT (ENAN & NASIS) | 4,998 | 6,054 | 3 | 1,300 | 7,357 | | | | 7,357 | |
| [ENAN] | | | | [1,300] | | | | | | |
| **TOTAL, BUREAU OF INDIAN EDUCATION** | 657,912 | 689,612 | 8,227 | -33,859 | 663,980 | 24,935 | 18,928 | 0 | 620,117 | 0 |
| | | | | | | | | | | |
| **TOTAL OIP** | 1,988,223 | 2,047,809 | 28,369 | -87,888 | 1,988,290 | 710,193 | 119,260 | 42,876 | 1,115,961 | 300,672 |



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RED LAKE BAND OF CHIPPEWA )
INDIANS, )
 )
          Plaintiff, )
 )
        v. ) Civil Action No.  1:06CV01826 (CKK)
 )
UNITED STATES OF AMERICA, et al., )
 )
         Defendants )
 )

**ORDER**

    The Court has considered the motion of Plaintiff Red Lake Band of Chippewa Indians for summary judgment on Counts I and III, and for partial summary judgment on Count II.

    After considering the moving and opposition papers, arguments of counsel and all other matters presented to the Court, IT IS HEREBY ORDERED THAT the motion is GRANTED; and

    IT IS ORDERED AND ADJUDGED that

    (i)  On Count I of the Complaint, Plaintiff is awarded money damages in the amount of $2,436,964 plus interest calculated from February 17, 2006;

    (ii)  On Count II of the Complaint, it is adjudged that in September 2006 the Defendants breached their duty to notify Plaintiff of the availability of approximately $200,000 in end-of-fiscal-year funds that Plaintiff was eligible to apply for and receive;

    (iii)  On Count III of the Complaint, Defendant Kempthorne is ordered to provide Plaintiff forthwith a detailed pay cost analysis for the years 2003-2006.

DATED: _____    _____
                                   Colleen Kollar-Kotelly
                                   United States District Judge


Copies to:

For the Defendants:

Reginald T. Blades, Jr.
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, NW
Room 12130
Washington, D.C. 20530
Phone:  (202) 616-8257

John Jasper
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240
(202) 208-3100


For Plaintiff:

Philip Baker-Shenk
Holland & Knight LLP
Suite 100
2099 Pennsylvania Avenue, NW, Suite 100
Washington D.C. 20006
Phone:  (202) 955-3000


# 5365644_v1